2025-1405

—————————————

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

—————————————

SHANGHAI TAINAI BEARING CO., LTD and C&U AMERICAS, LLC
*Plaintiff-Appellants*

v.

UNITED STATES

*Defendant-Appellee.*

—————————————

Appeal from the United States Court of International Trade in No. 22-cv-00038, Judge Steven A. Vaden

—————————————

Brief of Plaintiff-Appellants
SHANGHAI TAINAI BEARING CO., LTD
C&U AMERICAS, LLC

DAVID J. CRAVEN
CRAVEN TRADE LAW LLC
3744 N Ashland Avenue
Chicago, Illinois 60613
Tel. 773-709-8506
David.craven@tradelaw.com
Counsel to Plaintiff-Appellants

April 14, 2025

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 2025-1405 |
| **Short Case Caption** | Shanghai Tainai Bearing Co., Ltd. v. United States |
| **Filing Party/Entity** | C&U Americas, LLC |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 02/11/2025

Signature: /s/ David Craven

Name: David Craven

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| C&U Americas, LLC | | Shanghai Tainai Bearing Co., Ltd. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑    None/Not Applicable          ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐    Yes (file separate notice; see below)    ☑    No    ☐    N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable          ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

**Case Number** 2025-1405

**Short Case Caption** Shanghai Tainai Bearing Co., Ltd. v. United States

**Filing Party/Entity** Shanghai Tainai Bearing Co., Ltd.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 02/11/2025

Signature: /s/ David Craven

Name: David Craven

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Shanghai Tainai Bearing Co., Ltd. | | Wenzhou C&U Bearing Co., ltd |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑   None/Not Applicable ☐   Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below) ☑   No ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable ☐   Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

Certificate of Interest ...................................................................... i

Table of Contents ...................................................................... vii

Table of Authorities ...................................................................... viii

Statement of Related Cases ...................................................... 1

Statement of Jurisdiction ............................................................ 2

Statement of the Issues ............................................................... 4

Statement of the Case ................................................................. 5

Statement of Facts ....................................................................... 7

Summary of Argument ................................................................ 10

Standard of Review ..................................................................... 11

Argument ...................................................................................... 13

A.      The Department Should Not Have Multiplied the Surrogate Value of Finished Components by the Financial Ratios .................................. 13

B.      The Department Should Not Use Distorted Financial Statements .... 14

      1.      The Timken Romania Financial Statement is Badly Distorted 14

      2.      The Other Financial Ratios of Record, While Flawed, are Less Flawed .......................................... 17

      3.      The Department has a Preference to Use Multiple Financial Statements ........................................ 19

C.      The Department Should Not Have Deducted 301 Duties from the U.S. Price .................................................... 20

D.      The Department Should Have Included All Monies Received from the Customer in the U.S. Price ......................................... 27

E.      The Court and the Department erred when it did not provide an offset for Valuable By-Products .......................................... 33

Conclusion and Claim for Relief ............................................... 34

Statutory Addendum

Judgment Order in *Shanghai Tainai Bearing Co., Ltd. and C&U Americas, LLC v. United States*, (Sept. 14, 2023) .......................................... a

Slip Op in *Shanghai Tainai Bearing Co., Ltd. and C&U Americas, LLC v. United States*, Slip Op 23-132 (Sept. 14, 2023) ...................................... b

Slip Op in *Shanghai Tainai Bearing Co., Ltd. and C&U Americas, LLC v. United States*, 24-142 (December 18, 2024) ........................................ c

Proof of Service ........................................................................... d

Certificate of Compliance ........................................................... e

TABLE OF AUTHORITIES

***Court Cases***:

*ArcelorMittal Stainless Belg. N.V. v. United States*, 694 F.3d 82, (Fed. Cir. 2012)................................................6

*Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556 (1984)11

*Borusan Mannesmann Boru Sanyi ve Ticaret A.S. v. United States*, 63 F.4th 25 (Fed. Cir. 2023)......................................24

*Carpenter Technology, et al. v. United States*, 662 F.Supp.2d 1337 (2009) ...............................................11

*Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984)..............................................11

*Floral Trade Council v. United States,* 41 F.Supp.2d 319 (Ct. Int'l Trade 1999)......................................31,32

*Jinan Yipin Corp. v. United States*, 637 F.Supp.2d 1183 (2009) ...............................................11

*Jinko Solar Import and Export Co., Ltd., et al. v. United States*, 701 F.Supp.3d 1367, (Ct. Int'l Trade 2024)............21

*Loper Bright Enterprises v. Raimondo*, 144 S.Ct. 2244 (2024) ...............................................11

*Micron Tech., Inc. v. United States*, 117 F.3d 1386 (Fed. Cir. 1997)...............................................11

*Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1344 (Fed. Cir. 2016)...............................................5

*Neimenggu Fufeng Biotechnologies Co., et. al. v. United States*, 741 F.Supp.3d 1354 (Ct. Int'l Trade 2024)............21

*Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990)...........................................5,14,19

*Saha Thai Steel Pipe Co., Ltd. v United States*, 828 F. Supp. 57, 64 (Ct. Intl Trade 1993) ...............................6

*Shakeproof Assembly Components Div. of Ill. Tool Works v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001).5,14,19

*Taian Ziyang Food v. United States*, 637 F.Supp.2d 1093 (2009) ...............................................11

*Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1361 (Fed. Cir. 2007)...........................................21,22

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716
F.3d 1370, 1379 (Fed. Cir. 2013)...............................5, 14,19


**Laws:**

19 U.S.C. §1516a ...................................................2

19 U.S.C. §1516a(b)(1)(B)(i)................................11

19 U.S.C. 1677(a) ............................................28,30

19 U.S.C. § 1677a(c)(1)(C)....................................22

19 U.S.C. § 1677a(c)(2)(A) ...................................22

19 U.S.C. 1677(b) ..................................................30

19 U.S.C. 1677(c)(2)................................................30

19 U.S.C. 1677(c)(2)(a)...........................................31

19 U.S.C. 1677(c)(2)(b)...........................................31

19 U.S.C. 1677(d) ..................................................30

19 U.S.C. §1862 ....................................................21

19 U.S.C. § 2411 ...................................................26

19 U.S.C. § 2411(b) ..............................................23

28 U.S.C. §1295(a)(5)..............................................2

28 U.S.C. §1581(c)..................................................2

28 U.S.C. § 2107(b) ................................................2

28 U.S.C. § 2654(c)..................................................2

**Administrative:**

19 CFR 152.101(d) ...............................................27

19 CFR 351.401(c).................................................28

*Circular Welded Carbon-Quality Steel Pipe from Oman*, 86
Fed. Reg. 18,513 (Apr. 9, 2021) .....................24,25

*Notice of Action and Request for Public Comment
Concerning Proposed Determination of Action Pursuant to
Section 301:  China's Acts, Policies and Practices Related to
Technology Transfer, Intellectual Property, and Innovation*,
83 Fed. Reg. 28710 (June 20, 2018) ....................20

*Notice of Determination and Request for Public Comment
Concerning Proposed Determination of Action Pursuant to*

*Section 301*, 83 Fed. Reg. 14,906  (Apr. 6, 2018) ..........24,25

*Request for Comments in Four-Year Review of Actions Taken in the Section 301 Investigation*, 87 Fed. Reg. 62,914 (Oct. 17, 2022) ......................................................................23

Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, Vol. I, 1994 U.S.C.C.A.N. 4040, 4319-19..........................23

*Stainless Steel Wire Rod from Korea*, 69 Fed. Reg. 19,153, 19,159-61 (Apr. 12, 2004) ....................................22,24,25,26

### Other:

Federal Circuit Rule 47.5 ......................................................1

Rule 4 of the Federal Rules of Appellate Procedure ..............2

Pursuant to Federal Circuit Rule 47.5 Plaintiff-Appellants Shanghai Tainai Bearing Co., Ltd And C&U Americas, Llc:

1. There have been no other appeals from this civil action or proceeding in the lower court to the U.S. Court of Appeals for the Federal Circuit or any other Appellate Court.

2. Plaintiff-Appellants are not aware of any other matter presently pending at the U.S. Court of International Trade which could be directly affected by the decision in this pending appeal.

<strong><em>STATEMENT OF JURISDICTION</em></strong>

1.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1295(a)(5) which confers on the U.S. Court of Appeals for the Federal Circuit exclusive jurisdiction of appeals from final decisions of the U.S. Court of International Trade.

2.    This matter is an appeal of a final determination and order by the United States Court of International Trade ("CIT"). Jurisdiction was proper before the U.S. Court of International Trade pursuant to 28 U.S.C. §1581(c). This provision of law confirms on the CIT exclusive jurisdiction over any civil action commenced under section 516A of the Tariff Act of 1930, as amended. (19 U.S.C. §1516a).

3.    This appeal is timely. Rule 4 of the Federal Rules of Appellate Procedure and 28 U.S.C. §§ 2107(b) and 2654(c) permit any party to file a Notice of Appeal within 60 days after entry of a judgment in a civil case to which the United States is a party. The United States was a party to the case before the CIT. The CIT's Initial Slip Opinion was issued on September 14, 2023[1] (APPX00001), the CIT's Remand Slip Opinion was issued on December 18,

---

[1] Pursuant to the Court's rules, citations to record documents included in the Joint Appendix are cited herein as "APPX__".

2024 (APPX000054) and the final Judgment was issued on December 18, 2024(APPX000086). Plaintiff-Appellants Shanghai Tainai Bearing Co., Ltd And C&U Americas, Llc filed a notice of appeal during the 60-day period after entry of judgment. This appeal was timely filed within the 60-day period after entry of judgment.

1.      Whether the U.S. Department of Commerce abused its discretion by using the surrogate financial ratios of a single entity.   Such financial statement of such entity was badly flawed and the Department incorrectly rejected the use of the other financial statements of record.

2.      Whether the U.S. Department of Commerce abused its discretion by applying financial ratios to certain surrogate values established for completed components.   By doing so the Department double-counted the manufacturing expenses.

3.      Whether the U.S. Department of Commerce abused its discretion by deducting Section 301 duties from U.S. Price in the antidumping duty calculation.  Such duties are remedial duties akin to antidumping and Section 201 duties and should not be deducted from U.S. price.

4.      Whether the U.S. Department of Commerce abused its discretion by capping certain payments from customers at the amount of Section 301 duties paid by Appellant.

5.      Whether the U.S. Department of Commerce abused its discretion when it refused to grant a by-product offset for certain valuable by-products and scrap.

6.      Whether the U.S. Court of International Trade committed error by ratifying the action of the administering authority.

There is an antidumping order on Tapered Roller Bearings from China which was published as *Antidumping Duty Order; Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, from the People's Republic of China*, 52 Fed. Reg. 22667 (June 15, 1987), as amended, *Tapered Roller Bearings from the People's Republic of China; Amendment to Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order in Accordance With Decision Upon Remand*, 55 Fed. Reg. 6669 (February 26, 1990). This appeal concerns the 2019/2020 administrative review, See *Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 85 Fed. Reg. 47731 (August 6, 2020). (APPX00177 to APPX00183 )

The general rule is that the administering authority should calculate dumping margins as accurately as possible and use the best available information. *See Shakeproof Assembly Components Div. of Ill. Tool Works v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001); *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990); *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1379 (Fed. Cir. 2013). In *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1344 (Fed. Cir. 2016), the Court explained that a Commerce determination is "'accurate' if it is correct as a <u>mathematical and factual matter</u>…" (Emphasis added). To achieve this required accuracy, "antidumping orders should

not be interpreted in a vacuum devoid of any consideration of the way the language of the order is used in the relevant industry." *ArcelorMittal Stainless Belg. N.V. v. United States*, 694 F.3d 82, 88 (Fed. Cir. 2012). *See also, Saha Thai Steel Pipe Co., Ltd. v United States*, 828 F. Supp. 57, 64 (Ct. Intl Trade 1993) (".. .the Department has honored one of the fundamental principles underlying the trade statute – accuracy. It is this endeavor for accuracy … that lends respectability to U.S. trade statutes. .").

Contrary to the foregoing, the Court of International Trade upheld a dumping margin which was not accurate, which was not based on the best available information, which used incorrectly calculated financial ratios, which incorrectly calculated US price, incorrectly deducted certain 301 duties from U.S. price and failed to provide an offset for the sale of scrap.

Plaintiff-Appellants Shanghai Tainai Bearing Co., Ltd And C&U Americas, Llc disagree with the decision of the U.S. Court of International Trade and this appeal followed.

a. The antidumping order on Tapered Roller Bearings was published in 1987 as *Antidumping Duty Order; Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, from the People's Republic of China*, 52 Fed. Reg. 22667 (June 15, 1987), as amended, *Tapered Roller Bearings from the People's Republic of China; Amendment to Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order in Accordance With Decision Upon Remand*, 55 Fed. Reg. 6669 (February 26, 1990).

b. This appeal concerns the 2020/21 administrative review, See *Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 85 Fed. Reg. 47731 (August 6, 2020). (APPX00177)

c. Commerce issued its preliminary results as *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Preliminary Results and Intent to Rescind the Review, in Part; 2019 – 2020*, 86 Fed. Reg 36099 (July 8, 2021) (APPX00088) and its final results as *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished from the People's Republic of China* ("Final Results") 87 Fed. Reg. 1,120 (January 10, 2022) (APPX00091) accompanied by Commerce's *Decision Memorandum for Final Results of Antidumping Duty Administrative Review: Tapered Roller Bearings and Parts Thereof,*

*Finished and Unfinished from the People's Republic of China,*
(APPX00094) .

d. In making its administrative determination, Commerce must determine the U.S. price for the subject merchandise and calculate a cost of production for such goods based on surrogate values. Care should be taken to ensure that the selected values accurately reflect the commercial realities.

e. The Department failed to use the correct financial ratios, basing the calculation on the financial statements of Timken Romania (APPX02217 – APPX02343) while ignoring the other statements of record. The Department also had of record the financial statement of URB Rulmenti Suceava (APPX04989 – APPX05029) and Compa S.A. (Sibu) (APPX01905 – APPX02102).

f. The Department improperly deducted Section 301 duties from U.S. price, ignoring the actual nature of such duties. (APPX00114)

g. The Department failed to include in U.S. price the full amounts of money received from the U.S. customers, capping certain payments at the amount of the 301 duties declared on the sales invoices. Such amounts were intended to be additions of the price and to offset additional costs. (APPX00116).

h.  The Department refused to provide an offset for sales of valuable scrap.

Such data was provided in Appellant's responses.  (APPX00118).

- The Department should not use distorted financial statements for entities related to the petitioner in calculating financial ratios.

- The Department should not apply surrogate financial ratios to those components which are valued by surrogate values for complete components.

- The Department should not have deducted 301 duties from U.S. price. Such duties are not "U.S. import duties" and are special duties akin to antidumping duties and Section 201 duties. Deducting 301 duties from U.S. price results in a double counting of the duties.

- The Department must include all money received by plaintiffs from its customers in payment of goods and should not improperly "cap" the payments characterized as monies to offset the 301 duties at the amount of the 301 duties.

- The Department must grant an offset for valuable by-products and scrap;

In reviewing judgments of the U.S. Court of International Trade, this Court "appl{ies} anew" the same statutory judicial review standard applied by the lower court. See *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1559 n. 10 (1984); *Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1392-93 (Fed. Cir. 1997). The standard of review, as set forth at 19 U.S.C. §1516a(b)(1)(B)(i) (2006), requires that:

> {t}he Court shall hold unlawful any determination, finding or conclusion found … to be unsupported by substantial evidence of record or otherwise not in accordance with law.
> 19 U.S.C. §1516a(b)(1)(B)(i) (2006)

In reviewing a question of law, this Court's deliberations are guided by the principles set forth in *Loper Bright Enterprises v. Raimondo*, 144 S.Ct. 2244 (2024). The Loper Bright decision specifically overruled the prior decision in *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 under which a court must provide deference to an agency's interpretation of a statute. As clearly stated in the *Loper Bright* opinion "*Chevron* is overruled. Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright* 144 S.Ct. 2244 at 2273.

Decisions of the Commerce Department must be based on "adequate reasoning." Simplistic or vague reasoning is inadequate. *Taian Ziyang Food v. United States*, 637 F.Supp.2d 1093 (2009) at 1126, 1140 and 1151; *Jinan Yipin*

*Corp. v. United States*, 637 F.Supp.2d 1183 (2009) at 1189, 1192, 1196, 1197;

*Carpenter Technology, et al. v. United States*, 662 F.Supp.2d 1337 (2009) at 1344

Application of legal and evidentiary standards of review to the agency's determination in this case demonstrate that Commerce's determinations in this matter were not in accordance with law and was not supported by substantial evidence and not based on adequate reasoning. The lower court's decision to sustain Commerce's decision under these standards was erroneous. This Court should remand this case to the lower court with instructions that it remand the matter to the administrative agency.

**A)** **The Department Should Not Have Multiplied the Surrogate Value of Finished Components by the Financial Ratios**

In calculating the COP in a non-market economy the Department takes the value of the raw materials and the cost of other inputs such as labor and energy and multiplies these by surrogate financial ratios. However, it is also the Department practice to exclude from the calculations certain inputs which would otherwise be double counted. In this case, the surrogate values for the turned cups and cones, cages and rollers were based on the HTS provisions for **turned cups and cones, cages and rollers**. (APPX05162 ) As such, the underlying material inputs that went into the production of these components was not necessary and would not be used. As Appellant reported the weights of the completed components, information that would primarily be in the possession to Appellant, there was no missing information. While the bills of materials and factors of production for these components was not of record, the selected surrogate values made the use of such inputs unnecessary. The surrogate value data valued the roller, turned cup or cone or cage based on the value for a completed roller, turned cup or cone or cage – in other words the value of the completed component. Such value necessarily included the amount of raw material consumed, the labor and energy expended and the like which went into the roller was irrelevant. Such financial ratios were already included in the finished

components.  As discussed herein, the Department's objective in antidumping duty calculations is to calculate a rate which is accurate and free of distortion.  *See Shakeproof Assembly Components Div. of Ill. Tool Works v. United States*, 268  F.3d 1376, 1382 (Fed. Cir. 2001); *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990); *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1379 (Fed. Cir. 2013).  The use of a surrogate value which is a completed component, and which is only assembled in the final product, already has the value of financial ratios incorporated into such value.  To apply the financial ratios for a full manufacturing operation to these surrogate values would result in a significant overstatement of the value of each of these components.

  B.  ***The Department Should Not Use Distorted Financial Statements***

    1.  *The Timken Romania Financial Statement is Badly Distorted*

In the final results the Department used the financial statement for Timken Romania as the basis for financial ratios.  (APPX05728). Timken Romania should not be used as the source for financial ratios as its corporate operations are radically dissimilar to those of Tainai, and critically, are badly distorted by the nature of Timken Romania's operations.  While Tainai produces antifriction bearings it primarily does so by assembling and finishing components (such as rollers) produced by third-parties.  Its direct work on the components is limited to grinding.

(See page 15 of Tainai's Section A Response of October 20, 2020.) (APPX00703, APPX00726 – APPX00728.)    In contrast, Timken Romania is a full-line producer of bearings which uses steel as a primary raw material. Timken Romania's operations are significantly more complex than the operations undertaken by Tainai and thus using Timken Romania as the basis for financial statement would be distortive and include values for significant operations not undertaken by Appellant.

This is not the only flaw.  In addition to operations which are not comparable, Timken Romania, has numerous related parties thus has heavily distorted sales and purchases.  Specifically, the sales and results are badly distorted due to the very high percentage of related party transactions. (APPX02290 – APPX02295 As clearly stated in the financial statement, Timken Romania had L421,113,434[2] in sales to affiliated parties. See Timken Romania SA Financial Statement (hereafter "TR FS") supplied as Exhibit 13 to petitioner's submission of surrogate values of December 11, 2020 at pages 36-37 (APPX02292 – APPX02295) out of total sales of L441,806,260 See TR FS at page 7 (APPX02234 - 02235) . This means that only L20,692,826[3] in sales were, in fact, to unaffiliated parties.  This is less than 5% of sales.[4]    The very high percentage of affiliated sales, and the relationship with the other members of the Timken Group, means that the financial statements are subject

---

[2] A Leu (the Romanian unit of currency) is approximately .25 USD.
[3] Derived by subtracting 421,113,424 from 441,806,260.
[4] Derived by placing 20,692,826 over 441,806,260.

to significant manipulation. This is not mere speculation. Timken Romania acknowledged that this relationship impacted its business. In its financial statement, Timken Romania wrote:

> During 2019, the Company held transactions with related parties which quantify approximately 96% of total turnover. Within the group, Timken Romania acts as a complex producer with limited functions and risks. For goods delivery transactions, Timken Romania acts as a limited distributor because, in most cases, the distributor activities were performed only when the company receives a firm order from a third-party customer. It can be considered a limited degree of dependence to related parties; the elimination of the dependent relationship with the affiliated distributor may result in a temporary reduction of the sales volume.
> Annual Report at page 5. (APPX02335)

The data is also suspect when compared with other data of other members of the industry in the same country. Specifically, and as will be detailed below, the non-representative nature of the Timken Romania financial statement is further demonstrated by the financial data of URB Rulmenti Suceava ("Rulmenti") PO See Exhibit SV-4 to Tainai's final submission of surrogate values of June 1, 2021. (APPX04989 – APPX05029) Rulmenti is also a Romanian producer of bearings. Rulmenti ran at a loss in 2019. (APPX04989) In this matter there are two companies (Rulmenti and Timken Romania) in the same country (Romania) and in the same industry (Bearings). One company is making healthy profits and another is losing money. This difference is critical. The primary difference appears to be that Timken Romania, the purportedly profitable entity, has a significant number of related party

transactions which may have artificially inflated its profits and potentially deflated its raw material costs while Rulmenti, the non-profitable entity, does not have these related party transactions. Two companies in the same industry and in the same country should not have such diverse results. In other words, the absence of profit for Rulmenti is evidence of the distortion of the financial statement of Timken Romania.

Finally, the data of Timken Romania is suspect because of Timken Romania's relationship with U.S. domestic producers. Timken Romania is part of the Timken Group, a large group of inter-related bearing producers including U.S. producers. Such producers have an incentive to exclude, or otherwise limit, international competitors such as Appellant from the U.S. market and to maintain artificially high margins to do so. To use the data of the entity with related entities, and the resultant very high financial ratios, would provide a significant benefit to the U.S. domestic industry unrelated to the actual conditions of antidumping duty competition.

> 2. *The Other Financial Ratios of Record, While Flawed, are Less Flawed*

The record has two additional financial statements of record, both of which, while flawed, are significantly less flawed than the financial statement of Timken Romania. The other two financial statements are Compa S.A. (Sibu) (APPX01905 – APPX02102) and the previously mentioned Rulmenti (APPX04989 –

APPX05029). The Rulmenti financial statement is of a producer of essentially identical merchandise in the country determined to be the source of surrogate values. It has sufficient detail in its financial statements to calculate ratios. The only flaw is that during the relevant period of time Rulmenti did not make a profit. This is a flaw. Appellant submits that such flaw is no more significant than the flaws in the Timken Romania financial statement, and at a minimum, could be used for two of the portions of the financial ratios that are not related to the profitability of a company. In fact, as discussed above, the Rulimenti financial statement is more reliable than that of Timken Romania as it does not have the distortions resulting from the presence of an overwhelming number of related party transactions.

The second financial statement is that of Compa S.A. (Sibu). (APPX01905 – APPX02102). While Sibu does not produce bearings, Sibu is involved in the processing and assembly of alloy metals into precision articles. This is similar to the operations undertaken by appellant – appellant produces articles of alloy metals and convert them into precision articles. Critically, the Sibu financial statement establishes the purchase (and therefore use) of milling, grinding and measuring machines. Machines used to perform the same operations undertaken by appellant. (APPX01933). While not bearings, these are precision articles of alloy metals, a description which would also apply to that of bearings. The Sibu financial statement does not have any flaws, and should have been used instead of, or at a minimum

with, the financial statement of Timken Romania.

3.    *The Department has a Preference to Use Multiple Financial Statements*

In this matter, the Department had a number of competing financial statements which could be used as the basis for financial ratios. None of these financial statements were perfect. One of them had no profitability,(Rulmenti) one of them was highly distorted with ratios that did not reflect commercial reality in their country (Timken Romania), and one of them produced similar, but not identical products. (Compa S.A. (Sibu)). The Department's decision to use a single financial statement – that of Timken Romania – and to refuse to use any of the other financial statements submitted for consideration was badly flawed. The purpose of using multiple financial statements is to avoid the distortion of using a single financial statement. This is particularly important in a matter, such as this one, where all of the financial statements have some flaws, and the values in the selected single financial statement are badly distorted, as admitted by the entity that issued the financial statements, by related parties transactions.

The Department's primary objective in selecting surrogates and calculating a margin is that of accuracy. Congress intended that Commerce calculate dumping margins as accurately as possible and use the best available information. *See Shakeproof Assembly Components Div. of Ill. Tool Works v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001); *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185,

1191 (Fed. Cir. 1990); *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1379 (Fed. Cir. 2013).

The Department's selection of the single Timken Romania financial statement did not work toward satisfiying this key objective of accuacy. As noted, the Timken Romania financial statement is badly distorted and the sole use of this financial statement, which has significant flaws, would result in an artificial increase in the margin.

C. **The Department Should Not Have Deducted 301 Duties from the U.S. Price**

In the determination, the Department adjusted the U.S. price by deducting from the U.S. price the amount of the Section 301 duties paid by Tainai's U.S. affiliate at the time of importation. Such Section 301 duties were imposed by the United States, pursuant to International Agreements, to address certain conduct by the People's Republic of China and to force China to modify its conduct.[5] These 301 duties are not ordinary duties. They are intended to address specific unfair competition and are to be lifted when the unfair competition has been eliminated. These 301 duties are more akin to remedial Antidumping duties and thus should not

---

[5] *See*, *Notice of Action and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies and Practices Related to Technology Transfer, Intellectual Property, and Innovation,* 83 Fed. Reg. 28710 (June 20, 2018). The notice expressly states that the purpose is "to obtain elimination of China's harmful acts, policies and practices".

be deducted from U.S. price. While the U.S. Court of International Trade has visited this issue three times and found that 301 duties should be deducted from the AD price, two of these three matters are not yet ripe for appeal, and the third is this matter. These three decisions on this issue are *Jinko Solar Import and Export Co., Ltd., et al. v. United States*, 701 F.Supp.3d 1367, (Ct. Int'l Trade 2024) and *Neimenggu Fufeng Biotechnologies Co., et. al. v. United States*, 741 F.Supp.3d 1354 (Ct. Int'l Trade 2024). All of these decisions are by the U.S. Court of International Trade, are not controlling on this Court and this issue has not yet been tested before, and reviewed by, the Court of Appeals.

It is well established that Antidumping Duties are not imposed on other trade corrective duties. The Department avoids applying antidumping duties on other trade corrective duties as a matter of policy, not as a matter of law in order to avoid the double counting of the remedy. The Courts have found that Section 201 duties are also remedial in nature and thus should not be deducted. *Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1361 (Fed. Cir. 2007). In contrast, Section 232 duties under the Trade Expansion Act of 1963 (19 U.S.C. §1862) are not intended to be remedial in nature, but rather are designed to protect the national security. Such 232 duties are not trade corrective actions and thus are deductible from the U.S. price. In calculating the amount of antidumping duties, the Department does not deduct either countervailing or antidumping duties from the U.S. price as to do otherwise

would create a cascade and would result in the imposition of antidumping duties based solely on the imposition of such duties. While the deduction of the countervailing duties is provided by Section 772(c)(1)(C), (19 U.S.C. § 1677a(c)(1)(C)). Antidumping duties are also not deducted from U.S. price as a matter of policy. Rather, this is a statutory construction consistently applied by the Department, and upheld by the Courts. Tainai submits that the term "United States import duties" referenced in Section 772(c)(2)(A) (19 U.S.C. § 1677a(c)(2)(A)) refers to "ordinary customs duties" and not duties imposed under Section 301. Commerce's longstanding policy not to deduct Section 201 duties because they "are special remedial duties" was first announced in 2004, affirmed by the CAFC, and implemented in AR8. *Stainless Steel Wire Rod from Korea*, 69 Fed. Reg. 19,153, 19,159-61 (Apr. 12, 2004) (final results) ("*SSWR*"); *Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1361 (Fed. Cir. 2007).

Commerce declined to deduct Section 301 duties, finding that it does "not consider section 301 duties to be 'special duties,' because like normal U.S. customs duties and unlike {ADDs} and section 201 duties, section 301 duties do not have a termination provision. Commerce's primary basis was, because such duties are indefinite, section 301 duties meet the definition of normal U.S. import duties. Yet the supposed indefinite nature of Section 301 duties is refuted by the U.S. Trade Representative ("USTR") having solicited comments concerning their effectiveness

and continued need to address China's actions to technology transfer, intellectual property, and innovation that were found to have been unreasonable or discriminatory and burden or restrict U.S. commerce. *Request for Comments in Four-Year Review of Actions Taken in the Section 301 Investigation*, 87 Fed. Reg. 62,914 (Oct. 17, 2022).

Moreover, the underlying purpose of Section 301 duties confirms they are remedial in the same manner as Section 201 duties and ADD, as distinguished from normal import duties. The statute itself instructs that USTR, upon finding that:

> an act, policy, or practice of a foreign country is unreasonable or discriminatory and burdens or restricts United States commerce . . . **shall take all appropriate and feasible action** . . . to **obtain the elimination of that act, policy, or practice**. Actions may be taken that are within the power of the President **with respect to trade in any goods or services**, or with respect to any other area of pertinent relations with the foreign country.

19 U.S.C. § 2411(b) (emphases added).

The Statement of Administrative Action accompanying the Uruguay Round Agreements Act confirms the remedial nature of Section 301 duties:

> Since it was enacted, section 301 has been the principal U.S. statute **for addressing foreign unfair practices that adversely affect U.S. exports of goods and services**. Section 301 authorizes {USTR} to take action, subject to the direction of the President, against acts, policies, or practices that are inconsistent with, or deny benefits under, trade agreements or that are unreasonable, unjustifiable, or discriminatory and burden or restrict U.S. commerce.
> H.R. Doc. No. 103-316, Vol. I, 1994 U.S.C.C.A.N. 4040, 4319-19 (emphasis added).

In assessing the Section 301 duties at issue, USTR had the remedial objective of eliminating harmful Chinese government practices with respect to technology transfer, intellectual property, and innovation, finding that China's actions:

1. "require or pressure technology transfer from U.S. companies";
2. "force U.S. companies seeking to license technology to Chinese entities to . . . favor Chinese recipients";
3. "transfer . . . technology to Chinese companies" through "investment in, and acquisition of, U.S. companies and assets"; and
4. constitute "intrusions into, and theft from . . . U.S. companies".

*Notice of Determination and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301*, 83 Fed. Reg. 14,906, 14,907 (Apr. 6, 2018) ("USTR Determination").

Accordingly, using Commerce's own longstanding findings, Section 301 duties should be considered "**special remedial measures**." *SSWR*, 69 Fed. Reg. at 19,159-61. "Although they are not identical to AD duties, they are more like them in purpose and function than they are like ordinary customs duties." *Id*. at 19,159. Indeed, Commerce, when declining to deduct Section 232 duties from U.S. prices, used language underscoring the necessity of doing so for Section 301:

> The objective of section 201 duties is to "**remedy the injurious effect on the U.S. industry of significant surge in imports**." In addition, the objective of AD duties is to "**remedy sales** by a foreign exporter in the U.S. market **at less than fair value**." . . . As such, these types of duties "are all directed at **the same overarching purposes - protecting the bottom line of domestic producers**."

*Circular Welded Carbon-Quality Steel Pipe from Oman*, 86 Fed. Reg. 18,513 (Apr. 9, 2021) ("*CWP from Oman*"),

It is critical to note that while the CAFC upheld the deductibility of 232 duties,

this is because such duties addressed the "national security . . . threat{} by the unsustainably low utilization of domestic steel-producing capacity" . Such duties are readily distinguishable from the Section 301 duties at issue in this case. *Borusan Mannesmann Boru Sanyi ve Ticaret A.S. v. United States*, 63 F.4th 25 (Fed. Cir. 2023). Like Section 201 duties, Section 301 duties serve a trade related, remedial purpose. This Court, therefore, is not bound by the CAFC decision affirming Commerce's practice with respect to Section 232 duties.

The Section 301 duties at issue remedy the specific types of harm to domestic companies that USTR found was caused by China's actions concerning technology transfer, intellectual property, and innovation. *USTR Determination*, 83 Fed. Reg. at 14,907. This remedial nature makes Section 301 akin to Section 201 and ADD, the assessment of which "are all directed at **the same overarching purposes - protecting the bottom line of domestic producers**." *CWP from Oman*, IDM Comment 1. There is no basis to distinguish these types of remedial duties, none of which should be deducted from U.S. price.

Furthermore, deducting these duties would result in double counting. Remedial duties should not be deducted from United States prices – whether Section 201, Section 301, or ADD as this would improperly count that duty twice: "first as {the applicable} duties, and a second time as an increase in that dumping margin." *SSWR from Korea*, 69 Fed. Reg. at 19,160. Assessing Section 301 duties remedies

China's practices with respect to technology transfer, intellectual property, and innovation; in the ADD context, "**to make such a deduction effectively would collect the . . . duties a second time**." *Id*. (emphasis added). The remedial nature of Section 301 duties makes domestic companies whole from the harm that USTR found caused by China, and deducting them from U.S. prices constitutes improper double-counting that puts affected domestic companies in a superior position. "Accordingly, to the extent that {301} duties may reduce dumping margins, this is not a distortion of any margin to be eliminated, but a legitimate reduction in the level of dumping.

In sum, the Section 301 duties are inherently temporary in nature as they are imposed under U.S. law implementing international agreements and in response to a specific conditions. See 19 USC § 2411.  Once this specific condition is resolved, the Section 301 duties must be lifted.   These duties are akin to other conditional duties – Antidumping and Countervailing – where a change in conduct will result in a change in the duties, including potentially eliminating them in full.  In contrast, ordinary customs duties are those duties which are not contingent on external events, but rather are ordinary duties at bound rates and cannot be "avoided" by taking actions to comply with demands for action.

D. ***The Department Should Have Included All Monies Received from the Customer in the U.S. Price***

The Department did not apply all payments reported as received from the Customers as part of the price paid or payable. Rather, the Department limited those payments denominated as "additional revenue for 301" to the value of Section 301 duties paid on the goods. (See I and D Memo issued in connection with the *Final Results*) (APPX00116). This was a legal error. Whether or not these payments were collected because of the Section 301 duties, these payments ultimately represented revenue received by Appellant on a specific sale. Even if the Section 301 duties were ultimately refunded, the additional revenue collected by Tainai would be retained and would not be refunded to the customer.

In evaluating the inappropriate nature of this cap, it is critical to examine the treatment of payments generally in international trade. In the case of Customs valuation, the price actually paid or payable is the total payment. 19 CFR 152.101(d) states:

> Price actually paid or payable. "Price actually paid or payable" means the **total payment** (whether direct or indirect, and exclusive of any charges, costs, or expenses incurred for transportation, insurance, and related services incident to the international shipment of the merchandise from the country of exportation to the place of importation in the United States) made, or to be made, for imported merchandise by the buyer to, or for the benefit of, the seller.
> 19 CFR 152.101(d) (Emphasis Added)

Thus, with respect to Customs valuation, the total payment, no matter how

27

characterized is included as part of the price paid or payable. This language is clear and unequivocal.

The antidumping duty law also contemplates the use of a price which is the money received from the customer and for which only limited adjustments are made. The regulation states:

> Use of price net of price adjustments. In calculating export price, constructed export price, and normal value (where normal value is based on price), the Secretary normally will use a price that is net of price adjustments, as defined in § 351.102(b), that are reasonably attributable to the subject merchandise or the foreign like product (whichever is applicable). The Secretary will not accept a price adjustment that is made after the time of sale unless the interested party demonstrates, to the satisfaction of the Secretary, its entitlement to such an adjustment.
> 19 CFR 351.401(c)

This regulation also reflects the statute. The Statute, at 19 U.S.C. 1677(a) states:

> (a)Export price
> The term "export price" means the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States, as adjusted under subsection (c).

> (b)Constructed export price
> The term "constructed export price" means the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter, as adjusted under subsections (c) and (d).

(c)Adjustments for export price and constructed export price

     The price used to establish export price and constructed export price shall be—

(1)increased by—

  (A) when not included in such price, the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the subject merchandise in condition packed ready for shipment to the United States,

  (B) the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States, and

  (C) the amount of any countervailing duty imposed on the subject merchandise under part I of this subtitle to offset an export subsidy, and

(2)reduced by—

  (A) except as provided in paragraph (1)(C), the amount, if any, included in such price, attributable to any additional costs, charges, or expenses, and United States import duties, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States, and

  (B) the amount, if included in such price, of any export tax, duty, or other charge imposed by the exporting country on the exportation of the subject merchandise to the United States, other than an export tax, duty, or other charge described in section 1677(6)(C) of this title.

(d)Additional adjustments to constructed export price

     For purposes of this section, the price used to establish constructed export price shall also be reduced by—

(1)the amount of any of the following expenses generally incurred by or for the account of the producer or exporter, or the affiliated seller in the United States, in selling the subject merchandise (or subject merchandise to which value has been added)—

  (A) commissions for selling the subject merchandise in the United States;

  (B) expenses that result from, and bear a direct relationship to, the sale, such as credit expenses, guarantees and warranties;

  (C) any selling expenses that the seller pays on behalf of the

purchaser; and
 (D) any selling expenses not deducted under subparagraph (A), (B),
     or (C);
(2) the cost of any further manufacture or assembly (including
additional material and labor), except in circumstances described in
subsection (e); and
(3) the profit allocated to the expenses described in paragraphs (1) and
(2)
19 U.S.C. 1677a

The statute, as stated in 19 U.S.C. 1677(b),clearly provides that the price is

the price at which the subject merchandise is to be sold.  In the case of Appellant,

this price includes both the bearing price and the additional amounts collected to

compensate for duties, whether incorporated directly in the price or as a surcharge

made at the time of sale.

The statute clearly lays out the limited circumstances where the price can be

increased or decreased.  (19 U.S.C. 1677(c)(2) and (d))  In this case, the question is

whether the price can be reduced by the difference between the duty paid and the

portion of the price attributed to the duty paid.  The statute does not provide for such

reduction.   The statute makes it clear that the price can only be reduced by:

- Additional costs and duties attendant to bringing the subject merchandise to
  the United States.   This is already present in the calculation for Tainai for
  items such as Customs Duties.   It does not, however, include the difference
  between the 301 duties and the amount denominated as additional monies
  collected.

- Export taxes imposed on the exportation of goods.    This does not apply to
  the issue at bar.

This is revenue received and should be treated as such.   There is no legal basis

to distinguish between these payments and other payments made for the goods. None of the deductions set forth in the statute apply. The only potential argument is that the total price, including the additional money denominated as 301 reimbursement, could be reduced by the amount of the 301 duties. This is addressed in Section C of this submission. Further, the purported additional deduction is in the form of a cap. It does not consist of duty paid, it consists of a deduction for duty NOT paid – which is directly contrary to the express language of 19 U.S.C. 1677a(c)(2)(a) and (b).

The inclusion of these charges in the starting price is also supported by the decision in *Floral Trade Council v. United States,* 41 F.Supp.2d 319 (Ct. Int'l Trade 1999) In this case, the question was whether a surcharge imposed to cover the cost of antidumping duties was part of the price paid or payable. Commerce had challenged whether the surcharge should be deducted from the U.S. price in calculating CEP for unaffiliated consignees. There was no dispute that including this surcharge in U.S. price was proper for affiliated consignees. The Court rejected the argument finding that such surcharges were included, whether for affiliated on unaffiliated consignees. The Court stated:

> Section 1677a enumerates numerous expenses, included in the starting price, that do not accrue to the producer, including international air freight, Customs' clearance fees, selling expenses, and other charges. Congress specifically required that these expenses be deducted from CEP in subsections (c)(2) and subsection (d). See 19 U.S.C. § 1677a(c)(2)-(d). Again, as these expenses comprise part of the starting

price, they are included in the starting price. Therefore, if, as Commerce contends, Congress intended to restrict the CEP starting price to components of that price that actually accrue to the producer, the adjustments provided for in subsections (c)(2) and (d) would be superfluous. The canons of statutory construction provide that "[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant[.]" SUTHERLAND STAT CONST § 46.06 (5th ed.1992). Commerce's interpretation of the provision would render its subsections superfluous; therefore, the Court concludes that Commerce's interpretation is contrary to Congress's intent.

Finally, the SAA provides that, "constructed export price will be calculated by reducing the price of the first sale to an unaffiliated customer in the United States by the amount of the following expenses[.]" SAA at 823. The price of the first sale in the United States includes the antidumping surcharge, and the surcharge is not listed as one of the adjusted expenses. Therefore, the legislative history indicates that the CEP should include the antidumping surcharge.

The statute's language and legislative history, examined according to the accepted canons of construction, indicate that Congress intended to include antidumping surcharges in the starting price whether or not the consignee is related to the producer/exporter. Therefore, Commerce's application of the provision is not in accordance with law.
*Floral Trade Council* at 335

These 301 duty charges are akin to items such as antidumping surcharges and material surcharges. They are ordinarily part of the starting price and, in the absence of a provision directing their non-inclusion, should be included in the price. In sum, the Department had no legal authority to "cap" these payments and such cap cannot stand and the lower Court erred when it found that the Department had legal authority to do so.

E.  ***The Court and the Department erred when it did not provide an offset for Valuable By-Products.***

The Department did not grant a by-product offset.  This was a reversible error.  Tainai provided the sales information for the scrap that it sold.  However, due to the nature of the records maintained in the ordinary course of business, the quantity of scrap produced by each operation is not directly recorded.   However, Tainai explained, in detail, how it allocated the scrap that it sold to the product that it produced. (APPX01456, APPX01475 – APPX01477).   Critically, the quantity of scrap produced is the same as the quantity of scrap sold.   Appellant has no business purpose for retaining scrap as it would not be re-used in Appellant's operations.  The record is clear, there is no evidence of record that Tainai purchased and resold steel scrap.   There is a reasonable inference that scrap is a natural consequence of the production process.    There is clear evidence that scrap is sold for money.  The failure to provide a by-product offset, after such by-product has been sustained by the ordinary business records of the company, results in an artificial increase in the margin and results in a margin which is not accurately calculated.  The refusal to provide a scrap offset, based on the technical absence of detailed inventory records of the scrap, is unreasonable and an abuse of discretion.

In conclusion, the Department's determination is not based on sound facts and deficient reasoning.   The Department has:

- Abused its discretion by using the surrogate financial ratios of a single entity.   The data for such entity was badly flawed and incorrectly rejected the use of the other financial statements of record.

- Abused its discretion by applying financial ratios to surrogate values based on values for complete components.   The application of the financial ratios to such complete components resulted in double counting.

- Unlawfully deducted section 301 duties from the U.S. price.   Section 301 duties are remedial in nature and are akin to antidumping and Section 301 duties.   Section 301 duties should not be deducted from U.S. price to avoid double counting.

- Abused its discretion by capping certain payments received from U.S. customers at the amount of Section 301 duties paid by appellant.   Such cap is not authorized by statute.

- Abused its discretion when it refused to grant a by-product offset for certain valuable by-products.

For the foregoing reasons, Plaintiff-Appellants requests that this Court

overturn the decision of the Court of International Trade and direct the lower Court to remand this matter to the Department of Commerce with instructions to reconsider its determination.

Respectfully submitted,

/s/David J. Craven
DAVID J. CRAVEN
CRAVEN TRADE LAW LLC
3744 N Ashland
Chicago, IL 60613

(773) 709-8506

Counsel to Plaintiff-Appellants

April 14, 2025

Addendum

Pursuant to Fed. Cir. Rule 28 (11)

## Index to Addendum

| Description | Appendix Citation |
| --- | --- |
| Judgment Order in *Shanghai Tainai Bearing Co., Ltd. and C&U Americas, LLC v. United States*, (Sept. 14, 2023) | APPX00086 |
| *Shanghai Tainai Bearing Co., Ltd. and C&U Americas, LLC v. United States*, Slip Op 23-132 (Sept. 14, 2023) | APPX00001 |
| *Shanghai Tainai Bearing Co., Ltd. and C&U Americas, LLC v. United States*, Slip Op 24-142 (December 18, 2024) | APPX00054 |

Judgment Order in
*Shanghai Tainai Bearing Co., Ltd. and*
*C&U Americas, LLC v. United States*
(Sept. 14, 2023)

## UNITED STATES COURT OF INTERNATIONAL TRADE

SHANGHAI TAINAI BEARING CO., LTD. and C&U AMERICAS, LLC,

    *Plaintiffs*,

*and*

PRECISION COMPONENTS, INC., XINCHANG NEWSUN XINTIANLONG PRECISION BEARING MANUFACTURING CO., LTD, and HEBEI XINTAI BEARING FORGING CO., LTD,

    *Consolidated Plaintiffs*,

v.

UNITED STATES,

    *Defendant*.

Before: Stephen Alexander Vaden, Judge

Consol. Court No. 1:22-cv-00038

## <u>JUDGMENT</u>

This case concerns Shanghai Tainai Bearing Co. and C&U Americas, LLC's (collectively, Tainai) challenge to the final results of the antidumping duty administrative review for tapered roller bearings from China for the period of June 1, 2019 to May 31, 2020.  *See* Compl., ECF No. 7; *see also Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Results and Partial Recission of Review; 2019-2020* (*Final Results*), 87 Fed. Reg. 1,120 (Dep't of Com. Jan. 10, 2022).  Tainai alleged that the Department of

Consol. Court No. 1:22-cv-00038                                              Page 2

Commerce's (Commerce) *Final Results* were unsupported by substantial evidence and the agency's actions were arbitrary and capricious.  Compl. ¶¶ 15–54, ECF No. 7.

    The Court first considered Tainai's claims in *Shanghai Tainai Bearing Co. v. United States (Tainai I)*, 47 CIT __, 658 F. Supp. 3d 1269 (2023).  It remanded the case to Commerce to further explain or reconsider its use of partial facts available with an adverse inference as applied to missing factors of production information.  *Id.* at 1289.  The Court also ordered Commerce to further explain its decision to exclude from U.S. price extra revenue Tainai collected in addition to Section 301 duties.  *Id.* at 1296.  On January 12, 2024, Commerce filed its Remand Results, ECF No. 57.

    For the reasons discussed in the Opinion issued this day, and after due deliberation, it is hereby:

    **ORDERED** that the portions of Commerce's *Final Results*, 87 Fed. Reg. 1,120, that were not remanded in *Tainai I*, 47 CIT __, 658 F. Supp. 3d 1269, are **SUSTAINED**;

    **ORDERED** that Commerce's Remand Results, ECF No. 57, are **SUSTAINED**; and it is further

    **ORDERED** that judgment is entered for Defendant.

    **SO ORDERED.**

                                        _____

                                    Stephen Alexander Vaden, Judge

Dated: December 18, 2024
     New York, New York

*Shanghai Tainai Bearing Co., Ltd.*
*and C&U Americas, LLC v. United States*,
Slip Op 23-132
(Sept. 14, 2023)

Slip Op. No. 23-132

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| SHANGHAI TAINAI BEARING CO., LTD. AND C&U AMERICAS, LLC, <br><br> *Plaintiffs,* <br><br> *and* <br><br> PRECISION COMPONENTS, INC., XINCHANG NEWSUN XINTIANLONG PRECISION BEARING MANUFACTURING CO., LTD, and HEBEI XINTAI BEARING FORGING CO., LTD, <br><br> *Consolidated Plaintiffs,* <br><br> v. <br><br> UNITED STATES, <br><br> *Defendant.* | Before: Stephen Alexander Vaden, Judge <br><br> Consol. Court No. 1:22-cv-00038 |

## <u>OPINION</u>

[Granting in part and denying in part Plaintiffs' Motion for Judgment on the Agency Record.]

Dated: September 14, 2023

*David Craven,* Craven Trade Law LLC, of Chicago, IL, for Plaintiffs and Consolidated Plaintiffs.

*L. Misha Preheim*, Assistant Director, and *Kelly Geddes*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant United States.  With them on the brief were *Brian*

*M. Boynton*, Principal Deputy Assistant Attorney General; *Patricia M. McCarthy*, Director, Commercial Litigation Branch; *Claudia Burke*, Assistant Director, Commercial Litigation Branch; and *Jesus N. Saenz*, Of Counsel, U.S. Department of Commerce, Office of the Chief Counsel for Trade Enforcement & Compliance.

**Vaden, Judge:**  Plaintiffs Shanghai Tainai Bearing Co., Ltd. and C&U Americas, LLC filed suit objecting to Commerce's resolution of the thirty-third administrative review of the antidumping order on tapered roller bearings from China.  Joined by several Consolidated Plaintiffs, Shanghai Tainai brings multiple claims of error against Commerce's final determination.  They find moderate success.  Commerce failed to consider the necessary factors established by the Federal Circuit before applying a partial adverse inference to Shanghai Tainai to punish it for the non-compliance of its suppliers in the underlying investigation.  Commerce also failed to justify its decision to deduct certain surcharges Shanghai Tainai included as extra profit on top of the Section 301 duties when calculating the U.S. price.  Plaintiffs' winning streak stops there, however, as the Court rejects their remaining claims, including the claim that the Section 301 duties themselves should have been deducted from the U.S. price.  Consequently, the Motions for Judgment on the Agency Record shall be **GRANTED IN PART AND DENIED IN PART**.

## BACKGROUND

Shanghai Tainai is a Chinese manufacturer of tapered roller bearings (TRBs), a type of precision bearing that facilitates the rotational movement of an

axle.[1]  Tapered roller bearings are made out of four basic components:  rollers, cages, cups, and cones.  Rollers are small steel cylinders that are held together in a circular housing called a cage.  The caged rollers are inserted between two steel rings, allowing them to move.  The inner ring is called the cone, and the outer ring is called the cup.  The antidumping order on tapered roller bearings from China (the Order) has been in place since June 15, 1987, and covers

> . . . tapered roller bearings and parts thereof, finished and unfinished, from China; flange, take up cartridge, and hanger units incorporating tapered roller bearings; and tapered roller housings (except pillow blocks) incorporating tapered rollers, with or without spindles, whether or not for automotive use.

*Decision Memorandum for the Final Results of the 2019-2020 Administrative Review of the Antidumping Duty Order on Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China* (Decision Memo) at 2–3 (Jan. 4, 2022), J.A. 1,004–05, ECF No. 43.   Shanghai Tainai's Motion for Judgment on the Agency Record challenges the final results of the thirty-third administrative review of the Order, which covers imports of tapered roller bearings from China during the period of June 1, 2019 through May 31, 2020 (the Period of Review).   *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 Fed. Reg. 47,731 (Dep't of Com. Aug. 6, 2020).

---

[1] Shanghai Tainai has brought its Motion together with another entity, C&U Americas LLC.   In earlier proceedings before this Court, Shanghai Tainai failed to explain the relationship between itself and C&U Americas.   *See Shanghai Tainai Bearing Co., Ltd. v. United States*, 582 F. Supp. 3d 1299, 1308 (CIT 2022) (referring to the "recurring mystery" of the relationship between Shanghai Tainai and C&U Americas and noting that Plaintiffs' counsel declined the Court's request to shed light on it.).   The Court therefore refers generally to Plaintiffs as Shanghai Tainai.

## I.    The Disputed Administrative Review

On August 6, 2020, Commerce initiated the present administrative review of the Order.  *See id.*  Commerce selected Shanghai Tainai as the sole mandatory respondent because it was the largest exporter of tapered roller bearings from China during the Period of Review.  *See Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China*, 86 Fed. Reg. 36,099 (Dep't of Com. July 8, 2021) and accompanying Preliminary Decision Memorandum at 3, J.A. at 13,073, ECF No. 43.  Commerce received questionnaire responses from Shanghai Tainai and subsequently published its Preliminary Results on July 8, 2021.  *See* 86 Fed. Reg. 36,099 (Dep't of Com. July 8, 2021).

In its Preliminary Results, Commerce took issue with a number of Shanghai Tainai's questionnaire responses.  Commerce noted that Shanghai Tainai had not provided "bills of materials" from its suppliers that could substantiate Shanghai Tainai's reported "factors of production."  Preliminary Decision Memorandum at 15, J.A. at 13,085, ECF No. 43.  19 U.S.C. § 1677b(c)(1)(B) requires that Commerce determine the normal value of subject merchandise from non-market economies such as China "on the basis of the value of the factors of production utilized in producing the merchandise" and that such value "be based on the best available information regarding the values of such factors in a market economy country . . . considered to be appropriate by [Commerce]."  Commerce therefore requires that Chinese respondents such as Shanghai Tainai provide factors of production data that describe the inputs used to manufacture the merchandise as well as the price

of each input in a surrogate market-economy country.[2]  *See* Response to Section D of

the Department's Initial Questionnaire by Shanghai Tainai Bearing Co., Ltd

(Section D Questionnaire Response) at D-1, J.A. at 81,156, ECF No. 44.  In the

current review, Shanghai Tainai reported the following inputs as factors of

production:  chrome steel, cold-rolled steel, turned cups and cones, rollers, cages,

and anti-rust oil.  *Id.* at D-15, J.A. at 81,170.  Commerce chose Romania as the

surrogate country to value these inputs.[3]  However, when Commerce requested that

Shanghai Tainai substantiate its reported factors of production by submitting bills

of materials from its input suppliers, Shanghai Tainai responded that its affiliated

suppliers "do not maintain production slips" and that it "'had no way of knowing the

direct input bills of materials for the unaffiliated suppliers.'"  Preliminary Decision

Memorandum at 15, J.A. at 13,085 (quoting Response to the Department's A, C and

D Supplemental Questionnaire by Shanghai Tainai Bearing Co., Ltd. at 27, J.A. at

82,201, ECF No. 44).  Commerce further noted that Shanghai Tainai did not report

all the necessary factors of production data for its products.  For example, it omitted

a factor of production value for "rollers" despite a product description indicating

that rollers should be included as a cost.  *Id.* at 15–16, J.A. at 13,085–86.

For its Preliminary Results, Commerce used Shanghai Tainai's reported

factors of production as "facts available," averaged this data to assign a value to

missing fields, calculated an estimated dumping margin of 36.75 percent, and

---

[2] Shanghai Tainai also included the labor and energy costs of its affiliate suppliers in its factors of production database.  Section D Questionnaire Response at D-15, J.A. at 81,170, ECF No. 44.

[3] Shanghai Tainai does not challenge the selection of Romania.  Oral Arg. Tr. 41:11–12, ECF No. 52 (Mr. Craven:  "We do not object to the use of Romania.").

issued additional supplemental questionnaires to both Shanghai Tainai and its unaffiliated suppliers that sought to substantiate the factors of production data. *Id.*; 86 Fed. Reg. at 36,100. The unaffiliated suppliers did not respond to Commerce's supplemental questionnaires sent directly to them. *See* Decision Memo at 7, J.A. at 1,009, ECF No. 43. Shanghai Tainai maintained that, despite its requests, its suppliers remained unable to provide the factors of production data. *See* Response to the Department's Second Supplemental Questionnaire by Shanghai Tainai Bearing Co., Ltd. (Second Supplemental Questionnaire Response) at 6, J.A. at 84,320, ECF No. 44. Shanghai Tainai attached letters it had sent to suppliers requesting bills of materials for inputs it had purchased. *Id.* at Ex. SSD-2, J.A. at 84,406–16. Shanghai Tainai also attached a single response email from a supplier, who declined to provide the information. *Id.* at J.A. 84,415. Shanghai Tainai claimed that, because it was not affiliated with these suppliers, "Tainai has no power to compel their assistance." *Id.* at J.A. 84,320.

Along with its response to the Second Supplemental Questionnaire, Shanghai Tainai submitted a case brief that challenged numerous other aspects of Commerce's Preliminary Results. *See* Administrative Case Brief of Shanghai Tainai Bearing Co., Ltd., Sept. 10, 2021 (Shanghai Tainai Case Brief), J.A. at 84,449, ECF No. 44. Shanghai Tainai first objected to Commerce's use of financial statements from Timken Romania SA, a bearings manufacturer, as the basis for calculating the surrogate values of Shanghai Tainai's factors of production. *Id.* at 2, J.A. at 84,450. It claimed that Timken Romania's complex manufacturing

Case 1:22-cv-00038-SAV    Document 56    Filed 09/14/23    Page 7 of 53

Consol. Court No. 1:22-00038                                            Page 7

operations and use of related-party transactions made it an inappropriate comparator and that Commerce should have instead used the financial data of alternative surrogate value candidates URB Rulmenti Suceava or Compa S.A. Sibiu. *Id.* at 4–5, J.A. at 84,452–53. Shanghai Tainai next objected to what it termed "double counting" in the valuation of rollers, a factor of production in its tapered roller bearings. *Id.* at 7, J.A. at 84,455. It argued that, although it purchased finished rollers, Commerce refused to value them using the purchase price. Instead, Commerce used a surrogate value that "included the cost for the materials as well as the cost of the processing to convert the materials into rollers and the profit for the producer of the rollers." *Id.* Shanghai Tainai also claimed that Commerce's dumping margin defied "commercial and economic reality," citing to *Baoding Mantong Fine Chemistry Co., Ltd. v. United States*, 113 F. Supp. 3d 1332 (CIT 2015) for the proposition that such margins must be discarded. *Id.* at 11, J.A. at 84,459. Plaintiff asserted that its significant operating profit would be impossible if it were dumping at the margin Commerce calculated in the Preliminary Results. *Id.*

Shanghai Tainai further alleged that Commerce improperly deducted Section 301 duties from the U.S. price of its tapered roller bearings, resulting in a higher dumping margin. *Id.* at 8, J.A. at 84,456. It argued that, although 19 U.S.C. § 1677a(c)(2)(A) requires the deduction of "United States import duties," the statute should be interpreted to refer to ordinary customs duties and not those duties imposed under Section 301, which are temporary "special" duties and therefore

Case 1:22-cv-00038-SAV    Document 56    Filed 09/14/23    Page 8 of 53

Consol. Court No. 1:22-00038                                    Page 8

properly included in the U.S. price. *Id.* at 9, J.A. at 84,457. Shanghai Tainai also claimed that Commerce improperly capped the U.S. price by deducting customer payments denominated as "additional revenue for 301" from the price, even where Shanghai Tainai charged amounts that exceeded the amount of Section 301 duties. *Id.* at 10, J.A. at 84,458. This tended to increase Shanghai Tainai's dumping margin by reducing the U.S. price. Finally, Shanghai Tainai faulted Commerce for declining to grant a "by-product offset" for scrap metal that it sold, which further increased its dumping margin. *Id.* at 10–11, J.A. at 84,458–59.

On January 10, 2022, Commerce published its Final Results and accompanying Decision Memo. *See Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China: Final Results and Partial Recission of Review; 2019-2020* (Final Results), 87 Fed. Reg. 1,120 (Dep't Com. Jan. 10, 2022); Decision Memo, J.A. at 1,003, ECF No. 43. It decided to apply partial facts available with an adverse inference to fill the gaps in Shanghai Tainai's missing factors of production data. *See* Decision Memo at 7, J.A. at 1,009, ECF No. 43. When an interested party fails to act to the best of its ability to comply with a request for information from Commerce, Commerce may use an inference adverse to that party in selecting the information that will fill the gap in the record. *See* 19 U.S.C. § 1677e(b). Here, Commerce did not find that Shanghai Tainai had failed to cooperate to the best of its ability. Instead, it based its decision to apply an adverse inference on the lack of cooperation from Shanghai Tainai's suppliers. *See* Decision Memo at 8, J.A. at 1,010, ECF No. 43 ("[W]e find that Tainai has

Case 1:22-cv-00038-SAV    Document 56    Filed 09/14/23    Page 9 of 53

Consol. Court No. 1:22-00038                                              Page 9

cooperated with Commerce's requests for information, but its missing [factors of production] information from unaffiliated suppliers necessitates the use of partial AFA[.]"[4]).  To do this, Commerce relied on *Mueller Comercial De Mexico, S. de R.L. De C.V. v. United States*, 753 F.3d 1227 (Fed. Cir. 2014).  *See id*. at 12–13, J.A. at 1,014–15.  In *Mueller*, the Federal Circuit affirmed Commerce's practice of using facts available with an adverse inference to calculate a respondent's dumping margin in situations where the respondent cooperated but the respondent's supplier did not.  *See Mueller*, 753 F.3d at 1233.  The Court described this practice as resting on policy considerations; namely, that doing so may cause the respondent to induce a supplier's compliance by refusing to do business with the supplier unless it cooperates with Commerce's requests for information.  This may deter the supplier's non-cooperation.  *See id.*

Commerce found that Shanghai Tainai "could potentially induce compliance on the part of its unaffiliated suppliers."  Decision Memo at 13, J.A. at 1,015, ECF No. 43.  It wrote:

> Based on Tainai's large volume of entries during the POR[5] and the quantity of TRBs that it purchased from suppliers, it is reasonable to conclude that Tainai is an important customer to its Chinese TRB suppliers, which means that Tainai is in a position to exercise its leverage over its TRB suppliers to induce them to cooperate.  Thus, we find that it is reasonable to conclude that Tainai has some business mechanism to induce its suppliers to cooperate.  Furthermore, Tainai may choose not to do business with these suppliers in the future due to their lack of cooperation and instead select suppliers . . . that [are] willing to commit to participation in an [antidumping] review.  By applying AFA with respect to the missing data, Commerce is relying on

---

[4] Adverse facts available, *i.e.*, the acronym-happy trade bar's way of saying Commerce drew an adverse inference when choosing among the facts available for selection.

[5] Period of review

the statutory means that it has available to induce the cooperation of these parties so that Commerce has the information necessary to calculate accurate dumping margins.

*Id.* at 13–14, J.A. at 1,015–16.  Commerce therefore applied partial facts available with an adverse inference for the missing factors of production data.  It summarized the methodology it used to do so:

> Here, the missing data are the inputs for [turned cups and cones, rollers, or cages] that are then assembled by Tainai into finished TRBs.  Accordingly, as partial AFA, we are applying the highest [factors of production] usage rate reported by Tainai's affiliated suppliers for turned cups and cones, tapered rollers, and cages within each product type sourced solely from the unaffiliated suppliers for each associated CONNUM.[6]

*Id.* at 13, J.A. at 1,015.  Commerce emphasized that (1) it "calibrated the remedy so that only purchases from uncooperative producers impact Tainai's weighted-average dumping margin," and (2) its methodology "uses Tainai's submitted [factors of production] data in determining the normal value of each CONNUM[.]"  *Id.*  It concluded that this manner of applying adverse facts available was "consistent with the overriding purpose of the Act of fairness and accuracy" as well as "the purpose of applying AFA, which is to deter non-cooperation without being punitive."  *Id.*  This methodology yielded a dumping margin of 538.79 percent.  Final Results, 87 Fed. Reg. at 1,121.  By way of comparison, the China-wide entity rate that

---

[6] "CONNUM" is an acronym for "control number" and denotes a distinct tapered roller bearing product.  To ensure that Commerce is comparing like products in the home and U.S. markets, it asks respondents to sort merchandise according to key differentiating categories — in this review, by product description, outer diameter, inner diameter, and weight.  For example, cup-50-25-0.30 would be a distinct product, or CONNUM, with a "cup" design, an outer diameter of 50, an inner diameter of 25, and a weight of 0.30 kilograms.  *See* Request For Information at Section C, J.A. at 1,448–49, ECF No. 43.

Commerce assigned to companies that did not request a separate rate was 92.84 percent. *Id.*

Commerce's Final Results also rejected the other arguments Shanghai Tainai made in its case brief. Commerce first found that it was appropriate to use Timken Romania's financial statements to value Shanghai Tainai's factors of production because neither alternative entity met regulatory criteria: Rulmenti operated at a loss, and Compa S.A. Sibiu did not produce comparable merchandise. Decision Memo at 18, J.A. at 1,020, ECF No. 43. In contrast, Timken Romania's financial statements were usable because (1) Timken Romania produced tapered roller bearings and (2) its financial statements were accompanied by an auditor's report that identified no irregularities. *Id.* at 19, J.A. at 1,021.

Commerce next denied that it double counted the value of Shanghai Tainai's purchases of finished rollers by using a surrogate value rather than the purchase price. *Id.* at 20, J.A. at 1,022. Commerce explained that Shanghai Tainai purchased these rollers from non-market economy suppliers, and 19 U.S.C. § 1677b(c)(1) combined with 19 C.F.R. § 351.408 require Commerce to apply surrogate values to all such factors of production. *Id.* at 21, J.A. at 1,023. Commerce also rejected Shanghai Tainai's argument that its dumping margin defied commercial and economic reality. *Id.* at 28, J.A. at 1,030. Commerce explained that "[t]he fact that the [factor of production] consumption rates we are using as partial AFA are the highest such rates does not *per se* make them unrealistic or unreasonable. The [factor of production] consumption rates are Tainai's own rates and, therefore,

commercial, and nothing on the record indicates they are aberrational." *Id.* Commerce denied the precedential authority of *Baoding Mantong* and pointed out that, in *Nan Ya Plastics Corp. Ltd. v. United States*, 810 F.3d 1333 (Fed. Cir. 2016), the Federal Circuit held that Commerce's determination is accurate "'if it is correct as a mathematical and factual matter,'" and reflects commercial reality if "'it is consistent with the method provided in the statute.'" *Id.* at 29, J.A. at 1,031 (quoting *Nan Ya Plastics*, 810 F.3d at 1344). Therefore, Commerce "'need not examine the economic or commercial reality of the parties, specifically, or of the industry more generally, in some broader sense.'" *Id.*

Commerce next disagreed that Section 301 duties were improperly deducted from U.S. price and cited to prior decisions that treated these duties as "U.S. import duties," which are required by statute to be deducted. *Id.* at 22, J.A. at 1,024. Commerce also continued to find that amounts Shanghai Tainai charged customers to offset the Section 301 duties must be capped at the actual amount of the Section 301 duties and that additional amounts could not be included in the U.S. price of the merchandise. *Id.* at 22–23, J.A. at 1,024–25. Commerce concluded by finding that it correctly denied Shanghai Tainai's claim for a by-product offset because Plaintiff had failed to provide production records that could substantiate the amount of scrap generated from the production of subject merchandise during the period of review. *Id.* at 26, J.A. at 1,028.

After receiving the Final Results, which contained a far larger dumping margin than Commerce had found in the Preliminary Results, Shanghai Tainai

submitted a ministerial error allegation.  *See* Ministerial Error Allegations of Shanghai Tainai Bearing Co., Ltd. (Ministerial Error Allegations), J.A. at 84,881, ECF No. 44.  Shanghai Tainai's allegation focused on Commerce's methodology for choosing partial facts available and alleged that it did not properly implement its decision to "rel[y] on Tainai's highest reported usage rate for each of the [factors of production] on a product-specific rate for each control number[.]"  *Id.* at 3, J.A. at 84,883.  Rather than select the factor of production on a product-specific basis, Commerce allegedly selected the factor of production on a more general component-level basis, leading to distortions.  For example, Shanghai Tainai alleged that Commerce took factors of production usage rates from much heavier, more expensive bearings and applied them to lighter, cheaper bearings that shared nothing in common besides being "the same general type of component" but which "are simply not the same product."  *Id.* at 4–5, J.A. at 84,884–85.  Shanghai Tainai further alleged that the absence of factors of production data for the production of finished inputs — such as turned cups and cones, rollers, and cages — was "ultimately irrelevant" because Shanghai Tainai purchased these inputs in a finished state and knew their usage rates.  *Id.* at 6–7, J.A. at 84,886–87.

On February 10, 2022, Commerce published its response to Shanghai Tainai's ministerial error allegations.  *See 2019–2020 Antidumping Administrative Review of Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China:  Allegation of Ministerial Errors in the Final Results* (Ministerial Error Response), J.A. at 13,467, ECF No. 43.  Commerce

rejected both of Shanghai Tainai's allegations, describing them as falling outside of

19 CFR § 351.224(f)'s definition of a ministerial error as "an error in addition,

subtraction, or other arithmetic function, clerical error resulting from inaccurate

copying, duplication, or the like, and any other similar type of unintentional error."

*Id.* at 3–5, J.A. at 13,469–71.  Commerce wrote, "While we were less than exact in

our phrasing, the language in our memoranda and programing indicates our

intention to apply the AFA on a product description basis as that product was

reported in the CONNUM." *Id.*  It described its manner of selecting facts otherwise

available with an adverse inference and applying surrogate values to finished

inputs as reflecting intentional methodological choices rather than an unintentional

error. *Id.*

## II.    The Present Dispute

On February 24, 2022, Shanghai Tainai filed its Complaint alleging that

Commerce's Final Results were unsupported by substantial evidence and arbitrary

and capricious.  *See* Complaint, ECF No. 7.  In its Motion for Judgment on the

Agency Record, (Pls.' Br.), Shanghai Tainai claimed the same defects that it had

alleged during the administrative process:  (1) Commerce improperly applied facts

available with an adverse inference to a cooperative entity; (2) the facts that

Commerce selected were unreasonable and distortive; (3) the dumping margin that

Commerce calculated defied commercial and economic reality; (4) Commerce erred

in selecting the financial statements of Timken Romania as the source for the

surrogate values of Shanghai Tainai's factors of production; (5) Commerce

improperly valued finished inputs purchased by Shanghai Tainai using surrogate values; (6) Commerce improperly deducted Section 301 duties from the U.S. price of the subject merchandise; (7) Commerce improperly capped amounts that Shanghai Tainai charged its customers and denominated as "additional revenue for 301"; and (8) Commerce should have granted Shanghai Tainai a by-product offset.  Pls.' Br. at 13, 23, 24, 31, 35, 42, 44, 46, 52, ECF No. 32.

Shanghai Tainai's Motion was accompanied by a separate Motion from Chinese entities that were not selected for individual review but received the same rate as Shanghai Tainai.  *See* Consolidated Plaintiffs' Motion for Judgment on the Agency Record, ECF No. 34; *see also* 19 U.S.C. § 1673d(c)(5)(A) (providing that the all-others rate shall be an average of the dumping margin assigned to entities selected for individual review).  These Consolidated Plaintiffs (Precision Components, Inc., Xinchang Newsun Xintianlong Precision Bearing Manufacturing Co., Ltd. and Hebei Xintai Bearing Forging Co., Ltd.) moved for judgment on the agency record with an accompanying brief whose sole claim was that any new rate resulting from a remand of Commerce's Final Results should also be applied to the Consolidated Plaintiffs.  *See* Consolidated Plaintiffs' Motion for Judgment on the Agency Record at 10, ECF No. 34.

The Government then filed its Response to Plaintiffs' Motion for Judgment on the Agency Record (Def.'s Br.), ECF No. 37, rejecting Shanghai Tainai's arguments. *See* Def.'s Br., ECF No. 37.  The Government described its decision to apply facts available with an adverse inference as reasonable.  *Id*. at 9.  19 U.S.C. § 1677e(b)(1)

provides for the application of facts available with an adverse inference whenever an "interested party" has failed to cooperate to the best of its ability with a request for information. The Government pointed to Commerce's determination that Shanghai Tainai's unaffiliated suppliers were interested parties in their own right because they were "producers of subject merchandise." *Id.* at 10 (citing the scope of the Order as including "TRBs and parts thereof, finished and unfinished."). Because Commerce had issued questionnaires seeking factors of production data from both Shanghai Tainai and its unaffiliated suppliers, the suppliers' failure to respond meant that "the statute permitted Commerce to 'use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available,' or, fill the gap in the data with information that may result in a higher dumping margin in order to induce future cooperation with Commerce's requests." *Id.* at 11 (quoting 19 U.S.C. § 1677e(b)(1)(A)). The Government also argued that Shanghai Tainai's efforts to collect this data from its suppliers were lacking, noting that Shanghai Tainai only sought the information after the Preliminary Results and could only demonstrate a single round of correspondence with its suppliers. *Id.* at 15. The Government noted that Shanghai Tainai had previously participated in a 2012–13 new shipper review under the Order; therefore, it and its suppliers knew, or should have known, that "[t]his is *fundamental* data that any producer or importer should be prepared to provide." *Id.* at 13 (emphasis in original).

The Government also rejected Shanghai Tainai's other claims. It described Commerce's choice of facts available to fill the gaps in the record as reasonable

because Commerce used "reported costs for similar inputs from Tainai's affiliated producers," did so only for "components that were 100% provided by unaffiliated parties," and determined that choosing facts with an adverse inference was "necessary to induce future cooperation from Tainai's unaffiliated suppliers." *Id.* at 18. The Government denied that Commerce's determination needed to reflect "commercial reality" as an independent standard, citing Federal Circuit precedent. *Id.* at 23. The Government next argued that the claims originating in Shanghai Tainai's ministerial error allegations — namely, that Commerce used factors of production data from highly dissimilar products and that missing factors of production data for finished inputs it purchased were irrelevant — were not ministerial errors and were adequately addressed by Commerce's Ministerial Error Response. *Id.* at 25–27. The Government then claimed that Commerce reasonably determined that Timken Romania's financial statements were the best available information for calculating surrogate value, pointing to Commerce's statutory discretion to make such a determination and to various defects in alternative financial statements that rendered them unusable. *Id.* at 30–31. Regarding the deductibility of Section 301 duties, the Government cited Commerce's consistent practice of deducting them from U.S. price as "U.S. import duties" and argued that Commerce reasonably capped amounts that Shanghai Tainai charged customers and denominated as "additional revenue for 301" by limiting such amounts to the actual amount of the Section 301 duties. *Id.* at 34, 36. Finally, the Government described Commerce's denial of Shanghai Tainai's request for a by-product offset as

a reasonable response to Shanghai Tainai's failure to provide evidence of the amount of scrap it produced during the period of review. *Id.* at 38–39.

On March 23, 2023, the Court held oral argument. *See* Oral Arg. Tr., ECF No. 52. There, the Court ordered supplemental briefing on Shanghai Tainai's two claims related to Section 301 duties. First, the Court asked the parties to consider the deductibility of Section 301 duties from U.S. price in light of the Federal Circuit's decision in *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 63 F.4th 25 (Fed. Cir. 2023), which upheld this Court's decision that Section 232 duties are deductible as "U.S. import duties." Second, the Court ordered supplemental briefing on the question of Commerce's capping of amounts charged to customers invoiced as "additional revenue for 301" after Plaintiff clarified the nature of these charges at oral argument. *See* Oral Arg. Tr. 40:13–18, ECF No. 52; *see also* Defendant's Response to the Court's March 23, 2023 Order (Def.'s Supp. Br.), ECF No. 53; Plaintiffs' Response to the Court's March 23, 2023 Order (Pls.' Supp. Br.), ECF No. 54. With the record now complete, the Court decides the parties' claims.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction over Plaintiffs' challenge to the Final Results under 19 U.S.C. § 1516a(a)(2)(B)(i) and 28 U.S.C. § 1581(c), which grant the Court authority to review actions contesting final determinations in antidumping reviews. The Court must sustain Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise

not in accordance with the law." 19 U.S.C. § 1516a(b)(1)(B)(i). If they are unsupported by substantial evidence or not in accordance with the law, the Court must "hold unlawful any determination, finding, or conclusion found." *Id.* "[T]he question is not whether the Court would have reached the same decision on the same record[;] rather, it is whether the administrative record as a whole permits Commerce's conclusion." *See New American Keg v. United States*, No. 20-00008, 2021 WL 1206153, at *6 (CIT Mar. 23, 2021). Furthermore, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).

Reviewing agency determinations, findings, or conclusions for substantial evidence, the Court assesses whether the agency action is reasonable given the record as a whole. *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."). The Federal Circuit has described "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *DuPont Teijin Films USA v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

## DISCUSSION

### I. Summary

Commerce may apply facts otherwise available with an adverse inference against a cooperating respondent on the theory that doing so will incentivize the respondent's non-cooperative suppliers to provide information sought during an antidumping review.  However, when it does so, Commerce must satisfy specific requirements that the Federal Circuit has identified — namely, Commerce must make a case-specific determination that the respondent can influence its suppliers' decision to cooperate, and Commerce must take into account the predominant interest in accuracy and explain any deterrence-based rationale that is used against the cooperating party.  The Court finds that Commerce failed to meet this standard and remands Commerce's Final Results for additional explanation consistent with those requirements.  In doing so, the Court does not accept Shanghai Tainai's claim that Commerce calculated a dumping margin that had no basis in commercial reality.  The Court also rejects Plaintiffs' argument that Commerce improperly selected the financial statements of Timken Romania when calculating surrogate values.  That entity's information was the best available to Commerce.

The Court agrees with Shanghai Tainai that Commerce did not sufficiently explain its decision to cap price increases that Shanghai Tainai masked by invoicing its customers for Section 301 duty payments.  The Court takes issue with Commerce's attribution of these amounts to the sale of services, rather than merchandise, and additionally rejects its unacceptably narrow interpretation of the

regulation defining price adjustments.  However, Commerce was correct to deduct the actual Section 301 duty payments from U.S. price, as doing otherwise would ignore the clear textual command in the presidential order enacting the duties that they must be in addition to existing duties.  Finally, Commerce's rejection of Shanghai Tainai's request for a by-product offset was proper because Plaintiff conceded that it failed to record the quantity of by-product it produced during the period of review.

## II.  Application of Partial Facts Available with an Adverse Inference

When foreign merchandise is sold in the United States at less than its fair value — thereby injuring a domestic industry — the law allows Commerce to impose antidumping duties on the merchandise.  Antidumping duties equal the amount by which the foreign market value, known as the "normal value," of the merchandise exceeds the U.S. price of the merchandise.  19 U.S.C. § 1677b(a). When Commerce is missing data necessary to calculate the normal value of merchandise subject to an antidumping investigation, the antidumping statute provides a two-part process to fill the gap.  *See* 19 U.S.C. § 1677e(a).  The statute enables Commerce to use "facts otherwise available" in place of the missing information if:

(1) Necessary information is not available on the record, or

(2) An interested party or any other person —

(A) Withholds information that has been requested by [Commerce],

      (B) Fails to provide such information by the deadlines for submission of

           the information or in the form and manner requested, . . .

      (C) Significantly impedes a proceeding under this subtitle, or

      (D) Provides such information but the information cannot be verified[.]

Separately, 19 U.S.C. § 1677e(b) permits those facts otherwise available to be chosen with an adverse inference if "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from [Commerce]." Although § 1677e(a) and § 1677e(b) are often collapsed into "adverse facts available" or "AFA," the two statutory processes require distinct analyses rather than the single analysis implied by the term "AFA." Commerce first must determine that it is missing necessary information; and, if it wishes to fill the resulting gap with facts that reflect an adverse inference against an interested party, Commerce must secondarily determine that the party has failed to cooperate by not acting to the best of its ability. *See Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1346 (Fed. Cir. 2011).

      Here, Commerce chose an unorthodox path to justify its application of facts otherwise available with an adverse inference to Shanghai Tainai. After first determining in its Preliminary Results that Shanghai Tainai had failed to provide bills of materials for its factors of production, Commerce notified Shanghai Tainai of the deficiency and used Shanghai Tainai's reported factors of production information as facts otherwise available — without an adverse inference — to fill the gap in the record. *See* Decision Memo at 10, J.A. at 1,012, ECF No. 43.

Commerce then sent a supplemental questionnaire to both Shanghai Tainai and its unaffiliated suppliers, seeking the missing information. Shanghai Tainai reported to Commerce its fruitless attempts to elicit the information from its suppliers; meanwhile, the suppliers ignored Commerce's questionnaire. *See id.* at 6–7, J.A. at 1,008–09; *see also* Second Supplemental Questionnaire Response at Ex. SSD-2, J.A. at 84,406–16, ECF No. 44. Commerce therefore concluded in its Final Results that, although "Tainai has been cooperative throughout this review . . . its suppliers have not." Decision Memo at 7, J.A. at 1,009, ECF No. 43. Commerce's ultimate decision to apply facts otherwise available with an adverse inference against Shanghai Tainai's missing factors of production data was therefore *not* grounded in Plaintiff's failure to "act to the best of its ability to comply with a request for information," as § 1677e(b) would seem to require. Rather, it was based on the *suppliers*' failure to cooperate. Commerce found that "Tainai's unaffiliated TRB component suppliers are interested parties within the meaning of [19 U.S.C. § 1677(9)] because they are producers of subject merchandise (*i.e.*, all TRBs and parts thereof, finished and unfinished, from China are subject merchandise) and they failed to cooperate by not providing their [factors of production] data, either through Tainai or directly to Commerce." *Id.* at 12, J.A. at 1,014. Commerce therefore determined that, "consistent with [§ 1677e(b)], which states that Commerce may apply AFA when an interested party has failed to cooperate by not acting to the best of its ability in responding to Commerce's requests for information, we find the use of partial AFA with respect to the uncooperative producers to be appropriate." *Id.*

The legal standard that Commerce must meet in order to apply facts available with an adverse inference against a respondent on the basis of its suppliers' non-compliance is explained in *Mueller Comercial De Mexico, S. de R.L. De C.V. v. United States*, 753 F.3d 1227 (Fed. Cir. 2014). In the administrative proceeding underlying that case, respondent Mueller's supplier, Ternium, failed to report production cost data on a product-specific basis because it claimed such data was not "readily available." *Id.* at 1230. The Federal Circuit found that "[i]n this case, Mueller is a cooperating party, while Ternium is not." *Id.* at 1232. Commerce nonetheless calculated Mueller's dumping margin using an adverse inference because it "found that Mueller could and should have induced Ternium's cooperation by refusing to do business with Ternium, and Ternium would not be sufficiently deterred if Mueller were unaffected by Ternium's non-cooperation[.]" *Id.* at 1233. The Federal Circuit concluded that "Commerce may rely on such policies as part of a margin determination for a cooperating party like Mueller, *as long as the application of those policies is reasonable on the particular facts and the predominant interest in accuracy is properly taken into account as well.*" *Id.* (emphasis added).

The Federal Circuit explained that this doctrine requires more than a mere deterrence rationale. It cited *F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000) for the proposition that, for non-cooperating parties, § 1677e(b) must be applied to arrive at "a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended

as a deterrent to noncompliance." *Mueller*, 753 F.3d at 1234. This was "[a]ll the more so for a cooperating party, for which the equities would suggest greater emphasis on accuracy in the overall mix." *Id.* Indeed, "Commerce cannot confine itself to a deterrence rationale and also must carry out a case-specific analysis of the applicability of deterrence and similar policies." *Id.* In cases of supplier non-cooperation, Commerce must carefully consider whether the cooperating respondent has a mechanism to force the non-cooperating supplier's cooperation. "[I]f the cooperating entity has no control over the non-cooperating suppliers, a resulting adverse inference is potentially unfair to the cooperating party." *Id.* at 1235. Therefore, "Commerce must take into account that Mueller itself was a cooperating party and that Commerce's inducement/evasion approach to Mueller's rate calculation could discourage Mueller's own cooperation." *Id.* at 1236.

In sum, if Commerce has either (1) failed to consider evidence that reasonably detracts from the conclusion that Shanghai Tainai had sufficient control over its suppliers to force their cooperation by declining to do business with them; or (2) failed to properly take into account the predominant interest in accuracy — for instance, by failing to carry out a case-specific analysis of its deterrence rationale or failing to take into account whether a cooperating party will be discouraged from future cooperation — then Commerce lacks substantial evidence to apply facts available with an adverse inference against a cooperating party on the basis of supplier non-cooperation. Here, Commerce failed to meet either standard.

"The concept of 'control,' as discussed in *Mueller*, does not require actual control.  Instead, it requires Commerce to consider record evidence concerning the practical ability of a respondent to induce the supplier's cooperation."  *Venus Wire Industries Pvt. Ltd. v. United States*, 471 F. Supp. 3d 1289, 1309 (CIT 2020). Commerce did not conduct such an analysis here.  Its discussion of Shanghai Tainai's ability to induce its suppliers' cooperation consisted of the following paragraph:

> While Tainai argues that it could not persuade its suppliers to cooperate with Commerce's requests for information, the record evidence supports our finding that Tainai could potentially induce compliance on the part of its unaffiliated suppliers.  Commerce chose Tainai as a mandatory respondent in this review because it accounted for the largest volume of entries of subject merchandise during the POR.  *Based on Tainai's large volume of entries during the POR and the quantity of TRBs that it purchased from suppliers, it is reasonable to conclude that Tainai is an important customer to its Chinese TRB suppliers, which means that Tainai is in a position to exercise its leverage over its TRB suppliers to induce them to cooperate.*  Thus, we find that it is reasonable to conclude that Tainai has some business mechanism to induce its suppliers to cooperate.  Furthermore, Taiani may choose not to do business with these suppliers in the future due to their lack of cooperation and instead select suppliers . . . willing to commit to participation in an AD review.  By applying AFA with respect to the missing data, Commerce is relying on the statutory means that it has available to induce the cooperation of these parties so that Commerce has the information necessary to calculate accurate dumping margins.

Decision Memo at 13–14, J.A. at 1,015–16, ECF No. 43 (emphasis added).  Although it is true that Shanghai Tainai purchased a large quantity of tapered roller bearing parts from its suppliers as a collective group, Commerce's analysis ignored the other side of the equation — whether such quantity was significant as to each supplier. Shanghai Tainai cited record evidence that "Tainai had multiple suppliers, all of

which only supplied a small portion of Tainai's needs . . . . Simply put, Tainai was not a significant enough customer of any of these entities to assert any market power over these entities."  Pls.' Br. at 21, ECF No. 32 (citing to Shanghai Tainai's Response to Section D of the Department's Initial Questionnaire at Ex. D-7, J.A. at 81,310–12, ECF No. 44, providing a diversified supplier chart and recording the percentage of total input quantity purchased from each supplier).    Whether Shanghai Tainai's claim was true as a factual matter was not established because Commerce failed to consider the question.  *See* Oral Arg. Tr. 15:13–16, ECF No. 52 (The Court:  "[Commerce] seems to speak in terms of generalities of what may be true in a large number of cases and not to the specific supplier scenario that [Shanghai Tainai] put data in the record to support.").  Such one-sided analysis is barred by the requirements that Commerce's determinations be supported by substantial evidence and that the evidence be "case specific."  *See Universal Camera Corp.*, 340 U.S. at 488 ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."); *Mueller*, 753 F.3d at 1234 ("Commerce cannot confine itself to a deterrence rationale and also must carry out a case-specific analysis of the applicability of deterrence and similar policies.").

The Government's arguments to the contrary miss the mark.  Its brief depends heavily on the idea that Shanghai Tainai failed to use its best efforts to cooperate with Commerce's requests for data because it waited until after the publication of the Preliminary Results to seek what it should have known was necessary data and then only asked its suppliers once for the information.  *See*

Def.'s Br. at 15, ECF No. 37; *see also id.* at 12 ("Substantial evidence supports Commerce's finding that Tainai and its unaffiliated suppliers failed to cooperate by not acting to the best of their ability in providing a complete and accurate response to requests for production information"); *id.* at 16 ("Commerce's determination that Tainai failed to act to the best of its ability is supported by substantial evidence[.]"). Commerce, however, made no such determination. It concluded precisely the opposite, writing "we find that Tainai has cooperated with Commerce's requests for information[.]" Decision Memo at 8, J.A. at 1,010, ECF No. 43. The Government's arguments otherwise are not merely *post hoc* rationalizations; they are directly contradicted by Commerce's Final Results. *See Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962) ("The courts may not accept appellate counsel's *post hoc* rationalizations for agency action[.]"). And when the Government did address Shanghai Tainai's arguments concerning the diversity of its supplier network, it did so by merely restating Commerce's finding that Shanghai Tainai accounted for the largest volume of entries of subject merchandise during the period of review and purchased a large quantity of tapered roller bearings from its suppliers. *See* Def.'s Br. at 19, ECF No. 37. That ignored Plaintiff's argument and data suggesting that it was not a large enough customer of any one supplier to induce compliance with Commerce's information requests. *See* Pls.' Br. at 21, ECF No. 32.

Commerce's determination to apply facts available with an adverse inference was also deficient for a second, independent reason: It failed to properly take into account the predominant interest in accuracy. *See Mueller*, 753 F.3d at 1233

("Commerce may rely on such policies as part of a margin determination for a cooperating party like Mueller, as long as the application of those policies is reasonable on the particular facts *and the predominant interest in accuracy is properly taken into account as well*.") (emphasis added).  It is true that, under the antidumping statute, Commerce has discretion to choose among facts available in order to draw an adverse inference.  *See* 19 U.S.C. § 1677e(b)(2) (providing that an adverse inference may rely on any information placed on the record).  However, "Commerce's discretion in these matters . . . is not unbounded" — especially for a cooperating party.  *De Cecco*, 216 F.3d at 1032.  The Federal Circuit has recognized that Commerce must appropriately balance the competing goals of accuracy and deterrence when it selects facts otherwise available with an adverse inference.  Although adverse facts are chosen in order to deter non-cooperation, "We find no support in our caselaw or the statute's plain text for the proposition that deterrence, rather than fairness or accuracy, is the overriding purpose of the antidumping statute when calculating a rate for a cooperating party."  *Changzhou Wujin Fine Chemical Factory Co., Ltd. v. United States*, 701 F.3d 1367, 1378 (Fed. Cir. 2012); *see also Mueller,* 753 F.3d at 1234 (Adverse inferences must be applied to arrive at "'a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to noncompliance,'" but for a cooperating party "the equities would suggest greater emphasis on accuracy in the overall mix.") (quoting *De Cecco*, 216 F.3d at 1032).  And, as the Government acknowledges, Commerce must support its selection of facts otherwise available with a reasonable

Case 1:22-cv-00038-SAV    Document 56    Filed 09/14/23    Page 30 of 53

Consol. Court No. 1:22-00038                                              Page 30

explanation. *See* Oral Arg. Tr. 10:12–23, ECF No. 52 (The Court: "[T]he Government would agree that however broad the discretion Commerce may have to pick among the facts available when drawing an adverse [inference], if there is a limit of some sort, that limit would at least be . . . Commerce needs to have an adequate explanation for its methodology about why it picked a particular fact . . . . Would that be fair?" Ms. Westercamp: "That's correct, Your Honor.").

Despite assigning Shanghai Tainai an eye-popping dumping margin of 538.79 percent, Commerce asserts that it carefully calibrated its choice of facts available to prioritize accuracy rather than deterrence. *See, e.g.*, Decision Memo at 13, J.A. at 1,015, ECF No. 43 ("[T]he manner in which we have applied partial AFA in this review is consistent with the Court's decision in *Mueller* (*i.e.*, consistent with the overriding purpose of the Act of fairness and accuracy) and the purpose of applying AFA, which is to deter non-cooperation without being punitive."). The Government catalogued what it presented as reasonable concessions that Commerce made when calculating Shanghai Tainai's dumping margin, arguing that "Commerce did not apply 'total' AFA, but rather took Tainai's efforts into account in reaching its determination, limiting its application of adverse facts available to only the missing information where Tainai's unaffiliated suppliers provided 100 percent of the factors of production for chrome steel, rollers, and turned cups and cones." Def.'s Br. at 13, ECF No. 37. Commerce "use[d] Tainai's own data" and substituted "the highest factor of production usage rate reported by Tainai's affiliated suppliers" for these inputs, which "has the effect of 'calibrating the remedy so that only purchases

from uncooperative producers impact Tainai's weighted-average dumping margin.'"
*Id.* at 17–18 (quoting Decision Memo at 13, J.A. at 1,105, ECF No. 43).

It is hard to see how Commerce's methodology could have effectively "[taken] Tainai's efforts into account" or "calibrat[ed] the remedy." *Id.* The dumping margin that Commerce calculated — 538.79 percent — wildly exceeded both the margin calculated in the Preliminary Results (36.75 percent) and the China-wide rate assigned to entities that did not participate in the investigation at all (92.84 percent). Despite Commerce's finding that Shanghai Tainai was a cooperative entity, the margin it calculated could hardly have been more punitive had Shanghai Tainai refused to participate. Commerce did not discuss how assigning such a high rate to a cooperating party could potentially disincentivize cooperation despite *Mueller*'s requirement that "Commerce must take into account that [the respondent is] a cooperating party and that Commerce's inducement/evasion approach to [the respondent's] rate calculation could discourage [the respondent's] own cooperation." *Mueller*, 753 F.3d at 1236. The dumping rate at issue in *Mueller* — 48.33 percent — is likewise dwarfed by the margin at issue here. Commerce's recitation of the ways in which it could have calculated an even higher margin does not satisfy its duty to explain the margin it did calculate.

Shanghai Tainai alleged in detail how Commerce's methodological choices resulted in such a high dumping margin. Commerce selected facts otherwise available by "applying the highest [factors of production] usage rate reported by Tainai's affiliated suppliers for turned cups and cones, tapered rollers, and cages

within each product type sourced solely from the unaffiliated suppliers for each associated CONNUM." Decision Memo at 13, J.A. at 1,015, ECF No. 43. But rather than select the usage rates "within each product type," Commerce selected them within a more general "component" category. Pls.' Br. at 26, ECF No. 32. Shanghai Tainai produces tapered roller bearings in three different component categories — assembly, cup, or cone — and each category can vary widely in weight and diameter. *See* Revised U.S. Sales Database, J.A. at 83,545, ECF No. 44. In order to sort Shanghai Tainai's bearings into distinct products, or CONNUMs, Commerce asked Shanghai Tainai to provide the product description (that is, the component type), the outer diameter, the inner diameter, and the product weight of each bearing. *See* Request for Information at Section C, J.A. at 1,448–49, ECF No. 43. By not selecting usage rates within the same "product type," surrogate values were calculated for bearings using data that came from different bearings that were up to five times heavier and nearly twice as large in diameter. *See* Pls.' Br. at 28, ECF No. 32. For example, a bearing with a total weight of less than one kilogram was calculated to use many times its total weight in turned cups and rollers — inputs that would not weigh more than the bearing into which they are incorporated. *Cf.* Revised U.S. Sales Database, J.A. at 83,545, ECF No. 44 (reporting tapered roller bearing CONNUMs as sold in the U.S.); Margin Calculation, Calculated Inputs, J.A. at 84,730–40, ECF No. 44 (calculating uniform input usage rates for tapered roller bearings of differing weights). This had the effect of greatly increasing the surrogate value of Shanghai Tainai's bearings. Rather than take into account the

Consol. Court No. 1:22-00038                                                    Page 33

other dimensions that Commerce used to sort bearings into distinct products or CONNUMs — inner diameter, outer diameter, and weight — Commerce looked only to the component category, "arbitrarily selecting a value without any consideration as to the enumerated factors identified by the Department as important in dividing, categorizing and analyzing the bearings." Pls.' Br. at 27, ECF. No. 32.

Commerce never explained how this methodological choice reflected "the overriding purpose of the Act of fairness and accuracy." Decision Memo at 13, J.A. at 1,015, ECF No. 43. Instead, it pointed to other, unrelated methodological choices; declared that *these* reflected Commerce's concern with accuracy; and failed to engage with the implications of its key choice to apply factors of production usage rates at the component level without taking diameter or weight into account. *See id.* When Shanghai Tainai challenged Commerce's choice in its ministerial error allegation,[7] Commerce responded that:

> While we were less than exact in our phrasing, the language in our memoranda and programing indicates our intention to apply the AFA on a product description[8] basis as that product was reported in the CONNUM. Thus, while Tainai and PCI may have preferred that we use a different methodology to apply partial AFA to certain of Tainai's [factors of production], we intentionally made the methodological choice to apply the highest [factor of production] usage rate for turned cups and cones, rollers, and cages to each CONNUM based on the product type using the descriptions Tainai provided . . . . Accordingly

---

[7] Because Commerce used facts otherwise available with an adverse inference for the first time in its Final Results, Shanghai Tainai did not have an earlier opportunity to challenge Commerce's methodology.

[8] "Product description" is one of four fields that Commerce used to create CONNUMs, each of which is a distinct tapered roller bearing product. The other fields were inner diameter, outer diameter, and weight. Shanghai Tainai used the "product description" field to capture the component type: assembly, cup, or cone. *See* Pls.' Br. at 27, ECF No. 32; *see also* Request For Information at Section C, J.A. at 1,448–49, ECF No. 43.

> we find this allegation does not qualify as a ministerial error pursuant
> to 19 CFR 351.224(f).

Ministerial Error Response at 3, J.A. at 13,469, ECF No. 43. The Government's

brief merely cited this rationale and concluded that "Commerce fully considered the

physical characteristics of the reported CONNUMs." Def.'s Br. at 27, ECF No. 37.

But simply resting on Commerce's discretion to do what it did fails to satisfy the

requirement to "carry out a case-specific analysis of the applicability of deterrence

and similar policies" when dealing with a cooperating respondent. *Mueller*, 753

F.3d at 1234. In such situations, Commerce must carefully explain how its

methodological choices — certainly including those that result in a 538.79 percent

dumping margin — prioritize accuracy over deterrence. *See id.* at 1234. Because

Commerce did not do so, it failed to ensure that "the predominant interest in

accuracy is properly taken into account," as the Federal Circuit requires. *Id.* at

1233.

In making this finding, the Court does not accept Shanghai Tainai's separate

argument that Commerce's dumping margin "is inherently excessive and must be

discarded" because the margin "def[ies] commercial and economic reality." Pls.' Br.

at 31, 34, ECF No. 32. Although *Baoding Mantong Fine Chemistry Co., Ltd. v.*

*United States*, 113 F. Supp. 3d at 1338, found that the "assignment of so prohibitive

a dumping margin as 453.79% as a remedial measure is difficult to comprehend

from a commercial or economic standpoint," the Federal Circuit later clarified that

there is no independent "commercial and economic reality" test. *See Nan Ya*

*Plastics*, 810 F.3d at 1344 (holding that "[w]hen Congress directs the agency to

Case 1:22-cv-00038-SAV    Document 56    Filed 09/14/23    Page 35 of 53

Consol. Court No. 1:22-00038                                        Page 35

measure pricing behavior and otherwise execute its duties in a particular manner, Commerce need not examine the economic or commercial reality of the parties specifically, or of the industry more generally, in some broader sense," and that Commerce's determination "reflects 'commercial reality' if it is consistent with the method provided in the statute, thus in accordance with the law.").

Nor does the Court decide Shanghai Tainai's claim that, because it purchased finished inputs, surrogate values for the materials used in these inputs were not needed so that there were no gaps in the record to fill. *See* Pls.' Br. at 23–24, ECF No. 32 ("Simply put, since it was a roller, or a turned cup or cone or a cage, and since the surrogate value data valued the roller, turned cup or cone or cage, the amount of raw material consumed, the labor and energy expended and the like which went into the roller was irrelevant. Such values were already included in the finished components."). The Court does not wish to tie the agency's hands given the breadth of the remand necessary to cure Commerce's errors. Should Commerce decide to base its calculations on the finished inputs rather than the materials used to make those inputs, it remains free to do so.

The Federal Circuit permits Commerce to draw an adverse inference against a cooperating party for the actions of its non-cooperative suppliers based on case-specific facts and analyses. Commerce's decision to invoke generalities to draw such an inference against Shanghai Tainai fails to meet this burden. Commerce also fails to discuss the incentives created by its decision to assess such a high dumping margin on a party the agency found to be cooperative. On remand, Commerce must

first consider the record evidence regarding the control that Shanghai Tainai could have exerted over its diversified suppliers and recognize that a deterrence rationale applied against a cooperating party that lacks the ability to control its suppliers may be unfair to that party. Commerce must then explain how its methodological choices — specifically those that tended to increase Shanghai Tainai's dumping margin — comported with its duty to prioritize accuracy over deterrence when dealing with a cooperating respondent. In doing so, Commerce must be attuned to the risk that calculating a dumping margin for a cooperating respondent that is significantly higher than the all-others rate given to non-participating entities "could discourage [the respondent's] own cooperation." *Mueller*, 753 F.3d at 1236. If Commerce finds that it lacks substantial evidence to conclude that Shanghai Tainai was in a position to induce cooperation from its suppliers or that its methodology of selecting facts otherwise available with an adverse inference did not sufficiently prioritize accuracy over deterrence, Commerce should take new action to bring its Final Results into conformity with the Federal Circuit's mandates.

### III.  Selection of Surrogate Values

When Commerce investigates an antidumping respondent that is based in a non-market economy country such as China, Commerce must value the subject merchandise using information taken from a market economy country. 19 U.S.C. § 1677b(c). Commerce does this by valuing the factors of production used to create the subject merchandise — such as raw materials, labor, and utilities — based on their value in a market economy country that is (1) at a comparable level of

Case 1:22-cv-00038-SAV   Document 56   Filed 09/14/23   Page 37 of 53

Consol. Court No. 1:22-00038                                          Page 37

development to the non-market economy country and (2) a significant producer of comparable merchandise. *Id.* § 1677b(c)(4). Commerce must select the "best available information" to value the factors of production. *Id.* § 1677b(c)(1). However, Commerce has "broad discretion" to select the market economy information that it uses to calculate surrogate values for a non-market economy respondent. *Zhejiang DunAn Hetian Metal*, 652 F.3d at 1341.

Here, Commerce determined that Brazil, Malaysia, Mexico, Romania, Russia, and Turkey were economically comparable to China and were significant producers of comparable merchandise during the period of review. *See* Preliminary Decision Memo at 6–7, J.A. at 13,076–77, ECF No. 43. Because the parties only placed complete surrogate value information for Romania on the record and because no party argued in favor of selecting a different country, Commerce did not consider surrogate value data from any country other than Romania. *Id.* at 7, J.A. at 13,077; *see also* Oral Arg. Tr. 41:11–12, ECF No. 52 (Mr. Craven: "We do not object to the use of Romania."). The Romanian surrogate value information on the record consisted of the financial statements of three Romanian entities: Compa S.A. Sibiu (Compa), URB Rulmenti Suceava (Rulmenti), and Timken Romania. Commerce determined that Timken Romania's financial statements were the best available information for calculating surrogate values because the company is "a producer of comparable merchandise, [the financial statements] are contemporaneous with the POR, demonstrate profitability, are publicly available, are free of known countervailed subsidies, and generally satisfy Commerce's criteria for selecting

surrogate companies." Decision Memo at 19–20, J.A. at 1,021–22, ECF No. 43. Commerce determined that Compa's financial statements were not suitable for use in deriving surrogate values "because [Compa] is not a producer of comparable merchandise." Instead, it "manufactures valves, windscreen wiper components, and components for turbochargers and injections systems, none of which are comparable to TRBs." *Id.* at 18, J.A. at 1,020. Commerce also determined that Rulmenti's financial statements were not usable because "[i]t is Commerce's practice to only consider companies that are profitable for calculation of surrogate financial rations" and "[d]uring the POR, Rulmenti operated at a loss." *Id.*

Shanghai Tainai challenges Commerce's decision to rely on Timken Romania's financial statements and exclude those of Compa and Rulmenti. *See* Pls.' Br. at 35, ECF No. 32. Shanghai Tainai cites Commerce's "preference for multiple financial statements," alleges that Compa produces comparable merchandise to Shanghai Tainai because Compa "engages in the precision grinding and finishing of metal components and assembles them into finished goods," and claims that Rulmenti's lack of profit is "a defect which can be readily remedied by setting the profit to zero." *Id.* at 37–38. Conversely, Shanghai Tainai argues that Timken Romania's financial statement "is badly distorted by a significant number of affiliated party transactions and its active participation as a member of the Timken Group." Plaintiff "submits that these distortions are so significant as to require the non-use of this financial statement." *Id.* at 38. In particular, Shanghai Tainai takes issue with the fact that the Timken Group is "a large group of inter-related

bearing producers including U.S. producers with an incentive to exclude, or otherwise limit, international competitors such as Tainai from the U.S. market" and conducts operations that "are significantly more complex than the operations undertaken by Tainai." *Id.* at 39–40. Shanghai Tainai notes that the Timken Group "was an active participant in the review on behalf of the domestic industry." *Id.* at 38. In the alternative, Shanghai Tainai argues that Commerce should have at least averaged the three financial statements together to "help avoid the distortion that results from the use of a single financial statement." *Id.* at 42.

The Government rebuts Shanghai Tainai's claims by first referencing Commerce's determination that the record contained only one usable financial statement — that of Timken Romania — so that Commerce's preference for using multiple financial statements was not applicable here. Def.'s Br. at 33, ECF No. 37. The Government next argues that the distortions alleged by Shanghai Tainai did not render Timken's financial statement unusable. Although Timken Romania belongs to the Timken Group, which participated in the underlying administrative review of the order on the side of the domestic industry, the Government cited to Commerce's explanation that "it has previously used surrogate financial statements of entities that are affiliated with the petitioners and such a status does not disqualify a given financial statement from consideration." *Id.* (citing Decision Memo at 19, J.A. at 13,405, ECF No. 43). Further, the Timken Group's status as a large group of inter-related bearing producers that conducts complex operations should not be disqualifying given that Commerce found that Shanghai Tainai was

itself part of "a multinational group of inter-related bearing producers." *Id.* at 34 (citing Decision Memo at 19, J.A. at 13,405, ECF No. 43).  The Government thus concludes that record evidence supported Commerce's determination that Timken Romania's financial statements constituted the best available information for calculating surrogate values.  *Id.*

The Government is correct.  Because Shanghai Tainai did not object to the selection of Romania as the surrogate country, Commerce had a limited universe of financial statements to choose from in calculating surrogate values.  Each financial statement was flawed.  In the ensuing "ugly dog contest," Commerce was forced to rank these flaws and come to a reasonable determination regarding which financial statement was "the least bad one."  Oral Arg. Tr. 42:15, 43:8, ECF No. 52.  At oral argument, the Court registered its concern that Timken Romania's parent "is a competitor of [Shanghai Tainai]" and was "the instigator" of the challenged administrative review.  *Id.* at 42:23–24.  However, Timken Romania's financial statements were "accompanied by an auditor's report that identifies no irregularities in Timken Romania's reporting."  Decision Memo at 19, J.A. at 1,021, ECF No. 43.  The Court therefore declines to find that it was unreasonable for Commerce to reject the financial statements of companies that did not manufacture bearings or turn a profit — flaws that are worse than those of Timken Romania.  Shanghai Tainai tellingly noted that ranking these flaws amounts to "a weighing question."  Oral Arg. Tr. 44:15, ECF No. 52.  Yet, this Court may not reweigh the evidence and substitute its judgment for Commerce's.  *See Matsushita Elec.*, 750

F.2d at 936. Rather, the Court may only review the record to ascertain "whether a reasonable mind could conclude that Commerce chose the best available information." *Jiaxing Bro. Fastener Co. v. United States*, 822 F.3d 1289, 1300–01 (Fed. Cir. 2016). The parties bear the burden of building the record from which Commerce makes its decision. *See Qingdao Sea-Line Trading Co., Ltd. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014) ("The burden of creating an adequate record lies with the interested parties and not with Commerce.") (citing *QVD Food Co., Ltd. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011)). Given the limited options the parties placed on the record, the Court declines to second-guess Commerce's determination.

## IV.  Section 301 Duties

### A.  Deduction of Section 301 Duties from U.S. Price

In calculating Shanghai Tainai's dumping margin, Commerce deducted Section 301 duty payments from the U.S. price of the subject merchandise. Decision Memo at 22, J.A. at 1,024, ECF No. 43. This increased Shanghai Tainai's dumping margin by reducing the U.S. price. Under 19 U.S.C. § 1677a(c)(2)(A), "[U.S. price] shall be reduced by the amount, if any, included in such price, attributable to any . . . . United States import duties, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States." This helps ensure an "apples [to] apples" comparison between merchandise sold in the home market and the U.S. market by

deducting costs associated with transporting merchandise to the United States. *Smith-Corona Group v. United States*, 713 F.2d 1568, 1578 (Fed. Cir. 1983).

However, not all duties are deductible as "United States import duties." For instance, antidumping duties are considered "special duties" distinct from "United States import duties" and are not deducted from U.S. price because doing so would create a circularity problem in which the imposition of antidumping duties would itself result in increased antidumping duties. *See Power Steel Co., Ltd. v. United States*, No. 20-03771, 2021 WL 6098309 at *3 (CIT Dec. 23, 2021). Shanghai Tainai argues that this same treatment should be extended to Section 301 duties, which are imposed when the United States Trade Representative determines that the actions of a foreign government are unreasonable or discriminatory and burden or restrict U.S. commerce. *See* 19 U.S.C. § 2411(b)(1). Although Shanghai Tainai did not cite any authority for its argument, it believes these duties are akin to antidumping duties because they are imposed "in response to a specific conditions" [*sic*] and are removed when that condition is resolved. Pls.' Br. at 45–46, ECF No. 32. By contrast, deductible "U.S. import duties" should be interpreted to include only "ordinary customs duties" that "are not contingent on external events, but rather are ordinary duties at bound rates and cannot be 'avoided' by taking actions to comply with demands for action." *Id.* at 46. The Government rejects Shanghai Tainai's argument. It first cites *Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1362 (Fed. Cir. 2007) for the proposition that "[n]ormal customs duties . . . have no termination provision and are permanent unless modified by Congress."

Def.'s Br. at 35, ECF No. 37.  The Government then notes that Commerce has determined that Section 301 duties "are normal customs duties as they have been imposed without a termination date" and that Commerce's consistent practice is to deduct them as U.S. import duties.  *Id.*

On March 15, 2023, the Federal Circuit decided *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 63 F.4th 25 (Fed. Cir. 2023).  There, the Federal Circuit held that certain duties imposed under Section 232, a separate statute that provides for duties to remedy national security threats, were deductible from U.S. price as "United States import duties."  *See* 19 U.S.C. § 1677a(c)(2)(A).  The Federal Circuit reasoned that Presidential Proclamation 9705, which enacted the Section 232 duties at issue, "makes clear that the duty newly being imposed was to add to, and not partly or wholly offset, the antidumping duties that would be due without the new duty."  *Borusan*, 63 F.4th at 34.  The Federal Circuit cited language in Proclamation 9705 declaring that the duties are to be imposed "in addition to any other duties" and that "[a]ll anti-dumping, countervailing, or other duties and charges applicable to such goods shall continue to be imposed."  Proclamation 9705 Adjusting Imports of Steel into the United States, clause 2, 83 Fed. Reg. 11,625, 11,627, 11,629 (Mar. 15, 2018).  The Federal Circuit concluded from this language that:

> [W]hen applied to an article covered by antidumping duties, the Proclamation 9705 and antidumping duties must together result in a full imposition of both duties . . . . *i.e.*, by subtraction of the Proclamation 9705 duty from the U.S. price if the Proclamation 9705 duty is built into it.  Otherwise, the Proclamation 9705 duty would be offset substantially or completely by a reduction in the antidumping

> duty itself (through an increase in the U.S. price and therefore a
> decrease in the dumping margin), defeating the evident 'in addition to'
> prescription of Proclamation 9705.

*Borusan*, 63 F.4th at 35.  Declining to deduct the Section 232 duties imposed by

Proclamation 9705 would have the effect of increasing the U.S. price of Borusan's

merchandise and thereby reduce its dumping margin and antidumping liability,

vitiating Proclamation 9705's requirement that its duties add to, rather than

subtract from, any antidumping duties owed on subject merchandise.  The Federal

Circuit therefore upheld Commerce's decision to deduct these Section 232 duties

from U.S. price by treating them as "United States import duties."

The parties did not reference *Borusan* in their briefing.  This Court ordered

supplemental briefing on the applicability of *Borusan* and the Court of

International Trade decision it upheld, *see Borusan Mannesmann Boru Sanayi ve

Ticaret A.S. v. United States*, 494 F. Supp. 3d 1365 (CIT 2021), to the deductibility

of Section 301 duties.  *See* Def.'s Supp. Br., ECF No. 53; Pls.' Supp. Br., ECF No. 54.

The Government described Commerce's determination that Section 301 duties are

deductible "United States import duties" as consistent with the Federal Circuit's

reasoning in *Borusan*.  Specifically, the Government invoked the language of the

legal instrument that proposed the Section 301 duties.  *See* Notice of Determination

and Request for Public Comment Concerning Proposed Determination of Action

Pursuant to Section 301:   China's Acts, Policies, and Practices Related to

Technology Transfer, Intellectual Property, and Innovation (Notice of

Determination Pursuant to Section 301), 83 Fed. Reg. 14,906 (U.S. Trade Rep. Apr.

Case 1:22-cv-00038-SAV    Document 56    Filed 09/14/23    Page 45 of 53

Consol. Court No. 1:22-00038                                                    Page 45

6, 2018).  Like Proclamation 9705, the Notice of Determination provided that "the proposed action is *an additional duty* of 25 percent on a list of products of Chinese origin identified in the Annex to this Notice."  Notice of Determination Pursuant to Section 301, 83 Fed. Reg. at 14,907 (emphasis added).  To illustrate, the Notice explained that, "if a good of Chinese origin is currently subject to a zero ad valorem rate of duty, the product would be subject to a 25 percent ad valorem rate of duty; if a good of Chinese origin were currently subject to a 10 percent ad valorem rate of duty, the product would be subject to a 35 percent ad valorem rate of duty, and so on."  *Id.*  The Government argues that this language "clearly implies that Section 301 duties are intended to be imposed *in addition* to other duties."  Def.'s Supp. Br. at 8, ECF No. 53.

The Notice of Determination Pursuant to Section 301 did not, by itself, enact the Section 301 duties.  The instrument that did, the Notice of Action Pursuant to Section 301, 83 Fed. Reg. 40,823 (U.S. Trade Rep. Aug. 16, 2018), also refers to the Section 301 duty as an "additional duty."  *Id.* at 40,824.  Indeed, the Notice of Action contains even stronger language than the Notice of Determination, providing that "[p]roducts of China that are provided for in new HTSUS heading 9903.88.02, as established by Annex A of this notice . . . will be subject to an additional ad valorem duty of 25 percent.  The rates of duty applicable to products of China that are provided for in new HTSUS heading 9903.88.2 *apply in addition to all other applicable duties, fees, exactions, and charges*."  *Id.* at 40,824 (emphasis added). This language tracks that of Proclamation 9705, which "directed that the [Section

232 duty] was to be imposed 'in addition to any other duties, fees, exactions, and charges applicable to such imported steel articles.'" *Borusan*, 63 F.4th at 29 (quoting Proclamation 9705, 83 Fed. Reg. at 11,627). Under *Borusan*, Commerce's decision to treat Section 301 duties as deductible "United States import duties" is correct.

Shanghai Tainai fails to engage with the order's language and instead argues that Section 301 duties are different in kind from Section 232 duties because the latter "are put in place to protect the National Security and have no end point" whereas the former "are subject to termination after 4 years absent an affirmative determination to extend such duties." Pls.' Supp. Br. at 7, ECF No. 54. Shanghai Tainai argues for applying a set of factors from *Wheatland Tube Co. v. United States*, 495 F.3d 1355 (Fed. Cir. 2007), which found that yet another class of duties, Section 201 "safeguard" duties, were non-deductible special duties akin to antidumping duties. The *Wheatland Tube* factors are (1) whether the duties are remedial duties that provide relief from the adverse effects of imports; (2) whether the duties are imposed as a result of a finding of injury or threat to a U.S. industry; and (3) whether the duties provide only temporary relief. *Id.* at 1362. Shanghai Tainai asserts that Section 301 duties pass the *Wheatland Tube* test for non-deductibility because the duties "were imposed in order to provide relief from unfair competition in the form of the theft of intellectual property," "were the result of an express finding of threat to the U.S. as a result of the conduct in question," and "provide only temporary relief." Pls.' Supp. Br. at 8, ECF No. 54.

Case 1:22-cv-00038-SAV    Document 56    Filed 09/14/23    Page 47 of 53

Consol. Court No. 1:22-00038                                                        Page 47

However, *Borusan* instructs that it is the text of the legal order levying duties that is paramount; and it is unnecessary for a reviewing court to apply the *Wheatland Tube* factors where that text has spoken clearly. *See Borusan*, 63 F.4th at 36 ("We do not decide whether [the holding] could soundly rest on distinctions between § 232 and the § 201 regime more generally, and the distinction between 'normal' and 'special' duties . . . . That approach presents challenges that we may avoid. The Commerce decision sufficiently rests on the proclamation-specific basis set forth above."). If the legal instrument enacting statutory duties provides that such duties are intended to be additional to existing duties, then it is reasonable for Commerce to treat them as "United States import duties" and deduct them from the U.S. price when calculating dumping margins. This principle, as elucidated in *Borusan*, extends beyond Section 232 duties and applies to other statutory duties. *See id.* at 33 ("If a statute merely authorizes a governmental officer or body to impose a duty, as § 232 authorizes the President to do, it is the particular exercise of the authority that determines — based on the character of that exercise — whether the prescribed duty comes within [United States import duties].").  Here, "the particular exercise of the authority" to enact the Section 301 duties at issue intended for these duties to be additional to antidumping duties. The Court therefore affirms Commerce's determination.

**B. Capping of Amounts Denominated as "Additional Revenue for 301"**

In its brief, Shanghai Tainai claims that Commerce wrongly limited "payments denominated as 'additional revenue for 301' to the amount of Section 301

duties paid on the goods." Pls.' Br. at 46, ECF No. 32. The nature of this claim was initially unclear to both the Court and the Government. *See* Oral Arg. Tr. 31:6–16, ECF No. 52. At oral argument, Shanghai Tainai clarified what it believed happened:

> MR. CRAVEN: [T]he price reported in the sales database consisted of two elements. There was the selling price on the invoice to the customer, and there was a second line on the invoice that was denominated as 301 duties for certain customers. We have requested that the price include both the price paid for the good and the price charged to the client for the increase in price for the 301 duties. For certain clients Tainai simply raised the price on the invoice. For other clients, to justify the price increase, they denominated them as 301 duties.
>
> The Commerce Department determined that they would only allow us to raise the price on the 301 duties to the extent that we had paid 301 duties and that any difference between those two was not allowed to be added to the U.S. price. So if, for example, the 301 duties were 95 cents and on the line item called 301 duties Tainai reported a dollar, the Commerce Department reduced the dollar to 95 cents.

*Id.* at 33:14–34:5. Here, Shanghai Tainai was direct — it saw an opportunity to mask a price increase by invoicing the increase as part of the Section 301 duty payment. It did so by billing customers for more than the actual amount of the Section 301 duties. *Id.* That tended to increase the U.S. price of the subject merchandise; but Commerce reduced these overcharges by capping them at the actual amount of the Section 301 duties, reducing the U.S. price and thereby increasing Shanghai Tainai's dumping margin.[9]

---

[9] At oral argument, the Court asked Shanghai Tainai's counsel to clarify how its challenge to Commerce's capping of Section 301 duty charges was distinct from its challenge to Commerce's deduction of Section 301 duties. Shanghai Tainai's counsel responded that its capping claim "has nothing to do" with deduction but rather "is a question simply of what

Commerce justified its decision by invoking its general practice "not to attribute revenue from related expenses to the price of subject merchandise because that uncapped amount represents profit on the sale of services, not profit on the sale of the merchandise." Decision Memo at 24, J.A. at 1,026, ECF No. 43. Commerce analogized these revenues to revenue that respondents receive from providing U.S. freight, citing to a past determination in which Commerce found "that it would be inappropriate to increase the gross unit price for subject merchandise because of profits earned on the provision or sale of freight; such profits should be attributable to the sale of the freight service, not to the subject merchandise." *Id.* at 24–25, J.A. at 1,026–27. Commerce also claimed that it was limited by 19 C.F.R. § 351.501(c), which directs Commerce to calculate U.S. price "net of price adjustments . . . that are reasonably attributable to the subject merchandise[.]" Price adjustments are defined as "a change in the price charged for subject merchandise . . . such as a discount, rebate, or other adjustment, including, under certain circumstances, a change that is made after the time of sale, that is reflected in the purchaser's net outlay." 19 C.F.R. § 351.102(b)(38). Commerce "note[d] that U.S. import duty revenues are not included in the list provided at 19 CFR 351.102(b)(38)." Decision Memo at 25, J.A. at 1,027, ECF No. 43. Commerce therefore concluded that it would "continue to cap additional tariff revenue by the amount of Section 301 duties applicable to each sale." *Id.*

---

the client paid to Tainai for the goods . . . [the amounts] were collected long after the duty was paid and it was collected for the goods." Oral Arg. Tr. 36:4–15, ECF No. 52.

The Court struggles to see the reason in Commerce's determination that the additional amounts Shanghai Tainai charged its customers in excess of Section 301 duties were "profit[s] on the sale of services, not profit[s] on the sale of the merchandise." *Id.* at 24, J.A. at 1,026. Costs to the customer associated with Section 301 duties were invoiced as part of the cost of the merchandise, and Commerce did not explain what "service" Shanghai Tainai provided its customers by passing along the padded cost of the Section 301 duties to them. At any rate, it is unclear why these amounts were attributable to the sale of services when "uncapped," but could become part of U.S. price up to the amount of the Section 301 duties, as Shanghai Tainai pointed out. *See* Pls.' Supp. Br. at 9, ECF No. 54 ("The United States does not dispute that this additional revenue should be part of the price paid or payable, but rather only disputes that portion of the revenue which exceeds the amount of the 301 duty reported as paid on the entry.").

The Court further finds Commerce's textual analysis unreasonable. 19 C.F.R. § 351.401(c) directs Commerce to calculate U.S. price "net of price adjustments," and "price adjustment" is defined as "a change in the price charged for subject merchandise . . . such as a discount, rebate, or other adjustment, including, under certain circumstances, a change that is made after the time of sale, that is reflected in the purchaser's net outlay." 19 C.F.R. § 351.102(b)(38). Commerce claims that the amounts at issue do not meet this definition of a "price adjustment" because "U.S. import duty revenues are not included in the list provided at 19 CFR 351.102(b)(38)." Decision Memo at 25, J.A. at 1,027, ECF No.

43; *see also* Oral Arg. Tr. 38:22–23, ECF No. 52 (counsel for the Government arguing that the charges are not price adjustments "because, again, these aren't rebates. These aren't deductions. This is a 301 duty."). However, that list is bookended by the terms "such as" and "or other adjustment." *See* 19 C.F.R. § 351.102(b)(38). These terms clarify that the regulation's list of price adjustments is not exhaustive, and a change in price need not be enumerated in order to qualify as a "price adjustment" within the meaning of § 351.401(c). *See Vazquez-Claudio v. Shinseki*, 713 F.3d 112, 115 (Fed. Cir. 2013) ("[T]he list . . . is preceded by 'such as,' and is therefore non-exhaustive."); *Alta Wind I Owner Lessor C v. United States*, 897 F.3d 1365, 1373 (Fed. Cir. 2018) (list of contracts that ended with "or other similar agreements" was "non-exhaustive"). Commerce's interpretation of the regulation is at odds with its plain text. On remand, Commerce must explain why the amounts at issue constitute profits on the sale of services rather than profits on the sale of merchandise and must consider whether there is any basis to exclude such amounts from the "price adjustments" described by § 351.401(c) and § 351.102(b)(38).

## V. By-Product Offset

Commerce's established practice is to "grant an offset to normal value, for sales of by-products generated during the production of subject merchandise, if the respondent can demonstrate that the by-product is either resold or has commercial value and re-enters the respondent's production process." *Arch Chemicals, Inc. v. United States*, 33 CIT 954, 956 (2009). The burden is on the respondent to provide

Commerce with sufficient information to support its claim of a by-product offset. *Id.* A respondent does not meet this burden if it fails to "document the quantity of scrap produced during the period of review" and merely "equate[s] total scrap sold during the period of review with total scrap produced during the period of review." *American Tubular Products, LLC v. United States*, 847 F.3d 1354, 1361 (Fed. Cir. 2017). Here, Shanghai Tainai concedes that "the quantity of scrap produced is not directly recorded" but attempts to argue that "the quantity of scrap produced is the same as the quantity of scrap sold." Pls.' Br. at 52, ECF No. 32. Because that argument is insufficient, Commerce's decision to deny Shanghai Tainai a by-product offset must be upheld.

## CONCLUSION

Shanghai Tainai brings a litany of challenges to Commerce's thirty-third administrative review of the antidumping order on tapered roller bearings from China. These challenges are of varying quality; accordingly, some have found the mark and others have fallen short. Shanghai Tainai is correct that Commerce failed to adequately explain both its use of facts otherwise available with an adverse inference against a cooperating respondent and its capping of price increases that were invoiced as Section 301 duty payments. However, this Court finds that Shanghai Tainai's other complaints — that Commerce's dumping margin defied commercial reality, relied on defective surrogate entity financial statements, wrongly deducted Section 301 duties from U.S. price, and failed to include a by-product offset — are without merit.

Consol. Court No. 1:22-00038                                        Page 53

The Court therefore **GRANTS IN PART** and **DENIES IN PART** Shanghai Tainai's Motion for Judgment on the Agency Record and **REMANDS** Commerce's Final Results for additional explanation consistent with this opinion. Commerce shall file its Remand Redetermination with the Court within 120 days of today's date. Defendant shall supplement the administrative record with all documents considered by Commerce in reaching its decision in the Remand Redetermination. Plaintiffs shall have thirty days from the filing of the Remand Redetermination to submit comments to the Court; and Defendant shall have thirty days from the date of Plaintiffs' filing of comments to submit a reply. Any revisions Commerce makes to the dumping margin assigned to Shanghai Tainai will be extended to the Consolidated Plaintiffs.

**SO ORDERED**.

Stephen Alexander Vaden, Judge

Dated: September 14, 2023
New York, New York

*Shanghai Tainai Bearing Co., Ltd. and C&U Americas, LLC v. United States*,
Slip Op 24-142 (December 18, 2024)

Slip Op. No. 24-142

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| SHANGHAI TAINAI BEARING CO., LTD. and C&U AMERICAS, LLC, | |
| *Plaintiffs*, | |
| *and* | |
| PRECISION COMPONENTS, INC., XINCHANG NEWSUN XINTIANLONG PRECISION BEARING MANUFACTURING CO., LTD, and HEBEI XINTAI BEARING FORGING CO., LTD, | Before: Stephen Alexander Vaden, Judge |
| *Consolidated Plaintiffs*, | Consol. Court No. 1:22-cv-00038 |
| v. | |
| UNITED STATES, | |
| *Defendant*. | |

# OPINION

[Sustaining Commerce's Remand Determination.]

Dated: December 18, 2024

*David J. Craven*, Craven Trade Law LLC, of Chicago, IL, for Plaintiffs and Consolidated Plaintiffs.

*Geoffrey M. Long*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant United States. With him on the brief were *Kara M. Westercamp*, Senior Trial Counsel, *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, Commercial Litigation Branch, *L. Misha Preheim*, Assistant Director,

Commercial Litigation Branch, and *Jesus N. Saenz*, Of Counsel, U.S. Department of Commerce, Office of the Chief Counsel for Trade Enforcement & Compliance.

**Vaden, Judge:**   Before the Court is the U.S. Department of Commerce's (Commerce) remand determination in the thirty-third administrative review of the antidumping order on tapered roller bearings from China, filed pursuant to the Court's opinion in *Shanghai Tainai Bearing Co. v. United States* (*Tainai I*), 47 CIT __, 658 F. Supp. 3d 1269 (2023).   In *Tainai I*, the Court ordered Commerce to further explain or reconsider its use of partial facts available with an adverse inference. Specifically, the Court asked about the level of control Shanghai Tainai Bearing Co., Ltd. (Tainai) could exert over its unaffiliated suppliers and whether it is fair to apply a deterrence rationale against Tainai when it was a cooperating party.   The Court also ordered Commerce to further explain its decision to exclude from U.S. price additional revenue Tainai collected in addition to the amount collected for Section 301 duties.   For the following reasons, Commerce's remand determination is **SUSTAINED**.

## BACKGROUND

The Court presumes familiarity with this case's facts as described in its previous opinion. *See Tainai I*, 47 CIT __, 658 F. Supp. 3d at 1273–81.   This opinion recounts the facts relevant to review of the Remand Results. On September 14, 2023, the Court issued its decision granting in part and denying in part Tainai's Motion for Judgment on the Agency Record.   *Id.* at 1273.   Two issues from the prior opinion remain relevant in this remand determination.

Case 1:22-cv-00038-SAV    Document 74    Filed 12/18/24    Page 3 of 32

Consol. Court No. 1:22-cv-00038                                            Page 3

First, the Court held that Commerce improperly applied facts available with an adverse inference against Tainai based on the noncooperation of its unaffiliated third-party suppliers. *Id.* at 1289. Under Federal Circuit precedent, Commerce may apply facts available with an adverse inference against a cooperating party under limited circumstances. *See Mueller Comercial De Mexico v. United States*, 753 F.3d 1227, 1233–36 (Fed. Cir. 2014). Namely, Commerce must (1) determine that application of a deterrence-based rationale is reasonable based on the "particular facts" of the review and (2) take into account "the predominant interest in accuracy." *Id.* at 1233. The first factor requires Commerce to consider whether a respondent can influence its suppliers' decision to cooperate. *Id.* at 1234–35.

Tainai manufactures tapered rolling bearings and purchases inputs for its merchandise from numerous suppliers. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 Fed. Reg. 47,731, 47,736 (Dep't of Com. Aug. 6, 2020); *see* Tainai Resp. to Section D of the Dep't.'s Initial Questionnaire (Section D Questionnaire Resp.), Ex. D-7, J.A. at 81,309–12, ECF No. 44. Tapered roller bearings are comprised of four basic components: rollers, cages, cups, and cones. Section D Questionnaire Resp. at D-8, J.A. at 81,163, ECF No. 44. In the administrative review, Tainai reported these components as "factors of production." *Id.* at D-15, J.A. at 81,170. "Factors of production" is a statutory term that refers to the direct material inputs that go into a final product. 19 U.S.C. § 1677b(c)(3) ("[F]actors of production … include … quantities of raw materials employed .…"); *CP Kelco U.S., Inc. v. United States*, 949 F.3d 1348, 1357–58 (Fed. Cir. 2020) ("Commerce

Case 1:22-cv-00038-SAV    Document 74    Filed 12/18/24    Page 4 of 32

Consol. Court No. 1:22-cv-00038                                    Page 4

evaluates whether something is a factor of production by determining whether it is a direct material input.").  In a non-market economy like China, Commerce uses data detailing prices and descriptions of these inputs to determine the home (Chinese) market price of the subject merchandise, which it ultimately compares to the company's export (U.S.) price to calculate the dumping margin.  19 U.S.C. § 1677b(c)(1)(A)–(B); 19 U.S.C. § 1673.

During the administrative review, Commerce asked Tainai to submit data to substantiate the factors of production it reported.  Initial Questionnaire at D-4, J.A. at 1,474, ECF No. 43.  After sending supplemental questionnaires to Tainai and its suppliers, Commerce obtained the requested data for all factors of production that were used in Tainai's in-house production and its affiliated suppliers' production. Tainai Suppl. Questionnaire Resp. at 27, J.A. at 82,201, ECF No. 44.  But Tainai's unaffiliated suppliers did not respond to the requests.  Tainai Second Suppl. Questionnaire Resp. at 6, J.A. at 84,320, ECF No. 44.  Tainai explained that it requested the data from its unaffiliated suppliers, but the suppliers either did not reply or refused to send the data.  *Id.*  Commerce found that, although Tainai cooperated to the best of its ability, the company's unaffiliated suppliers did not, which left a gap in the record regarding factors of production data.  Decision Mem. for the Final Results of the 2019-2020 Admin. Review of the Antidumping Duty Order on Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China (Decision Mem.) at 7–8, J.A. at 1,009–10, ECF No. 43. Based on the unaffiliated suppliers' noncooperation, Commerce applied facts

Case 1:22-cv-00038-SAV   Document 74   Filed 12/18/24   Page 5 of 32

Consol. Court No. 1:22-cv-00038                                          Page 5

available with an adverse inference to fill that gap, and it assigned Tainai an eye-popping dumping margin of 538.79 percent.  *Id.* at 10, J.A. at 1,012, ECF No. 43 (applying adverse inference); *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China:  Final Results and Partial Rescission of Review; 2019-2020*, 87 Fed. Reg. 1120, 1121 (Dep't of Com. Jan. 10, 2022) (assigning dumping margin).

Tainai explained that, even though it is a large supplier of tapered roller bearings for the American market, it has a diverse supply chain.  *See* Pls.' Mot. for J. on Agency R. (Pls.' Mot.) at 21, ECF No. 32.  The company purchases comparatively small percentages of its inputs from numerous suppliers.  *Id.*  Tainai argued that it does not buy enough from any one supplier to influence that supplier to cooperate with Commerce's requests for information.  *Id.* ("Tainai was not a significant enough customer of any of these entities to assert any market power over [them].").  The Court agreed and found that Commerce's decision to apply partial facts available with an adverse inference against the otherwise-cooperative Tainai, based on its unaffiliated suppliers' noncooperation, was unsupported by substantial evidence. *Tainai I*, 47 CIT __, 658 F. Supp. 3d at 1284–85.  Commerce had not addressed this argument or the data Tainai submitted to demonstrate its lack of influence over its suppliers.  *Id.* at 1285.  Thus, the agency failed to "carry out a case-specific analysis of the applicability of deterrence and similar policies."  *Id.* at 1288 (quoting *Mueller*, 753 F. 3d at 1234).  Accordingly, the Court remanded the issue for further explanation or reconsideration.

Case 1:22-cv-00038-SAV    Document 74    Filed 12/18/24    Page 6 of 32

Consol. Court No. 1:22-cv-00038                                    Page 6

Second, the Court held that Commerce failed to explain its decision to "cap" additional revenue Tainai received from its customers related to its Section 301 duties. *Id.* at 1296. Section 301 duties are duties imposed to combat unfair trade practices in foreign countries. 19 U.S.C. § 2411. Under 19 U.S.C. § 1677a(c)(2)(A), Commerce must deduct "United States import duties" from a respondent's U.S. price. This Court has applied the Federal Circuit's analysis in *Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. United States*, 63 F.4th 25 (Fed. Cir. 2023), to hold that Section 301 duties are "United States import duties" for the purposes of § 1677a(c)(2)(A) and must be deducted from a respondent's U.S. price. *See, e.g.*, *Tainai I*, 47 CIT __, 658 F. Supp. 3d at 1293–94; *Jinko Solar Imp. & Exp. Co. v. United States*, 48 CIT __, 701 F. Supp. 3d 1367, 1390–92 (2024). Tainai's practice of charging more than the amount of actual Section 301 duty charges to its customers raises the question of whether Commerce should also deduct those extra amounts from Tainai's U.S. price.

Tainai billed its customers for the actual amount of Section 301 duties it owed to the U.S. Government. Tainai Suppl. Questionnaire Resp. at 11–12, J.A. at 82,185–86, ECF No. 44. It also tacked an additional charge for the duties onto its customers' invoices. Decision Mem. at 23, J.A. at 1,025, ECF No. 43. This billing practice raised the amount paid by U.S. purchasers. In the administrative review, Commerce excluded both the actual amount of Section 301 duties and Tainai's additional revenue charges from the U.S. price, which resulted in a lower U.S price. *Id.* at 24–25, J.A. at 1,026–27. Because dumping margins are determined by comparing the

sales price in the United States to the sales price in the home market, *see* 19 U.S.C. § 1673, anything that reduces U.S. price makes the dumping margin rise. Therefore, Commerce's decision to deduct the additional Section 301 duty charges increased Tainai's dumping margin by reducing the U.S. price. Tainai argued that Commerce improperly excluded the additional revenue from the U.S. price. Pls.' Mot. at 46, ECF No. 32. Commerce responded that, "consistent with its practice," it would not attribute Tainai's revenue from related expenses to the price of subject merchandise "because it 'represents profit on the sale of *services*, not profit on the sale of the *merchandise*.'" Def.'s Br. at 36–37, ECF No. 37 (citing Decision Mem. at 24, J.A. at 1,026, ECF No. 43). The Court ordered Commerce to (1) explain how the additional revenue is related to profits on the sale of services and not on the sale of subject merchandise and (2) consider "whether there is any basis to exclude such amounts from the 'price adjustments' described by [19 C.F.R.] § 351.401(c) and [19 C.F.R.] § 351.102(b)(38)." *Tainai I*, 47 CIT __, 658 F. Supp. 3d at 1296; *see also* Remand Results at 3, ECF No. 57.

Commerce published its Remand Results on January 12, 2024. Remand Results, ECF No. 57. It reduced the dumping margins for both Tainai and the non-examined companies under review from 538.79 percent to 76.58 percent. *Id.* at 29. The agency set forth a new determination explaining its reconsideration of the application of facts available with an adverse inference and its decision to continue excluding the additional revenue Tainai collected in connection with Section 301 duties from Tainai's U.S. price. *See id.* at 8–29.

Case 1:22-cv-00038-SAV    Document 74    Filed 12/18/24    Page 8 of 32

Consol. Court No. 1:22-cv-00038                                    Page 8

On the issue of whether drawing an adverse inference was appropriate, Commerce changed positions under protest. It found, "Upon a reexamination of record evidence, we are unable to determine, based on this record, whether Tainai has sufficient control over its suppliers to induce their cooperation in the underlying administrative review." *Id.* at 10. Commerce modified its calculations to use partial neutral facts available to fill the gap in the record created by the missing factors of production information. *Id.* at 3–4, 10. In the original proceedings, "[W]here Tainai's unaffiliated … suppliers provided 100 percent of the [factors of production] for turned cups and cones, rollers, or cages, Commerce valued the unreported [tapered roller bearing] component [factors of production] using Tainai's highest [factors of production] consumption rates for [tapered roller bearings] sold in the United States." *Id.* at 5; *see also* Decision Mem. at 12, J.A. at 1,014, ECF No. 43. On remand, Commerce instead "rel[ied] on Tainai's allocation methodology for its direct input materials [factors of production]." Remand Results at 24, ECF No 57.

Commerce also stated in its Remand Results that it is "troubled by the implications of the Court's opinion." *Id.* at 13. It raised concerns that it would need to obtain information exclusively in the noncooperative suppliers' possession to comply with the Court's instructions to examine Tainai's control over its suppliers. *Id.* at 13–14. In essence, Commerce alleges that the Court's opinion creates an unworkable standard. To apply facts available with an adverse inference, Commerce must find that Tainai had sufficient control over its suppliers to induce cooperation. Such a finding requires Commerce to consider what percentage of a supplier's total

production of a given product Tainai is purchasing.  The larger the percentage, the likelier it is that Tainai could induce a supplier's cooperation.  Non-party, noncooperative suppliers may decline to respond to Commerce's requests for information; and Commerce cannot force the suppliers to comply because it lacks subpoena power.  *Id.* at 9, 13–14.  Commerce therefore claims it is "limited" in its ability to collect the required information.  *Id.* at 14.  *But see infra* n.2 (noting Commerce obtained the information it complains here is impossible to receive in the following year's review).

Commerce chose to further explain its decision to exclude the additional revenue Tainai collected in connection with its Section 301 duties.  Remand Results at 4, ECF No. 57.  In its Remand Results, Commerce explained that Tainai reported in its initial questionnaire "an amount that Tainai charged its customers related to section 301 duties imposed on certain sales."  *Id.* at 6.  In a supplemental questionnaire response during the underlying review, Tainai identified three different situations where it billed customers this additional amount:  (1) an all-inclusive price approach, where Tainai sent its customers a single invoice with a single price that included the actual Section 301 duties and the additional revenue; (2) an itemized invoice approach, where Tainai issued its customers one itemized invoice that listed Tainai's charge for the merchandise and Tainai's Section 301 duties charge as separate line items — the duties line item including the Section 301 duties Tainai actually owed and the additional revenue; and (3) a separate invoice approach, where Tainai issued two invoices — one invoice billing for the cost of the

merchandise and one invoice billing for the Section 301 duties and the additional revenue. *Id.* (citing Tainai Suppl. Questionnaire at 11–12, J.A. at 82,185–86, ECF No. 44); Oral Arg. Tr. at 67:16–71:9, ECF No. 72 (Tainai's counsel identifying the three types of invoices). Commerce continued to find on remand that "Tainai's additional tariff charge revenue relates directly to the section 301 duty expense and, therefore, is considered a movement-related revenue attributable to movement services incidental to transporting the subject merchandise to the United States." Remand Results at 21, ECF No. 57. But Commerce treated the excess revenue differently depending on how Tainai categorized the revenue on its invoices. *Id.* at 28–29.

In situations where Tainai billed customers for a single price, inclusive of Section 301 duties and the additional revenue, Commerce only deducted the actual Section 301 duties Tainai owed from Tainai's U.S. price. *Id.* at 29; *see also* Oral Arg. Tr. at 69:19–70:2, ECF No. 72 (THE COURT: "So what you're saying is … where it was an [all-inclusive] price — the federal Government of course knows what the duty amount is. It charges the duty; it receives the duty." MR. CRAVEN: "And we reported the duty." THE COURT: "Correct. All [the Government] did, in that case, is deduct the amount of the duty and nothing else with regard to any profit you may have made on the duty." MR. CRAVEN: "Correct."); Oral Arg. Tr. at 73:9–23, ECF No. 72 (Defendant's counsel agreeing with this characterization of Commerce's approach). Commerce did not attempt to discern how much of the all-inclusive price listed on Tainai's invoice was attributable to the additional revenue Tainai pocketed

by charging its customer more for Section 301 duties. Oral Arg. Tr. at 69:19–70:2, ECF No. 72. Commerce included that additional revenue in Tainai's U.S price, which increased Tainai's U.S. price and decreased Tainai's dumping margin.

In situations where Tainai used an itemized invoice, Commerce deducted both the actual Section 301 duties Tainai owed and the additional revenue from Tainai's U.S. price. Remand Results at 4, ECF No. 57. The agency explained that it considered the additional revenue to be a movement-related expense because it was premised on the payment of Section 301 duties and thus was incidental to shipping the merchandise into the United States. *Id.* Commerce deducts such movement-related expenses from U.S. price. 19 U.S.C. § 1677a(c)(2)(A) ("The price used to establish … constructed export price shall be … reduced by … the amount … attributable to any additional costs, charges, or expenses … which are incident to bringing the subject merchandise from … the exporting country to … the United States[.]") In other words, when Tainai used an itemized invoice approach, the additional revenue was not included in U.S. price thereby increasing Tainai's dumping margin.

Finally, where Tainai used a separate invoice approach, Commerce also deducted the actual section 301 duties and the additional revenue from Tainai's U.S. price. Remand Results at 22, ECF No. 57; *see also* Draft Remand Calculation Mem. at 3, J.A. at 84,922, ECF No. 64 ("Commerce modified its calculation so that in instances where Tainai reported that it issued a separate invoice to the customer for additional tariff revenue, we are not making any adjustments to U.S. price with

respect to Section 301 duties."); Final Draft Remand Calculation Mem. at 2, J.A. at 85,273, ECF No. 64 (noting Commerce made no additional changes). Once again, Commerce declined to include the excess Section 301 charges as part of Tainai's U.S. price, thereby increasing Tainai's dumping margin.

Tainai supports Commerce's decision to not use facts available with an adverse inference. *See* Pls.' Comments on Remand Determination (Pls.' Remand Br.) at 2–3, ECF No. 61 (accepting Commerce's decision to use partial neutral facts available). However, Tainai disagrees with the facts Commerce used to fill in the missing factors of production information. *Id.* ("[I]n calculating the [new] margin, [Commerce] selected … facts which were still adverse to Tainai and which were not neutral facts."). Tainai claims that Commerce "double count[ed] the financial ratios by valuing certain inputs using surrogate values for completed articles and then appl[ied] financial ratios to these surrogate values." *Id.* at 3. Tainai requests the Court again remand the case for Commerce to reconsider its selection of neutral facts. *Id.* at 4.

Tainai also opposes Commerce's continued decision to exclude some of the additional revenue the company received in connection with its Section 301 duties. *See id.* at 3–4. It maintains that this "tariff charge" is part of the unit price, akin to a material surcharge, and not a "charge for movement or other similar expenses." *Id.* For support, Tainai highlights that its invoices directly tied the tariff charge to the "quantity and part number on a 'unit price' basis." *Id.* at 3 (citing *e.g.*, Ex. SC-5(a) (separate invoices), SC-5(b) (itemized invoice), SC-5(c) (separate invoice), J.A. at

82,686–93, ECF No. 44).  Tainai requests that the Court remand the case again for Commerce to reconsider both issues.  *Id.* at 4.

The Court held oral argument on April 26, 2024, combining argument in this case with argument concerning the separate thirty-fourth administrative review of the same order.[1]  *See* ECF No. 69.  The Court ordered the parties to file supplemental briefs identifying an all-inclusive invoice — where Tainai billed its customer a single price — to assist with the review of the extra revenue issue.  ECF No. 68.

## JURISDICTION AND STANDARD OF REVIEW

As in *Tainai I*, the Court has jurisdiction over Tainai's challenge under 19 U.S.C. § 1516a(a)(2)(B)(i) and 28 U.S.C. § 1581(c), which grant the Court authority to review actions contesting final determinations in antidumping reviews.  The Court must sustain Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with the law."  19 U.S.C. § 1516a(b)(1)(B)(i).  "[T]he question is not whether the Court would have reached the same decision on the same record[;] rather, it is whether the administrative record as a whole permits Commerce's conclusion."  *New Am. Keg v. United States*, 45 CIT __, No. 20-00008, 2021 Ct. Intl. Trade LEXIS 34, at *15 (Mar. 23, 2021).  Furthermore, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  *Matsushita Elec. Indus. Co. v. United States*, 750

---

[1] The Court issued its opinion sustaining Commerce's Final Results in the thirty-fourth administrative review concurrently with this opinion.  *See Shanghai Tainai Bearing Co. v. United States*, 48 CIT __, Slip Op. 24-143 (Dec. 18, 2024).

F.2d 927, 933 (Fed. Cir. 1984) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 619–20 (1966)).

Reviewing agency determinations, findings, or conclusions for substantial evidence, the Court assesses whether the agency action is reasonable given the "record as a whole." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."). The Federal Circuit has described "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Dupont Teijin Films USA v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Additionally, "results of a redetermination pursuant to court remand are … reviewed for compliance with the … remand order." *Ellwood City Forge Co. v. United States*, No. 1:21-00077, 47 CIT __, 2023 Ct. Intl. Trade LEXIS 113, at *7 (July 24, 2023) (internal quotation marks omitted).

## DISCUSSION

### I.    Summary

The Court remanded the issue of whether Commerce could use facts available with an adverse inference against a cooperating respondent based on the noncooperation of unaffiliated third-party suppliers. Under protest, Commerce determined that it could not do so on this record. It opted to apply neutral facts to fill the entirety of the gap in the record created by the absence of factors of production

data.  Commerce could have analyzed Tainai's suppliers individually to determine if
Tainai could induce their cooperation.  Commerce also could have found that Tainai
was uncooperative, which would obviate the need to analyze the company's control
over its suppliers.  The agency chose to do neither.  Despite this, the Court finds that
Commerce complied with its Order in *Tainai I*; and its determination to use neutral
facts is supported by substantial evidence.

The Court also remanded the issue of whether Commerce properly excluded
additional revenue Tainai collected in connection with its Section 301 duties.  On
remand, Commerce further explained its legal analysis and treatment of Tainai's
sales information based on the company's invoice practices.  Commerce determined
that Tainai's excess revenue is profit from a service, akin to a shipping and movement
fee, and is related to the Section 301 duties themselves — not the sale price for subject
merchandise.  The Court holds that Commerce's practice of excluding the additional
revenue from U.S. price is supported by substantial evidence.  Because the remand
determination complies with the Court's Order in *Tainai I* and is supported by
substantial evidence, Commerce's Remand Results will be **SUSTAINED**.

## I.    Application of Partial Facts Available with an Adverse Inference

The first issue is whether Commerce followed Federal Circuit precedent when
reconsidering its application of facts available with an adverse inference against a
cooperating respondent on the theory that it will incentivize unaffiliated third-party
suppliers to cooperate.  *Tainai I*, 47 CIT __, 658 F. Supp. 3d at 1281; *see also Mueller*,
753 F.3d at 1234–36.  Tainai supports Commerce's determination to use neutral facts

available, but it objects to the facts Commerce chose.  Pls.' Remand Br. at 1–3, ECF
No. 61.  The Court first addresses whether Commerce complied with *Mueller* and
then turns to Tainai's remaining objection.

## A.

In *Tainai I*, the Court followed the Federal Circuit's instructions in *Mueller*,
which allows Commerce to apply facts available with an adverse inference against a
cooperating respondent based on the noncooperation of its suppliers.  *Tainai I*, 47 CIT
__, 658 F. Supp. 3d at 1283 (citing *Mueller*, 753 F.3d at 1232–33).  However, the
Federal Circuit did not grant Commerce carte blanche to do so in every situation.
Each decision to apply an adverse inference to a cooperating party must be based on
that case's specific record; there is no formulaic incantation that works in every case.
*See Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1387 (Fed. Cir.
2014) ("[E]ach administrative review is a separate exercise of Commerce's authority
that allows for different conclusions based on different facts in the record.").  *Mueller*
requires Commerce to (1) determine that application of a deterrence-based rationale
is reasonable based on the "particular facts" of the review and (2) take into account
the predominant interest in accuracy.  *Mueller*, 753 F.3d at 1233.

Commerce found that Tainai cooperated, but its suppliers did not.  Decision
Mem. at 7–8, J.A. at 1,009–10, ECF No. 43.  Although Tainai produces a large number
of bearings, it sources the components of those bearings from a multitude of suppliers.
Section D Questionnaire Resp., Ex. D-7, J.A. at 81,310–12, ECF No. 44.
Consequently, Tainai maintained that it lacks the requisite market power to induce

cooperation from its suppliers.  Pls.' Mot. at 21, ECF No. 32.  To support its argument, Tainai provided a chart showing a list of its suppliers and the percentage of Tainai's total input quantity it purchased from each supplier.  Section D Questionnaire Resp., Ex. D-7, J.A. at 81,310–12, ECF No. 44.  Most of the suppliers listed did not appear to provide a notable percentage of Tainai's total inputs.  Instead, the chart depicted a company that has an incredibly diversified supplier portfolio.  *See id.*  Commerce maintained Tainai did have the ability to pressure its suppliers to cooperate but did not address the data Tainai provided.  Def.'s Resp. to Pls.' Mot. for J. on Agency R. (Def.'s Br.) at 19, 21, ECF No. 37.  Therefore, the Court remanded the issue for further explanation or reconsideration.  *Tainai I*, 47 CIT __, 658 F. Supp. 3d at 1297.

On remand, Commerce reversed course and determined under protest to apply neutral facts across the board to fill in the missing data.  Remand Results at 3–4, ECF No. 57.  *Tainai I* did not require Commerce to use an "all-or-nothing" approach to how it treats the absence of supplier data.  Following *Mueller*, the Court ordered Commerce to address Tainai's argument and data "suggesting that [Tainai] was not a large enough customer of *any one* supplier to induce compliance with Commerce's information requests."  *Tainai I*, 47 CIT __, 658 F. Supp. 3d at 1285 (citing Pls.' Mot. at 21, ECF No. 32) (emphasis added).  Commerce could have analyzed the data for each supplier individually and determined which suppliers Tainai could control and which suppliers it could not.[2]  *Compare id.*, *with* Def.'s Resp. to Pls.' Comments on

---

[2] Indeed, Commerce did so in the following year's review when it used the factors of production data provided by a single cooperating supplier but used facts available with an adverse inference to fill in gaps in the record created by noncooperative suppliers.  Issues and Decision Mem. (IDM) at 10–11, Case No. 23-20, J.A. at 1,012–13, ECF No. 42.  Although each

Case 1:22-cv-00038-SAV    Document 74    Filed 12/18/24    Page 18 of 32

Consol. Court No. 1:22-cv-00038                                    Page 18

Com.'s Remand Redetermination (Def.'s Remand Br.) at 3, ECF No. 62 (quoting Remand Results at 14–15, ECF No. 57) ("[T]he original dumping margin of 538.79 percent [was] based on 'the fact that Tainai's uncooperative suppliers, *as a whole*, provided a significant portion of the total inputs in question, thereby creating a substantial gap in the record.'") (emphasis added). Such an approach would be consistent with *Mueller's* requirement that Commerce make a case-specific determination. *Mueller*, 753 F.3d at 1233. But instead of examining the data Tainai provided about its relationships with individual suppliers, Commerce threw up its hands. It opted to apply neutral facts across the board — foregoing an approach that might also serve its deterrence interest and follow Federal Circuit precedent.

Commerce also tied its hands by determining that Tainai cooperated in this review. Decision Mem. at 7–8, J.A. at 1,009–10, ECF No. 43. The record here raises questions about how aggressively Tainai sought to gain the cooperation of its unaffiliated suppliers. In the subsequent year's administrative review, Commerce found that Tainai failed to cooperate to the best of its ability by waiting until the end of the information gathering period to seek its affiliates' cooperation. IDM at 10–11,

---

supplier's sales to Tainai as a percentage of the supplier's total sales were comparatively small, those percentages were not uniform. *See* Tainai Section A, C and D Questionnaire Additional Resp. (May 11, 2022), Ex. SD-5.2, Case No. 23-20, J.A. at 84,865–902, ECF No. 43. The supplier whose sales to Tainai made up the largest percentage of its total sales was also the only supplier that provided complete data in response to Tainai's requests. *Id.* at 84,885–86; IDM at 10, Case No. 23-20, J.A. at 1,012, ECF No. 42. In other words, the very information Commerce here claims it was impossible for it to receive Commerce both received and considered the following year. *Compare* Remand Results at 13–14, ECF No. 57 (claiming that Commerce could not possibly obtain such information), *with* Tainai Section A, C and D Questionnaire Additional Resp. (May 11, 2022), Ex. SD-5.2, Case No. 23-20, J.A. at 84,865–902, ECF No. 43 (obtaining exactly that information in the following year's review).

Case No. 23-20, J.A. at 1,012–13, ECF No. 42. The Court today affirms — by separate opinion — Commerce's decision there that Tainai's lackluster attempt to gain information from its affiliates in that review fails to represent its "maximum effort to provide Commerce with full and complete answers." *Shanghai Tainai*, 48 CIT __, Slip Op. 24-143 at 18–19, 22 (Dec. 18, 2024) (quoting *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003)). Commerce has elsewhere found that a respondent was uncooperative when the respondent provided evidence of its efforts comparable to what Tainai did here. *See Haixing Jingmei Chem. Prods. Sales Co. v. United States*, 42 CIT __, 335 F. Supp. 3d 1330, 1341 (2018) ("[Respondent's] … failure to demonstrate any effort to obtain th[e] necessary information beyond a single email communication to one of the two downstream customers adequately supports Commerce's decision to use adverse inferences when filling the gaps in the record."). However, the Court may not find facts for Commerce. Commerce has determined in this case that Tainai was cooperative, and no one challenges that determination.

Commerce believes that it cannot justify its application of facts available with an adverse inference on this record. Remand Results at 10, ECF No. 57 ("Upon a reexamination of record evidence, we are unable to determine, based on this record, whether Tainai has sufficient control over its suppliers to induce their cooperation in the underlying administrative review."). The Court's role is to determine whether Commerce's determination is supported by substantial evidence — not whether it is the best possible result. It "may not substitute its judgment for that of the [agency]

when the choice is between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *China Custom Mfg. v. United States*, No. 1:20-cv-00121, 45 CIT __, 2021 Ct. Int'l Trade LEXIS 165, at *17 (Dec. 6. 2021), *aff'd*, 61 F.4th 956 (Fed. Cir. 2023) (quoting *Goldlink Indus. Co. v. United States*, 30 CIT 616, 618 (2006)). Commerce could have conducted a supplier-by-supplier analysis and perhaps found that Tainai has the requisite level of influence to induce cooperation for some of its suppliers. Commerce could also reasonably conclude that Tainai could not induce cooperation from *any* of its suppliers. Both conclusions can find evidentiary support. The Court's limited role in reviewing the remand determination leads it to conclude that Commerce has properly applied the Federal Circuit's test for when it may draw an adverse inference against a cooperating party. *See Mueller*, 753 F.3d at 1233–34. Commerce's determination to use neutral facts available is supported by substantial evidence. *See Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1344 (Fed. Cir. 2021) ("Even if it is possible to draw two inconsistent conclusions from evidence in the record, such a possibility does not prevent Commerce's determination from being supported by substantial evidence.") (quoting *Am. Silicon Techs. v. United States*, 261 F.3d 1371, 1376 (Fed. Cir. 2001)).

## B.

Tainai objects to Commerce's choice of neutral facts to fill the gap in the record, maintaining that these facts are "still adverse to Tainai" and are not "neutral." Pls.' Remand Br. at 3, ECF No. 61. It challenges how Commerce valued certain completed

components — rollers, cups, and cages — that Tainai uses to manufacture tapered rolling bearings. Tainai purchased these components from its unaffiliated suppliers, as opposed to making the components itself. Oral Arg. Tr. at 36:13–19, ECF No. 72. Tainai argues that Commerce "double count[ed] the financial ratios by valuing [these components] using surrogate values for complete articles and then applying financial ratios to these surrogate values." Pls.' Remand Br. at 3, ECF No. 61. Rather than accepting the price Tainai paid its suppliers for the components, Commerce calculated a surrogate value for each component by valuing the materials used to make the component and adding amounts to those values for processing and profit. Decision Mem. at 20, J.A. at 1,022, ECF No. 43; *see also Tainai I*, 47 CIT __, 658 F. Supp. 3d at 1275 (explaining Commerce's calculation method). Tainai's proposed solution would see Commerce accept the prices it paid its suppliers and apply any necessary ratios to the prices it actually paid. Pls.' Comments on Draft Remand Determination, J.A. at 13,543, ECF No. 63 (arguing that Commerce should "calculat[e] the [normal value] without the [components'] values, and then add[] them in after the application of the financial ratios to produce a calculation that does not double count such factors"); *see also* Oral Arg. Tr. at 39:2–7, ECF No. 72.

When dealing with nonmarket economies like China, Commerce does not typically accept the prices producers pay for inputs as representing fair market value. Instead, Commerce must determine the value of the subject merchandise "on the basis of the value of the factors of production utilized in producing the merchandise" and then add "an amount for general expenses and profit plus the cost of containers,

coverings, and other expenses." 19 U.S.C. § 1677b(c)(1) (flush language).  It does this

by using the costs for a producer of similar merchandise located in a market economy

country of comparable development.  19 C.F.R. § 351.408(a) ("[Commerce] normally

will calculate normal value by valuing the nonmarket economy producers' factors of

production in a market economy country.").  In other words, rather than accepting

that the price the non-market economy manufacturer paid represents the fair value

of the sum of (1) the cost of the product's components; (2) general expenses and profit;

and (3) the cost of containers, coverings, and other expenses, Commerce constructs

this amount itself by determining a value for each individual input.  *See* 19 U.S.C. §

1677b(c)(1) (flush language).  "Commerce values certain factors of production, such

as selling, general, and administrative expenses, factory overhead, and profit, by

using financial ratios derived from financial statements of producers of comparable

merchandise in [a] surrogate country." *Ad Hoc Shrimp Trade Action Comm. v. United

States*, 618 F.3d 1316, 1319–20 (Fed. Cir. 2010) (citing *Dorbest Ltd. v. United States*,

604 F.3d 1363, 1368 (Fed. Cir. 2010)).  Ultimately, Commerce's task is to "attempt to

construct a hypothetical market value" of the subject merchandise.  *Nation Ford

Chem. Co. v. United States*, 166 F.3d 1373, 1375 (Fed. Cir. 1999).

         In *Tainai I*, the Court sustained Commerce's use of Romania as a surrogate

market economy country and Commerce's use of a Romanian company's financial

statements to calculate surrogate values.  *Tainai I*, 47 CIT __, 658 F. Supp. 3d at

1291.  On remand, Commerce continued to apply surrogate financial ratios to

calculate Tainai's factors of production regardless of whether Tainai manufactured

the tapered roller bearing component or purchased the components from its suppliers. Remand Results at 23–25, ECF No. 57. Commerce stated that Tainai "fails to demonstrate our position was contrary to law or unsupported by substantial evidence" and "does not provide sufficient reasoning for [its] surrogate value argument." *Id.* at 25.

Tainai cites no authority for why Commerce's determination is impermissible. It instead generally argues that Commerce should adjust its methodology to reflect Tainai's business model, which involves purchasing some components for use in further assembly. However, the Federal Circuit has held, "When Congress directs the agency to measure pricing behavior and otherwise execute its duties in a particular manner, Commerce need not examine the economic or commercial reality of the parties specifically, or of the industry more generally, in some broader sense." *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1344 (Fed. Cir. 2016). "Commerce's determination 'reflects "commercial reality" if it is consistent with the method provided in the statute, [and] thus in accordance with the law.'" *Tainai I*, 47 CIT __, 658 F. Supp. 3d at 1288 (quoting *Nan Ya Plastics*, 810 F.3d at 1344). Commerce followed the statute to calculate normal value based on "the value of the factors of production utilized in producing the [subject] merchandise." 19 U.S.C. § 1677b(c)(1) (flush language). Commerce has determined that, because Tainai and its suppliers are in a non-market economy, it should apply surrogate financial ratios — regardless of whether Tainai manufactured the component or purchased it. Def.'s Remand Br. at 4, ECF No. 62 (citing Decision Mem. at 20–21, J.A. at 1,022–23, ECF

No. 43). Tainai has given the Court no reason to question that decision. Commerce's choice of neutral facts available will be **SUSTAINED**.

## II.    Capping of Amounts Denominated as "Additional Revenue for 301"

The Court next turns to Commerce's decision to "cap" additional revenue Tainai collected from its customers in connection with its Section 301 duties. In *Tainai I*, the Court explained that Tainai claimed to increase its prices for some customers under the guise of collecting Section 301 duties. *Tainai I*, 47 CIT __, 658 F. Supp. 3d at 1294. Commerce excluded this additional revenue from Tainai's U.S. price, which increased Tainai's dumping margin. Decision Mem. at 23–25, J.A. at 1,025–27, ECF No. 43. In doing so, Commerce rejected Tainai's argument that the revenue should be included in U.S. price as a "price adjustment" because it was attributable to the price of the merchandise. *Id.* at 23–24, J.A. at 1,025–26; 19 C.F.R. § 351.401(c). The Court took issue with Commerce's reasoning that the revenue was attributable to the sale of services, rather than merchandise. *Tainai I*, 47 CIT __, 658 F. Supp. 3d at 1295–97. This distinction is relevant because revenue attributable to the sale of services should not be treated as a price adjustment to Tainai's U.S. price, but revenue attributable to the sale of merchandise should be included. *See* 19 C.F.R. § 351.401(c); 19 C.F.R. § 351.102(b)(38). The Court found that Commerce's interpretation of 19 C.F.R. § 351.102(b)(38), the regulation defining price adjustments, was "unacceptably narrow." *Tainai I*, 47 CIT __, 658 F. Supp. 3d at 1282. On remand, Commerce offered a more fulsome explanation for its finding that this extra revenue is attributable to services related to Tainai's collection of Section

301 duties rather than the price of the tapered roller bearings.  Remand Results at 25–29, ECF No. 57.  Because Commerce complied with the Court's Order and its determination is supported by substantial evidence, the Court will sustain its determination.

When determining whether subject merchandise is being sold at less than fair value, Commerce must make a "fair comparison" between the export price or constructed export price and normal value.  *See* 19 U.S.C. § 1677b(a).  Export price and constructed export price are further defined as "the price at which the subject merchandise is first sold" — in other words, the U.S. price.  19 U.S.C. § 1677a(a)–(b).  Normal value is the price for which the goods are sold in the manufacturer's home country.  19 U.S.C. § 1677b(a)(1)(B)(i).  At issue is whether the additional revenue Tainai received from customers in connection with Section 301 duties should be included in the U.S. price as a price adjustment — thereby narrowing the gap between the constructed export price and normal value and reducing Tainai's dumping margin.  Remand Results at 7, ECF No. 57 ("Tainai requests that the U.S. price include the price paid for the good and the price charged for the section 301 duties.").  The relevant question is whether the additional revenue Tainai received is truly part of the price of the subject merchandise.[3]

---

[3] At oral argument, the parties discussed whether the capping issue should be characterized as Commerce *reducing* Tainai's U.S. sales price or *refusing to add* the additional revenue to the U.S. sales price.  *Compare* Oral Arg. Tr. at 59:13–15, ECF No. 72 (MR. CRAVEN:  "The problem [is] that the additional [revenue is] being deducted from our price on the basis that those monies were not related to the sale."), *with id.* at 61:5–11, 61:23–24 (THE COURT:  "[F]rom [Commerce's] perspective, [Commerce] wouldn't be deducting anything from U.S. price because [Tainai] took in that extra revenue.  But [Commerce] also wouldn't be adding anything to [Tainai's] U.S. price because [it] wouldn't be agreeing with you that the

Case 1:22-cv-00038-SAV    Document 74    Filed 12/18/24    Page 26 of 32

Consol. Court No. 1:22-cv-00038                                    Page 26

Commerce must reduce the U.S. price by "the amount, if any, included in such price, attributable to any additional costs, charges, or expenses, and United States import duties, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States." 19 U.S.C. § 1677a(c)(2)(A).  These adjustments "help[] ensure an 'apples [to] apples' comparison between merchandise sold in the home market and the U.S. market by deducting costs associated with transporting merchandise to the United States." *Tainai I*, 47 CIT __, 658 F. Supp. 3d at 1291 (quoting *Smith-Corona Grp. v. United States*, 713 F.2d 1568, 1578 (Fed. Cir. 1983)).

The Court already sustained Commerce's decision to reduce U.S. price by Tainai's actual Section 301 duties, following the reasoning of the Federal Circuit's decision in *Borusan*.  *See Tainai I*, 47 CIT __, 658 F. Supp. 3d at 1294 (sustaining Commerce's finding that Section 301 duties are "United States import duties" within the meaning of 19 U.S.C. § 1677a(c)(2)(A)).  Aside from the issue of whether the duties should be deducted, the statute also contemplates that not all expenses paid for by the purchaser will be included in the U.S. price.  *See* 19 U.S.C. § 1677a(c)(2)(A) (excluding from U.S. price the "amount … attributable to any additional costs, charges, or expenses and United States import duties, which are incident to bringing

---

[additional revenue] was a profit on the merchandise as opposed to a profit on the duty."  MR. LONG:  "I understand Your Honor's articulation of the practice to be correct[.]").  Government counsel further noted that "we sometimes flip our conversation between sides [of the] ledger. Ultimately, … if there's profit from 301 duties, that is not being built into an increase in U.S. price."  *Id.* at 63:1–4.  For the sake of consistency, the Court will refer to Commerce's practice as refusing to include the additional revenue in U.S. sales price.

the subject merchandise" into the United States).   Commerce believes Tainai's additional Section 301 revenue should be excluded from U.S. price on this basis. Commerce analogizes the additional revenue to other excludable services an exporter might provide and charge to its U.S. customer, such as arranging freight, brokerage, or handling.  *See* Remand Results at 26, ECF No. 57 (identifying services Commerce acknowledges as "related to the subject merchandise" but are not "part of the subject merchandise").   On remand, Commerce reasoned that, because Section 301 duties are incidental to bringing subject merchandise from the exporting country into the U.S. and the statute requires adjusting U.S. price by United States import duties, charges related to Section 301 duties should similarly not be included in U.S. price.   "[A]ny additional revenue related to section 301 duties should not adjust the calculation of U.S. price; otherwise, it would 'contravene Commerce's ability to achieve a fair, 'apples-to-apples' comparison between U.S. price and foreign market value in accordance with the statute.'"  Def.'s Remand Br. at 7, ECF No. 62 (quoting Remand Results at 20, ECF No. 57).

Conversely, when calculating U.S. price, Commerce will account for "price adjustments … that are reasonably attributable to the subject merchandise …."  19 C.F.R. § 351.401(c).  A "price adjustment" is "a change in the price charged for subject merchandise or the foreign like product, *such as* a discount, rebate, or other adjustment."  19 C.F.R. § 351.102(b)(38) (emphasis added).  The use of "such as" in the regulation indicates that the regulation's list of price adjustments is not exhaustive, and a change in price need not be enumerated to qualify as a "price

adjustment." *See, e.g.*, *Vicentin S.A.I.C. v. United States*, 42 F.4th 1372, 1378 (Fed. Cir. 2022) ("The two phrases 'such as' and 'or other adjustment' convey that the definition is not limited to discounts and rebates."); *Vazquez-Claudio v. Shinseki*, 713 F.3d 112, 115 (Fed. Cir. 2013) (interpreting a list in another regulation as "non-exhaustive" where the list was preceded by "such as"). But a change in price must be directly attributable to the merchandise at issue, meaning Commerce will not include in U.S. price related expenses like freight charges. *See Dongguan Sunrise Furniture Co. v. United States*, 36 CIT 860, 896 (2012) ("[I]t was reasonable for Commerce to interpret the definition of price adjustment to not include the related freight expense.").

From Tainai's perspective, the additional revenue is "attributable to the subject merchandise," 19 C.F.R. § 351.401(c), and therefore should be treated as a price adjustment. Pls.' Remand Br. at 3–4, ECF No. 61. Tainai claims the revenue is "similar to that of a material surcharge." *Id.* It contrasts the revenue with "'freight' or 'insurance' expenses[,] which are set based on matters other than the goods and the price for such goods." *Id.* Tainai points to its invoices, which show the "tariff charge [being] directly tied to the quantity and part number [for a given product] on a 'unit price' basis." *Id.* at 3 (citing *e.g.*, Ex. SC-5(a) (separate invoices), SC-5(b) (itemized invoice), SC-5(c) (separate invoice), J.A. at 82,686–93, ECF No. 44).

Commerce claims that Tainai's additional revenue is not attributable to the subject merchandise and therefore should not be treated as a price adjustment. Remand Results at 22, ECF No. 57. The agency acknowledges the regulation's "such

as" language renders the listed changes "illustrative" as opposed to finite.  *Id.* at 17 n.56, ECF No. 57 (quoting *Dongguan*, 36 CIT at 896).  However, Commerce claims that reading the illustrative list to include tariff-based charges like Tainai's additional revenue would contradict the regulation's purpose, which is to "account for any changes to the *actual* starting price of the subject merchandise."  *Id.* (quoting *Dongguan*, 36 CIT at 896) (emphasis added).  Commerce views Tainai's additional revenue as incidental to importing the subject merchandise because it is premised on the payment of Section 301 duties, meaning the revenue is attributable to Tainai's "service" of moving the goods through Customs as opposed to the sale of the goods themselves.  *Id.* at 21–22.

This Court agrees with Commerce that Tainai's additional revenue is incidental to transporting the merchandise into the United States.  When calculating the constructed export price, Commerce will adjust the price to reflect any changes "that are reasonably attributable to the subject merchandise." 19 C.F.R. § 351.401(c). Tainai's additional revenue relates directly to its payment of Section 301 duties. Commerce therefore properly considered it "a movement-related revenue attributable to movement services incidental to transporting the subject merchandise to the United States."  Remand Results at 21, ECF No. 57.  It is, in essence, a handling fee. *See* Oral Arg. Tr. at 62:19–23, ECF No. 72 (THE COURT:  "According to you, [the additional revenue is] attributable to a service or perhaps better categorized as the frustration and expense of serving as a tax collection agent for the federal Government."  MR. LONG: "Yes, Your Honor.").

Tainai took three different approaches in charging its customers the additional revenue.  In some instances, it sent its customers one, "all-inclusive" invoice listing a single price that comingled the price of the merchandise, the value of Tainai's actual Section 301 duties, and the additional revenue.  Ex. SC-4(b)(iv), J.A. at 82,662, ECF No. 44; *see also* Oral Arg. Tr. at 67:20–68:4, ECF No. 72.  In other instances, Tainai issued one itemized invoice that separately listed Tainai's charge for the merchandise and Tainai's Section 301 duties charge.  Ex. SC-5(b), J.A. at 82,690, ECF No. 44; *see also* Oral Arg. Tr. at 68:8–12, ECF No. 72.  The duties line item lumped together the Section 301 duties Tainai actually owed and the additional revenue.  Finally, Tainai sent some customers two separate invoices:  one invoice billing for the cost of the merchandise and one invoice billing for the 301 duties and the additional revenue. Ex. SC-5(a), J.A. at 82,687–88, ECF No. 44; *see also* Oral Arg. Tr. at 68:13–18, ECF No. 72.

On remand, Commerce tailored its approach based on how Tainai charged its customers.  When Tainai issued an "all-inclusive" invoice, Commerce did not exclude from Tainai's U.S. price the additional revenue.  *See* Remand Results at 29, ECF No. 57.  Because the "all-inclusive" invoice did not feature line items, Commerce had no way of determining how much of the total billed cost was attributable to the "additional revenue" and how much was attributable to the merchandise.  In contrast, Commerce did exclude the additional revenue from Tainai's U.S. price in the other two situations.  *Id.* at 28–29.  Where Tainai listed the additional revenue under a tariff line item on an invoice, Commerce could determine the amount of additional

revenue being charged by subtracting the amount of actual Section 301 duties paid from the line item's total. The same is true for instances where Tainai sent a separate Section 301 duties invoice; Commerce could subtract the amount of Section 301 duties Tainai owed from the total charge listed on the invoice and determine how much additional revenue Tainai had billed it customers.

The practical effect of Commerce's approach is that the agency treats Tainai's additional revenue vis-à-vis U.S. price based on how Tainai characterizes the additional revenue charged. Commerce took Tainai at its word by following the company's own records and adjusting its treatment of the costs according to how Tainai represents them to its customers. *Cf.* 19 U.S.C. § 1677b(f)(1)(A) (requiring Commerce to calculate constructed value "based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country …."). Where Tainai treated the additional revenue as part of the product's price, Commerce did as well. Where Tainai treated it as a charge related to the Section 301 duties akin to a handling fee, Commerce did the same and declined to include the revenue in U.S. price. Oral Arg. Tr. at 62:19–23, ECF No. 72. On this record, the Court finds that Commerce has made a proper comparison between the U.S. price for the subject merchandise and normal value by not artificially inflating the U.S. price with charges Tainai itself characterizes as related to Section 301 duties. Because Commerce's determination to exclude the additional revenue associated with Section 301 duties is supported by substantial evidence, the Remand Results will be sustained.

## CONCLUSION

Although Commerce could have chosen to individually examine the data of each uncooperative supplier or found Tainai to be uncooperative, its decision to do neither and apply neutral facts to fill the resulting gap is supported by substantial evidence. The agency's decision to continue to use surrogate ratios when evaluating Tainai's input costs accords with the statute, case law, and Commerce's prior practice. Likewise, Commerce has adequately explained its decision to refuse to include some of the additional revenue Tainai earned related to Section 301 duties in its calculation of U.S. price. The Remand Determination complies with the Court's prior Order and is supported by substantial evidence. It is therefore **SUSTAINED**.

**SO ORDERED**.

Stephen Alexander Vaden, Judge

Dated: December 18, 2024
      New York, New York

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF SERVICE

**Case Number** 2025-1405

**Short Case Caption** SHANGHAI TAINAI BEARING CO., LTD v. US

> **NOTE:** Proof of service is only required when the rules specify that service must be accomplished outside the court's electronic filing system. See Fed. R. App. P. 25(d); Fed. Cir. R. 25(e). Attach additional pages as needed.

I certify that I served a copy of the foregoing filing on 04/14/2025

by ☐ U.S. Mail ☐ Hand Delivery ☐ Email ☐ Facsimile
☑ Other: CAFC CM/ECF

on the below individuals at the following locations.

| Person Served | Service Location (Address, Facsimile, Email) |
|---|---|
| Kara M. Westercamp | CAFC CM/ECF |
| | |
| | |
| | |
| | |

☐ Additional pages attached.

Date: 04/14/2025

Signature: /s/ David Craven

Name: David Craven

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:** 2025-1405

**Short Case Caption:** Shanghai Tainai Bearing Co., Ltd. v. U.S.

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 7332 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 04/14/2025

Signature: /s/ David Craven

Name: David Craven