# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

SHANGHAI TAINAI BEARING CO., LTD., C&U AMERICAS, LLC,

Plaintiffs-Appellants,

PRECISION COMPONENTS, INC., XINCHANG NEWSUN XINTIANLONG PRECISION BEARING MANUFACTURING CO., LTD., HEBEI XINTAI BEARING FORGING CO., LTD.,

Plaintiffs,

v.

UNITED STATES,

Defendant-Appellee.

On Appeal from the United States Court International Trade,
No. 22-00038, Judge Stephen A. Vaden.

## BRIEF OF DEFENDANT-APPELLEE

BRETT A. SHUMATE
*Assistant Attorney General*

PATRICIA M. McCARTHY
*Director*

*Of Counsel:*

CLAUDIA BURKE

JESUS N. SAENZ                 DANIEL BERTONI
*Senior Attorney, Office of Chief Counsel*    *Attorneys, Commercial Litigation Branch*
*for Trade Enforcement and Compliance*    *Civil Division, U.S. Department of Justice*
*U.S. Department of Commerce*    *P.O. Box 480, Ben Franklin Station*
*Washington, DC 20044*
*(202) 880-0336*

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION ........................................................................ 1

STATEMENT OF THE ISSUES ......................................................................... 1

STATEMENT OF THE CASE ........................................................................... 2

    I.      Legal Background ........................................................................ 2

           A. Antidumping Orders and Periodic Reviews ................................. 2

           B. Determining Normal Value in Nonmarket Economies ................. 3

           C. Adjustments to Export Price .................................................... 5

           D. Adjustments to Normal Value for Sales of Scrap ....................... 6

    II.     Factual Background ..................................................................... 6

           A. Commerce Used Romanian Data to Value Tainai's Production
              Costs ..................................................................................... 7

           B. Commerce Deducted Section 301 Duties from Tainai's
              U.S. Price and Capped Tainai's Duty Collection Fee .............. 8

           C. Commerce Denied Tainai an Offset for Sales of Scrap ............. 9

    III.   Proceedings Before the Court of International Trade and the Trial
         Court's Remand ........................................................................ 10

SUMMARY OF ARGUMENT ......................................................................... 11

ARGUMENT ............................................................................................. 13

    I.      Standard of Review .................................................................. 13

    II.     Commerce's Calculation of Normal Value Is Supported by
         Substantial Evidence ................................................................ 14

A. Commerce Reasonably Relied on the Financial Statements of Timken Romania, The Only Usable Statements on the Record, Which Were Verified by an Independent Audit.....................................14

B. Tainai Does Not Explain Why Commerce Should Have Deviated From its Procedure for Valuing Factors of Production.....................19

III.  Commerce Correctly Deducted the Cost of Section 301 Duties from U.S. Price...............................................................................22

A. The Court's Analysis in *Borusan* Governs Commerce's Deduction of Section 301 Duties.............................................22

B. Even under *Wheatland Tube*, Commerce Properly Deducted Section 301 Duties..............................................................25

IV.  Commerce's Decision to Cap and Tainai's Extra Revenue from Section 301 Duties and Exclude that Revenue from U.S. Price Is Supported by Substantial Evidence............................................29

V.  Commerce's Refusal to Grant a Byproduct Offset Is Supported by Substantial Evidence...........................................................32

CONCLUSION.............................................................................34

# TABLE OF AUTHORITIES

| Cases | Page(s) |
|---|---|

*Ad Hoc Shrimp Trade Action Comm. v. United States,*
  802 F.3d 1339 (Fed. Cir. 2015).................................................. 13

*Adv. Magnetic Closures, Inc. v. Rome Fastener Corp.,*
  607 F.3d 817 (Fed. Cir. 2010)................................................... 24

*Am. Tubular Prods., LLC v. United States,*
  847 F.3d 1354 (Fed. Cir. 2017)...........................................6, 33, 34

*APEX Exps. v. United States,*
  777 F.3d 1373 (Fed. Cir. 2015).................................... 5, 23, 26, 30

*Arch Chems., Inc. v. United States,*
  33 C.I.T. 954 (2009) ............................................................... 6

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States,*
  63 F.4th 25 (Fed. Cir. 2023) ........................................... *passim*

*Dorbest Ltd. v. United States,*
  462 F. Supp. 2d 1262 (Ct. Int'l Trade 2006) ........................... 4, 20

*Floral Trade Council v. United States,*
  41 F. Supp. 2d 319 (Ct. Int'l Trade 1999) .............................31, 32

*Home Meridian Int'l, Inc. v. United States,*
  772 F.3d 1289 (Fed. Cir. 2014)................................................. 4

*Jiaxing Bro. Fastener Co. v. United States,*
  822 F.3d 1289 (Fed. Cir. 2016).............................................. 3, 4

*Jinko Solar Imp. & Exp. Co. v. United States,*
  701 F. Supp. 3d 1367 (Ct. Int'l Trade 2024) ............................. 23

*Koyo Seiko Co. v. United States,*
  95 F.3d 1094 (Fed. Cir. 1996)................................................. 25

*Koyo Seiko Co. v. United States*,
    955 F. Supp. 1532 (Ct. Int'l Trade 1997) ........................................................ 31

*Matsushita Elec. Indus. Co. v. United States*,
    750 F.2d 927 (Fed. Cir. 1984) ................................................................. 16, 19

*Nation Ford Chem. Co. v. United States*,
    166 F.3d 1373 (Fed. Cir. 1999) .................................................................... 4

*Neimenggu Fufeng Biotechnologies Co. v. United States*,
    741 F. Supp. 3d 1354 (Ct. Int'l Trade 2024) ............................................... 8, 23

*Nippon Steel Corp. v. United States*,
    337 F.3d 1373 (Fed. Cir. 2003) ................................................................... 13

*QVD Food Co., Ltd. v. United States*,
    658 F.3d 1318 (Fed. Cir. 2011) ............................................................... 5, 17

*Risen Energy Co. v. United States*,
    122 F.4th 1348 (Fed. Cir. 2024) .......................................................... 4, 5, 19

*Shanghai Tainai Bearing Co. v. United States*,
    658 F. Supp. 3d 1269 (Ct. Int'l Trade 2023) ........................................... *passim*

*Shanghai Tainai Bearing Co. v. United States*,
    No. 22-00038, 2024 WL 5154032 (Ct. Int'l Trade Dec. 18, 2024) ................. *passim*

*Smith Corona Corp. v. United States*,
    915 F.2d 683 (Fed. Cir. 1990) .................................................................... 31

*U.S. Steel Corp. v. United States*,
    621 F.3d 1351 (Fed. Cir. 2010) .................................................................... 3

*Union Steel v. United States*,
    713 F.3d 1101 (Fed. Cir. 2013) ................................................................... 13

*Wheatland Tube Co. v. United States*,
    495 F.3d 1355 (Fed. Cir. 2007) ................................................... 23, 25, 27, 28

*Zhejiang DunAn Hetian Metal Co. v. United States*,
    652 F.3d 1333 (Fed. Cir. 2011) ............................................................... 5, 21

**Statutes**

19 U.S.C. § 1516a(b) ........................................................................... 13

19 U.S.C. § 1673 ................................................................................... 2

19 U.S.C. § 1673e(a) ............................................................................. 3

19 U.S.C. § 1675(a) ............................................................................... 3

19 U.S.C. § 1677a(b) ...................................................................... 31, 32

19 U.S.C. § 1677a(c) ..................................................................... *passim*

19 U.S.C. § 1677b(c) ..................................................................... *passim*

19 U.S.C. § 1862 .................................................................................. 22

19 U.S.C. § 1862(c) .............................................................................. 27

19 U.S.C. § 2251 .................................................................................. 27

19 U.S.C. § 2411 .............................................................................. 8, 22

19 U.S.C. § 2411(b) ......................................................................... 8, 27

19 U.S.C. § 2417(c) .............................................................................. 27

28 U.S.C. § 1295(a) ............................................................................... 1

**Regulations**

19 C.F.R. § 152.101(d) ......................................................................... 30

19 C.F.R. § 351.401(b) ...................................................................... 6, 33

19 C.F.R. § 351.401(c) ...................................................................... 6, 29

19 C.F.R. § 351.408(c) (2013) ................................................. 3, 4, 15, 20

# Administrative Determinations

*Addressing China's Laws, Policies, Practices, and Actions Related to Intellectual Property, Innovation, and Technology,*
82 Fed. Reg. 39,007 (Executive Office of the President Aug. 17, 2017).................. 20

*Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany,*
82 Fed. Reg. 16,360 (Dep't of Commerce Apr. 4, 2017)........................... 29

*Circular Welded Carbon-Quality Steel Pipe from the Sultanate of Oman,*
86 Fed. Reg. 18,513 (Dep't of Commerce Apr. 9, 2021)........................... 28

*Initiation of Antidumping and Countervailing Duty Administrative Reviews,*
85 Fed. Reg. 47,731 (Dep't of Commerce Aug. 6, 2020)............................. 7

*Notice of Action and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301,*
83 Fed. Reg. 28,710 (U.S. Trade Rep. June 20, 2018) ...................... 9, 23, 26

*Notice of Action Pursuant to Section 301,*
83 Fed. Reg. 40,823 (U.S. Trade Rep. Aug. 16, 2018)............................. 24

*Notice of Determination and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301,*
83 Fed. Reg. 14,906 (U.S. Trade Rep. Apr. 6, 2018) ............................. 9, 28

*Proclamation 9705,*
83 Fed. Reg. 11,625 (Mar. 8, 2018).............................................. 22

*Request for Comments in Four-Year Review of Actions Taken in the Section 301 Investigation,*
87 Fed. Reg. 62,914 (U.S. Trade Rep. Oct. 17, 2022) ......................... 26, 27

*Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China,*
86 Fed. Reg. 36,099 (Dep't of Commerce July 8, 2021) ............................ 7

*Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China,*
87 Fed. Reg. 1,120 (Dep't of Commerce Jan. 10, 2022) ............................ 7

## Other Authorities

Statement of Administrative Action,
   H.R. Doc. No. 103-316, vol. I, *reprinted in* 1994 U.S.C.C.A.N. 4040 .........................28

## STATEMENT OF RELATED CASES

No other appeal in or from the present civil action has previously been before this or any other appellate court. We are not aware of any related cases within the meaning of Federal Circuit Rule 47.5(b).

## STATEMENT OF JURISDICTION

This Court possesses jurisdiction to review an appeal from a final decision of the United States Court of International Trade. 28 U.S.C. § 1295(a)(5).

## STATEMENT OF THE ISSUES

1.     The agency record contained financial statements of three companies from which the Department of Commerce (Commerce) could calculate surrogate financial ratios. Commerce determined that two of these financial statements were unusable and used the third to calculate surrogate financial ratios, which Commerce then applied to all of plaintiff-appellant Shanghai Tainai Bearing Co.'s (Tainai's) factors of production. The first issue is whether substantial evidence supports Commerce's decision to use only the financial statement of Timken Romania to calculate the surrogate financial ratios and to apply the ratios to all of Tainai's factors of production.

2.     Tainai's tapered roller bearings (TRBs) are subject to additional duties imposed by the United States Trade Representative (USTR) pursuant to section 301 of the Trade Act of 1974. Commerce determined that these Section 301 duties constituted United States import duties under 19 U.S.C. § 1677a(c)(2)(A) and deducted the section 301 duties from Tainai's U.S. price, which increased Tainai's dumping margin. The second issue is whether substantial evidence supports Commerce's decision to deduct the section 301 duties and whether the decision was in accordance with law.

3.	Tainai reported separate revenue from collecting section 301 duties on some invoices.  Commerce capped the amount of this revenue at the cost of the duty itself and treated any additional profit from the revenue as incidental revenue from the act of importing, rather than as attributable to the merchandise itself.  Accordingly, Commerce excluded this additional revenue from the U.S. price.  The third issue is whether substantial evidence supports Commerce's capping and exclusion of this additional revenue.

4.	Because Tainai did not document the amount of scrap it produced and sold as a byproduct, Commerce determined that Tainai had not shown that it was entitled to a price offset.  The fourth issue is whether substantial evidence supports Commerce's determination not to grant a byproduct offset.

## STATEMENT OF THE CASE

## I.	Legal Background

### A.	Antidumping Orders and Periodic Reviews

The antidumping statute provides for the imposition of remedial duties on foreign merchandise when Commerce finds that the merchandise has been sold, or is likely to be sold, in the United States "at less than its fair value," and the International Trade Commission (ITC) finds that an industry in the United States is materially injured, or threatened with material injury, by reason of such merchandise.  19 U.S.C. § 1673.  At the conclusion of an antidumping duty investigation, if Commerce and the ITC have made the requisite affirmative findings, Commerce publishes an order that

will result in the eventual assessment of duties on imports of goods covered by the investigation. *Id.* § 1673e(a). If requested, on a yearly basis Commerce conducts an administrative review of an antidumping duty order and calculates a new dumping duty. *Id.* § 1675(a)(1)(B). Commerce reviews and determines the amount of antidumping duties for each administrative review by determining the normal value and the export price (or constructed export price) of each entry of the subject merchandise and then the dumping margin for each entry, which is the difference between normal value and export price. *Id.* § 1675(a)(1)-(2); *U.S. Steel Corp. v. United States*, 621 F.3d 1351, 1353 (Fed. Cir. 2010).

## B.    Determining Normal Value in Nonmarket Economies

When an antidumping order covers merchandise from a country with a nonmarket economy, Commerce calculates normal value based on factors of production obtained from a surrogate country. 19 U.S.C. § 1677b(c)(1)(B); *Jiaxing Bro. Fastener Co. v. United States*, 822 F.3d 1289, 1292 (Fed. Cir. 2016). The surrogate country should be "at a level of economic development comparable to that of the nonmarket economy country," and a significant producer[ ] of comparable merchandise."[1] 19 U.S.C. § 1677b(c)(4)(A)-(B).

---

[1] Although the statute permits Commerce to use data from multiple surrogate countries, Commerce's usual practice is to use a single surrogate country. 19 C.F.R. § 351.408(c)(2) (2013).

The factors of production that Commerce considers include labor, materials, and energy. 19 U.S.C. § 1677b(c)(3). Commerce values overhead, profit, and selling, general, and administrative expenses using public information gathered from financial statements that the parties have placed on the agency record from producers of identical or comparable merchandise in the surrogate country. 19 C.F.R. § 351.408(c) (2013); *Dorbest Ltd. v. United States*, 462 F. Supp. 2d 1262, 1301 n.36 (Ct. Int'l Trade 2006) (providing an overview of Commerce's surrogate financial ratios).

Commerce bases its valuation of factors of production on "the best available information" in the market economy. *Jiaxing Bro. Fastener*, 822 F.3d at 1292-93. (citing 19 U.S.C. § 1677b(c)(1)). "Commerce has broad discretion to determine what information meets [the 'best available information'] standard because the tariff statute does not define what constitutes the best available information." *Risen Energy Co. v. United States*, 122 F.4th 1348, 1353 (Fed. Cir. 2024) (cleaned up); *Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999) ("[T]he process of constructing foreign market value for a producer in a nonmarket economy country is difficult and necessarily imprecise. . . . [Section 1677b(c)] accords Commerce wide discretion in the valuation of factors of production in the application of those guidelines." (cleaned up)). The data Commerce relies on need not be perfect. *Jiaxing Bro. Fastener*, 822 F.3d at 1301 (citing *Home Meridian Int'l, Inc. v. United States,* 772 F.3d 1289, 1296 (Fed. Cir. 2014)). Therefore, when Commerce values factors of production, "the critical question" is whether Commerce uses the "best available information." *Zhejiang*

*DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011) (cleaned up).

The Court should sustain a surrogate financial determination if Commerce's "conclusions are of a kind that a reasonable mind might accept as adequately supported when viewing the record as a whole." *Risen Energy*, 122 F.4th at 1356. Commerce's surrogate value decisions and calculations are based on the record before the agency, and "[t]he burden of creating an adequate record lies with interested parties and not with Commerce." *QVD Food Co., Ltd. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) (cleaned up).

## C.   Adjustments to Export Price

The Tariff Act requires Commerce to reduce export price in some circumstances. 19 U.S.C. § 1677a(c)(2)(A). Commerce's goal in deducting the cost of import duties is to yield an "apples-to-apples comparison" of foreign and domestic prices in order to calculate an accurate dumping margin. *APEX Exps. v. United States*, 777 F.3d 1373, 1374-75 (Fed. Cir. 2015).

One deduction is for "an amount attributable to United States import duties." 19 U.S.C. § 1677a(c)(2)(A). Not all duties are deductible. For example, Commerce does not deduct the amount of antidumping duties themselves, because deducting those duties would increase the dumping margin, thereby creating a feedback loop that would increase the amount of antidumping duties. *APEX Exps.*, 777 F.3d at 1379 & n.2.

In addition to requiring the deduction of United States import duties, the Tariff Act requires Commerce to deduct from the U.S. price "additional costs, charges, or expenses [that] are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States." 19 U.S.C. § 1677a(c)(2)(A). Therefore, when calculating the U.S. price, Commerce implements price adjustments "that are reasonably attributable to the subject merchandise." 19 C.F.R. § 351.401(c).

### D. Adjustments to Normal Value for Sales of Scrap

Commerce may adjust normal value when a party meets its "burden of establishing to the satisfaction of the Secretary the amount and nature of a particular adjustment." 19 C.F.R. § 351.401(b)(1). One adjustment Commerce may make is to offset normal value for sales of a production byproduct. *See Arch Chems., Inc. v. United States*, 33 C.I.T. 954, 956 (2009). In essence, Commerce will determine that the cost of manufacturing is lower if a manufacturer's business model includes cost recovery by selling scrap. To be eligible for a byproduct offset, a manufacturer must provide evidence "linking the scrap sold with any scrap generated." *Am. Tubular Prods., LLC v. United States*, 847 F.3d 1354, 1361 (Fed. Cir. 2017).

## II. Factual Background

TRBs are composed of two conical rings, between which are sandwiched rollers housed in a cage, which ease the rotation of the rings. The inner ring is called

the cone and the outer ring is called the cup. *Shanghai Tainai Bearing Co. v. United States* [*Shanghai Tainai I*], 658 F. Supp. 3d 1269, 1273 (Ct. Int'l Trade 2023).

In 2020, Commerce initiated the thirty-third administrative review of the antidumping duty order covering TRBs from China entered between June 1, 2019, and May 31, 2020. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 Fed. Reg. 47,731 (Dep't of Commerce Aug. 6, 2020); Appx00177. In the review, Commerce examined Tainai and plaintiff-appellant C&U Americas, LLC, a producer and an importer of TRBs. Appx00564-00569. Commerce published its preliminary results on July 8, 2021 and its final results on January 10, 2022. *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China*, 86 Fed. Reg. 36,099 (Dep't of Commerce July 8, 2021); Appx05491; Appx05135; *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China*, 87 Fed. Reg. 1,120 (Dep't of Commerce Jan. 10, 2022); Appx00091; Appx05713.

## A.  Commerce Used Romanian Data to Value Tainai's Production Costs

As relevant to this appeal, Commerce calculated normal value for Tainai by referring to import data from Romania and the financial statement of SC Timken Romania SA (Timken Romania), which Commerce determined to be the only usable sources of information on the record. Appx05729-05733; Appx05142; Appx05161-05165. Commerce did not use the financial statements of two other Romanian

companies, because one company failed to make a profit and the other manufactured automotive components that were not similar to TRBs.  Appx05730.

To calculate constructed amounts for Tainai's overhead, profit, and selling and general expenses, Commerce applied the financial ratios from Timken Romania's financial statements to Tainai's factors of production, including premanufactured subcomponents that Tainai finished and assembled.  Appx05732-05733.

## B. Commerce Deducted Section 301 Duties from Tainai's U.S. Price and Capped Tainai's Duty Collection Fee

Section 301 of the Trade Act of 1974 (19 U.S.C. § 2411) authorizes the President to direct the USTR to investigate whether to impose duties on imports when the USTR determines that "an act, policy, or practice of a foreign country is unreasonable or discriminatory and burdens or restricts United States commerce." 19 U.S.C. § 2411(b)(1); *see Neimenggu Fufeng Biotechnologies Co. v. United States*, 741 F. Supp. 3d 1354, 1362-63 (Ct. Int'l Trade 2024).

Pursuant to Section 301, on August 18, 2017, the President directed the USTR to initiate an investigation. *Addressing China's Laws, Policies, Practices, and Actions Related to Intellectual Property, Innovation, and Technology*, 82 Fed. Reg. 39,007 (Executive Office of the President Aug. 17, 2017); *see* 19 U.S.C. § 2411.  After a notice and comment period, the USTR determined that "the acts, policies, and practices of the Government of China related to technology transfer, intellectual property, and innovation covered in the investigation are unreasonable or discriminatory and burden

8

or restrict U.S. commerce." *Notice of Determination and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301*, 83 Fed. Reg. 14,906, 14,906 (U.S. Trade Rep. Apr. 6, 2018). The April 6 notice proposed an "additional duty of 25 percent" on certain goods of Chinese origin and included a list of tariff subheadings for the products of Chinese origin that would be covered by the action, which included the subheading for TRBs. *Id.* at 14,907-54. On June 20, 2018, the USTR implemented "an additional ad valorem duty of 25 percent" on a subset of the products identified in the April 6 notice, which included TRBs. *Notice of Action and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301*, 83 Fed. Reg. 28,710, 28,711-12 (U.S. Trade Rep. June 20, 2018).

Commerce deducted from the U.S. price the amount of duties imposed on Tainai's TRBs pursuant to section 301, because Commerce determined that these duties constituted United States import duties. Appx05733-05735. Commerce also capped an additional source of revenue that Tainai reported from its collection of section 301 duties and excluded revenue from this duty collection fee from the U.S. price because it represented a profit Tainai made from the sale of import services. Appx05735-05737.

### C. Commerce Denied Tainai an Offset for Sales of Scrap

Finally, Commerce determined that Tainai had not provided sufficient data about its production of scrap steel to be entitled to an offset to normal value based on sales of a production byproduct. Appx05737-05739. Although Tainai provided

Commerce with information about the amount of scrap it sold, Tainai never connected this information to the amount of scrap it produced.  *Id.*

## III.   Proceedings Before the Court of International Trade and the Trial Court's Remand

Tainai challenged several aspects of Commerce's decision at the Court of International Trade (trial court), only some of which remain live on appeal.  On March 20, 2023, the trial court sustained Commerce's decisions (1) to use Timken Romania's financial statement, *Shanghai Tainai I*, 658 F. Supp. 3d 1269, 1291 (Ct. Int'l Trade 2023), (2) to deduct section 301 duties, *id.* at 1294, and (3) to deny a byproduct offset, *id.* at 1296.  But the trial court remanded Commerce's decision to cap the adjustment to U.S. price based on Tainai's additional revenue for section 301 duties. *Id.* at 1295-1296.

On remand, Commerce continued to cap Tainai's revenue related to section 301 duties in instances where "the amount of the 301 duties were reported separately" on invoices issued to Tainai's customers, considering this charge not to be attributable to the merchandise but to be incidental to the act of importing the TRBs to the United States.  Appx00129; Appx00142-00147.

The trial court sustained Commerce's remand decision in its entirety.  *Shanghai Tainai Bearing Co. v. United States* [*Shanghai Tainai II*], No. 22-00038, 2024 WL 5154032, at *12 (Ct. Int'l Trade Dec. 18, 2024).  As part of its decision that sustained Commerce's use of facts available (an issue the trial court had remanded but that is

not part of this appeal), the trial court approved of Commerce's decision to apply surrogate financial ratios to Tainai's factors of production, which included finished subcomponents of TRBs. *Id.* at *9.

## SUMMARY OF ARGUMENT

First, substantial evidence supports Commerce's decision to rely on the financial statement of Timken Romania alone as part of its surrogate value calculations. Commerce examined the evidence on the record, which consisted of Romanian data and the financial statements of three Romanian companies. Commerce used only the statement of Timken Romania because, of the alternatives, one company failed to make a profit and the other did not manufacture merchandise comparable to TRBs. The trial court correctly observed that Tainai was partly responsible for the "limited universe of financial statements" that were on the record and approved of Commerce's decision as a "reasonable determination regarding which financial statement was 'the least bad one.'" *Shanghai Tainai I*, 658 F. Supp. 3d at 1291.

Further, substantial evidence supports Commerce's decision to apply the surrogate ratios it calculated from Timken Romania's financial statements to all of Tainai's reported factors of production, including finished subcomponents. Although Tainai argues that such an application of the ratios overstates the amounts of profit, overhead, and other expenses, Tainai does not explain why Commerce should change its practice here, when Commerce's calculation reflects the reality of Tainai's business

11

model of sometimes purchasing finished subcomponents from a separate manufacturer. Therefore, the trial court correctly determined that Tainai had failed to undermine Commerce's decision. *Shanghai Tainai II*, 2024 WL 5154032 at *9.

Second, substantial evidence supports Commerce's decision to deduct the cost of section 301 duties from U.S. price. The Court has explained that the text of the implementing instrument controls whether the duty is to be imposed in addition (and therefore be deductible). The trial court correctly sustained Commerce's decision to deduct section 301 duties because the section 301 duties were clearly imposed in addition to other duties. *Shanghai Tainai I*, 568 F. Supp. 3d at 1293-94. Although Tainai contends that the purpose of section 301 duties is similar to non-deductible special duties, Tainai's argument proves the opposite point: that section 301 duties remedy broad economic concerns rather than simply the effect of low-cost imported merchandise.

Third, substantial evidence supports Commerce's decision to cap the extra revenue Tainai reported from the collection of section 301 duties and to exclude this revenue from the U.S. price. The trial court properly concluded that this revenue was incidental to transporting the merchandise into the United States and was not a part of U.S. price. *Shanghai Tainai II*, 2024 WL 5154032 at *11. Although Tainai argues that this revenue is attributable to the sale of TRBs, Commerce reasonably determined from how Tainai designated the tariff fee as a separate charge, or even on a separate

invoice, that the additional revenue arose from the sale of services, should be capped at the amount of the section 301 duties, and should not be part of U.S. price.

Finally, substantial evidence supports Commerce's denial of a byproduct offset. Tainai argues that it should be entitled to an offset because it recorded its sales of scrap. But Commerce reasonably required Tainai to provide evidence of its production of scrap, not just its sale of scrap, to obtain an offset to normal value. Because Tainai could not demonstrate how much scrap it produced, the trial court correctly sustained Commerce's decision. *Shanghai Tainai I*, 658 F. Supp. 3d at 1296.

## ARGUMENT

### I. Standard of Review

In reviewing the trial court's judgment, this Court "reappl[ies] the statutory standard of review that the Court of International Trade applied in reviewing the administrative record." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003). This Court will uphold Commerce's determination "unless it is 'unsupported substantial evidence on the record, or otherwise not in accordance with law.'" *Union Steel v. United States*, 713 F.3d 1101, 1106 (Fed. Cir. 2013) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)). Although this Court's *de novo* review repeats the analysis of the trial court, this Court has declared that it "will not ignore the informed opinion of the [trial court]." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1348 (Fed. Cir. 2015) (cleaned up).

## II. Commerce's Calculation of Normal Value Is Supported by Substantial Evidence

Of the three companies whose financial statements the parties placed on the record, Commerce determined that only the statement of Timken Romania was fit to be used as part of Commerce's calculation of Tainai's cost of production. Commerce then applied the surrogate ratio it calculated from the Romanian company to all of Tainai's factors of production. Because Commerce's decisions were based on the best evidence on the record and comported with statutory and regulatory requirements, the Court should sustain them.

### A. Commerce Reasonably Relied on the Financial Statements of Timken Romania, The Only Usable Statements on the Record, Which Were Verified by an Independent Audit

After Commerce determined that Brazil, Malaysia, Mexico, Romania, Russia, and Turkey were all economically comparable to China and were all significant exporters of comparable merchandise during the period of review, the parties placed on the record surrogate value information only from Romania. Appx05141; Appx01802-01803; Appx02115. Because there was no dispute that Romania was at a comparable level of economic development to China and was a significant producer of comparable merchandise, and because of the inclusion of a full complement of Romanian data on the record made it the "best available," Commerce selected Romania as the surrogate country. Appx05142; Appx05159.

To determine the financial ratios used to calculate overhead, profit, and selling, general and administrative expenses, Commerce uses public financial information from producers of identical or comparable merchandise in the surrogate country. 19 C.F.R. § 351.408(c)(4) (2013). In selecting this financial information, Commerce's preference is to use contemporaneous financial statements "that show a profit, from companies with a production experience similar to the mandatory respondent's production experience, and that are not distorted or otherwise unreliable, such as financial statements that indicate the company received subsidies." Appx05730. Additionally, Commerce's practice is not to use financial information from companies that do not make a profit during the relevant period. *Id.*

Of the three financial statements on the record, Commerce determined that only the 2019 financial statements of Timken Romania were usable and calculated the surrogate financial ratios based on those statements. Appx05731; Appx05163. Commerce found that Compa S.A., a Romanian manufacturer of valves and components of windshield wipers, turbochargers and injection systems, did not meet the requirement to be a manufacturer of comparable merchandise. Appx05730; Appx05163; Appx01962; Appx01999; 19 C.F.R. § 351.408(c)(4) (2013). Commerce also found that URB Rulmenti Suceava (Rulmenti) operated at a loss during the period of review, rendering its financial statement unusable. Appx05730; Appx05163; Appx04994-04996; Appx05015-05017.

By contrast, Commerce determined that Timken Romania was a producer of comparable merchandise and that its financial statements were "contemporaneous with the [period of review], demonstrate profitability, are publicly available, are free of known countervailed subsidies, and generally satisfy Commerce's criteria for selecting surrogate companies." Appx05731-05732. Accordingly, Commerce used Timken Romania's financial statements to calculate surrogate ratios. *Id.*

The trial court correctly sustained Commerce's decision, emphasizing that the parties, including Tainai, had provided only a limited amount of Romanian data from which Commerce could calculate surrogate financial ratios. *Shanghai Tainai I*, 658 F. Supp. 3d at 1291. Although the court analogized comparing the three companies to an "ugly dog contest," it concluded that Commerce was reasonable in selecting only Timken Romania. *Id.* This Court should affirm.

Tainai attacks Commerce's decision in three ways. Corrected Br. of Plaintiffs-Appellants (Applnt Br.) at 13-19, ECF No. 15. In each argument, Tainai asks the Court to reweigh the evidence before Commerce and to come to a different conclusion. This is an improper request of a Court whose role is to determine whether Commerce's decision is supported by substantial evidence, not whether the Court would have made the same decision when presented with the same record. *See Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 936 (Fed. Cir. 1984).

Tainai's third argument is best dealt with first. Tainai's relies on Commerce's general preference to use multiple financial statements to calculate surrogate financial

ratios to support the notion that Commerce should have looked beyond Timken Romania's financial statement.  Applnt. Br. at 18-19.  But Commerce's general preference can apply only when the record presents multiple usable financial statements.  Because this record contained usable financial statements from only one company, Commerce relied on Timken Romania's statement as the "best available information."  *See* Appx05730; 19 U.S.C. § 1677b(c)(1)(B); *QVD Food*, 658 F.3d at 1324.

Tainai's other two arguments challenge Commerce's evaluation of the three companies' financial statements.  Tainai's first argument characterizes Timken Romania's financial statements as "badly distorted" because of the nature of Timken Romania's operations, Timken Romania's sales to affiliated parties, and Timken Romania's relationship with producers in the United States.  Applnt. Br. at 13-16. Commerce considered and rejected Tainai's arguments concerning Timken Romania's operations.  Appx05731-05732.  Commerce explained that Timken Romania's sales to affiliates did not affect its analysis because Tainai offered no evidence to support its allegations of inflated profits.  Appx05731.  Commerce further rejected Tainai's arguments concerning (1) Timken Romania's more extensive operations — producing TRBs from raw steel rather than the finishing operations performed by Tainai — and (2) Timken Romania's status as part of a multinational group because Tainai too was part of a "multinational group of inter-related bearing producers."  Appx05731 (citing Appx00724-00727 and Appx00918-00925).

Regarding the alleged inflation of Timken Romania's profit through affiliated transactions, Commerce pointed out that Tainai also engaged in both affiliated and unaffiliated transactions because of its role finishing TRBs. Appx05731; *see* Appx00725-00726. Commerce also observed that Timken Romania's financial statement was accompanied by the report of an independent auditor and that Tainai did not identify any particular way in which Timken Romania's reported profit could have been inflated. Appx05731; *see* Appx02218-02222. This easily constitutes substantial evidence supporting Commerce's decision to use Timken Romania's financial statement to calculate surrogate financial ratios.

Tainai's second argument is that Commerce erred in rejecting the other two financial statements on the record. Regarding Rulmenti, Tainai contends that Commerce Commerce should have overlooked the "flaw" that Rumeniti was not profitable. Applnt. Br. at 16-17. But Tainai points to no authority other than its preference to support its argument. *Cf.* Appx05730 (citing several previous determinations to demonstrate Commerce's practice of not using financial statements from companies that failed to make a profit.). Regarding Compa, Tainai believes that Commerce should have considered the "precision articles" Compa manufactures to be comparable to TRBs. Applnt. Br. at 17. The statute directs Commerce to calculate normal value for nonmarket economy based on producers of "comparable merchandise." 19 U.S.C. § 1677b(c)(1)(4)(B). Because the statute does not define this term, Commerce has substantial discretion to determine which merchandise qualifies

as comparable so as to yield the "best available information." *See Risen Energy*, 122 F.4th at 1353. Although Tainai argues that the automotive components that Rulmenti manufactures are comparable to TRBs, Commerce reasonably determined that this merchandise (including valves and windshield wiper parts) was not comparable to TRBs. Appx05730 (citing Appx02361-02363). The Court should not second-guess this factual determination. *See Matsushita Elec.*, 750 F.2d at 936. Hence, substantial evidence supports Commerce's decision not to use the financial statements of Compa and Rulmenti.

**B.    Tainai Does Not Explain Why Commerce Should Have Deviated From its Procedure for Valuing Factors of Production**

Commerce valued Tainai's purchases of turned cups and cones, cages, and rollers from Chinese suppliers using Romanian import values obtained from the Global Trade Atlas published by Global Trade Information Services, Inc. Commerce then followed its usual procedure for valuing factors of production sourced from nonmarket economies by using the Romanian import values and calculating surrogate financial ratios based on Timken Romania's financial statement. Appx05732-05733; Appx05162-05163; Appx00150.

Tainai argues that Commerce overstated the costs of the turned cups and cones, cages, and rollers because the cost of the manufactured components "already has the value of financial ratios incorporated into such value." Applnt Br. at 12-13. Tainai asserts that its preferred method of calculation would be more accurate, but it

19

offers no support for that conclusory assertion. Indeed, Tainai's argument may be based on a misunderstanding of Commerce's surrogate ratio calculations. Commerce derives surrogate ratios from the financial statements of one or more surrogate companies and uses these ratios to calculate the "amount for general expenses and profit plus the cost of containers, coverings, and other expenses," which is added to the value of the factors of production obtained from the surrogate country. *See* 19 U.S.C. § 1677b(c)(1)(B); 19 C.F.R. § 351.408(c)(4) (2013). Accordingly, the numerator and denominator of the surrogate financial ratios are composed of data from the surrogate company (or companies) only. *See Dorbest*, 462 F. Supp. 2d at 1301 n.36. These surrogate ratios are then multiplied by the manufacturing cost that Commerce calculates for the company under investigation (based on the factors of production) to yield amounts of overhead, profit, and selling, general and administrative expenses. It is at this last step that Commerce includes the value of the turned cups and cones, rollers, and cages that Tainai purchased as completed components. The value of the finished subcomponents are not included in the financial ratios themselves.

In essence, Tainai appears to argue that it should receive a credit in the form of lower calculated overhead, profit, and selling, general, and administrative expenses because it purchased some turned cups and cones, rollers, and cages as finished subcomponents from other nonmarket economy suppliers. Tainai offers no support for the proposition that manufactured subcomponents are categorically excluded from being factors of production that can be part of Commerce's financial ratio

calculation. We agree with Tainai that the valuation of a manufactured component would be different from the valuation of raw steel and that the valuation of the manufactured component would likely include the overhead, profit, and other expenses of the component manufacturer. But it is not double-counting to acknowledge the reality that both a subcomponent manufacturer and the final assembler have overhead costs and may make a profit. The statutory language gives nonexclusive examples of factors of production and does not indicate any prohibition or limitation of Commerce's discretion. 19 U.S.C. § 1677b(c)(3). Accordingly, Commerce included manufactured subcomponents as factors of production, Appx05162-05163, a designation that Tainai does not challenge. Commerce then included all factors of production that Tainai sourced from nonmarket economy suppliers in its financial ratio calculations. Appx05732-05733.

Because Commerce followed its usual rational process in determining surrogate values, Tainai has failed to show that Commerce's decision to include all factors of production in its surrogate ratio calculations was an abuse of discretion or unsupported by substantial evidence. *See Zhejiang DunAn*, 652 F.3d at 1341. This Court should affirm the trial court because Tainai has "given no reason to question" Commerce's decision. *Shanghai Tainai II*, 2024 WL 5154032 at *9.

**III. Commerce Correctly Deducted the Cost of Section 301 Duties from U.S. Price**

Commerce determined that the duties imposed on TRBs from China under section 301 of the Trade Act of 1974 (19 U.S.C. § 2411) constituted United States import duties that should be deducted from the export price. Because the USTR imposed the section 301 duties in a legal instrument that clearly stated that the section 301 duties would be imposed in addition to other duties, substantial evidence supports Commerce's decision, which was otherwise lawful.

**A. The Court's Analysis in *Borusan* Governs Commerce's Deduction of Section 301 Duties**

The Court has held that certain duties imposed pursuant to section 232 of the Trade Expansion Act of 1962 (19 U.S.C. § 1862) constitute United States import duties that should be deducted from the U.S. price. *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 63 F.4th 25, 36-37 (Fed. Cir. 2023). In *Borusan*, the Court analyzed the text of the instrument enacting the section 232 duties, which specified that the duties were intended to be applied "in addition to any other duties," and held that the instrument's text meant that the section 232 duties constituted deductible United States import duties. *Borusan*, 63 F.4th at 34 (quoting *Proclamation 9705*, 83 Fed. Reg. 11,625, 11,627 (Mar. 8, 2018)). The Court explained that "[i]f a statute merely authorizes a governmental officer or body to impose a duty . . . it is the particular exercise of the authority that determines — based on the character of that exercise — whether the prescribed duty comes within § 1677a(c)(2)(A)." *Id.* at 33.

The Court also recognized deducting section 232 duties from U.S. price does not present the same "double-counting" or "circularity" issues as deducting antidumping duties from U.S. price. *Id.* at 30, 33 (citing *APEX Exps.*, 777 F.3d at 1379 & n.2). Finally, the Court specified that its decision was based solely on the text of Proclamation 9705, and not on any further analysis of section 232 duties more generally or on any distinction between "normal" and "special" U.S. import duties. *Id.* at 36.

By contrast, the Court has held that safeguard duties imposed pursuant to section 201 of the Trade Act are not normal United States import duties and that they should not be deducted from the U.S. price. *Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1365-67 (Fed. Cir. 2007).

In addition to the decision on appeal here, two judges of the Court of International Trade have applied the Court's decision in *Borusan* to the text of the notices that impose "additional" duties pursuant to section 301 and sustained Commerce's decisions to deduct section 301 duties from U.S. price. *Neimenggu Fufeng Biotechnologies*, 741 F. Supp. 3d at 1379; *Jinko Solar Imp. & Exp. Co. v. United States*, 701 F. Supp. 3d 1367, 1392 (Ct. Int'l Trade 2024).

Here, the language of the notices implementing section 301 duties is indistinguishable from the language of Proclamation 9705. The Federal Register notice implementing the section 301 duty on TRBs makes explicit that the new duties "apply in addition to all other applicable duties, fees, exactions, and charges." 83 Fed.

Reg. at 28,711. The new subheading 9903.88.01 that was created in the Harmonized Tariff Schedule of the United States (HTSUS) also explains that the duty rate for merchandise subject to the section 301 duty is '[t]he duty provided in the applicable subheading + 25%." *Id.* at 28,713.[2]

Because the trial court correctly applied this Court's holding in *Borusan* to sustain Commerce's decision to deduct the section 301 duties, the Court should affirm. *See Shanghai Tainai I*, 658 F. Supp. 3d at 1294.

Tainai offers no argument why the language of the legal instruments should not control the deductibility analysis. *See* Applnt. Br. at 19-25. Tainai has therefore waived any challenge to the trial court's decision on this issue.[3] *See Adv. Magnetic Closures, Inc. v. Rome Fastener Corp.*, 607 F.3d 817, 833 (Fed. Cir. 2010) ("[A] party waives an argument not raised in its opening brief.").

Accordingly, the Court should sustain Commerce's determination that the section 301 duties constituted United States import duties that should be deducted from the U.S. price pursuant to 19 U.S.C. § 1677a(c)(2)(A).

---

[2] The trial court referenced identical language from a later Federal Register notice that extended 25 percent duties pursuant to section 301 to an additional group of products through another new HTSUS subheading. *See* Appx00045 (discussing *Notice of Action Pursuant to Section 301*, 83 Fed. Reg. 40,823, 40,824 (U.S. Trade Rep. Aug. 16, 2018)).

[3] It is only by distinguishing the purpose of section 232 and section 301 duties that Tainai addresses *Borusan* at all. *See* Applnt. Br. at 24.

## B. Even under *Wheatland Tube*, Commerce Properly Deducted Section 301 Duties

Even though the Court in *Borusan* explained that the language of a proclamation controls whether additional duties are deductible, 63 F.4th at 36, and even though the trial court sustained Commerce's determination on this basis, Appx00047, Commerce's decision to deduct section 301 duties comports as well with the factors laid out in *Wheatland Tube*.[4] Indeed, Commerce made its determination over four years before this Court issued its decision in *Borusan*. Appx05734-05735.

In *Wheatland Tube*, the Court looked to three factors to support the conclusion that section 201 duties were special duties that were not deductible from the U.S. price: (1) whether the duties are "remedial duties that provide relief from the adverse effects of imports," (2) whether the duties result from a finding of injury or the threat of injury to the U.S. industry, and (3) whether the duties are temporary. 495 F.3d at 1362. Here, Commerce explained that section 301 duties were imposed to address "unfair trading acts, policies, and practices," rather than low-cost imports. Appx05734. And Commerce observed that the USTR imposed section 301 duties with no termination date. *Id.* Accordingly, even under the *Wheatland Tube* factors, substantial evidence supports Commerce's determination that section 301 duties are deductible United States import duties rather than non-deductible special duties.

---

[4] The Court may affirm the judgment of the trial court on a different ground from that relied upon by the agency. *See Koyo Seiko Co. v. United States*, 95 F.3d 1094, 1099-102 (Fed. Cir. 1996).

Tainai, which does not engage with the trial court's application of *Borusan*, directs its argument toward categorizing section 301 duties as "special duties" that should not be deducted from U.S. price under section 1677a(c)(2)(A). Applnt. Br. at 19-26. Tainai offers three arguments, none of which succeeds in altering the characterization of section 301 duties.

Tainai first analogizes section 301 duties to antidumping duties. Applnt. Br. at 19-21. We explained above that Commerce does not deduct antidumping duties because of the feedback effect such a deduction would have on the dumping margin. *See APEX Exps.*, 777 F.3d at 1379 n.2. Unlike antidumping duties, which are calculated based on the difference between normal value and U.S. price to remedy dumping, the USTR set the section 301 duties at a fixed 25 percent. *See* 83 Fed. Reg. at 28,713. Tainai does not explain why deducting a fixed duty would cause a problematic feedback effect.

Tainai next contests Commerce's finding that the section 301 duties were imposed without a termination period. Applnt. Br. at 21-22. Tainai relies on a subsequent action by the USTR to solicit comments as to the continued effectiveness of the section 301 duties. *Id.* (citing *Request for Comments in Four-Year Review of Actions Taken in the Section 301 Investigation*, 87 Fed. Reg. 62,914 (U.S. Trade Rep. Oct. 17, 2022)). In contrast to Tainai's interpretation of the October 17, 2022 request for comments, the document on its face says nothing about a termination date for the section 301 duties. Rather, it proposes only a four-year review of the duties'

effectiveness and the possibility of other actions. 87 Fed. Reg. at 62,915 (citing 19 U.S.C. § 2417(c)(2)). Indeed, the USTR observed that representatives of domestic industry had submitted notices pursuant to 19 U.S.C. § 2417(c)(1)(B) so that the section 301 duties would *not* terminate. *Id.* Therefore, the October 17, 2022 request for comments does not render unreasonable Commerce's conclusion that section 301 duties are indefinite in duration. *See* Appx05734; *Wheatland Tube*, 495 F.3d at 1362

Tainai's final argument asserts that section 301 duties are remedial in the same sense as antidumping duties and section 201 duties. Applnt. Br. at 22-25. We agree that the statute describes section 301 duties as remedying certain problems. But this Court's decisions make an important distinction: it matters what kind of problem is remedied. Like antidumping duties, section 201 duties remedy the direct economic effects of low-cost imports of specific merchandise. *See Wheatland Tube*, 495 F.3d at 1362 ("[Section] 201 safeguard duties aim to remedy the injurious effects on the U.S. industry of a significant surge in imports.") (citing 19 U.S.C. § 2251). Accordingly, Commerce does not deduct section 201 duties from U.S. price. In contrast, section 232 and section 301 duties address more systemic problems. Section 232 permits the President to impose duties "so that such imports will not threaten to impair the national security." 19 U.S.C. § 1862(c)(1)(A)(ii). Similarly, section 301 duties address acts, policies and practices of foreign countries that are unreasonable or discriminatory and burden or restrict United States commerce. *Id.* § 2411(b)(1). In accordance with the statute, the USTR's section 301 finding was based not on the

direct harm to U.S. manufacturers from low-cost imports, but on "the acts, policies, and practices of the Government of China related to technology transfer, intellectual property, and innovation." 83 Fed. Reg. at 14,906. Thus, section 301 duties are not remedial in the same sense as non-deductible special duties.

The quotations Tainai includes in its brief also support the distinction in the kinds of problems that the various kinds of duties remedy. The Statement of Administrative Action accompanying the Uruguay Round Agreements Act explains that section 301 duties address "foreign unfair practices that adversely affect U.S. *exports* of goods and services," not direct threats to the profitability of domestic producers from low-cost imports. *See* H.R. Doc. No. 103-316, vol. I, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4319 (emphasis added) (quoted at Applnt. Br. at 22). Tainai further emphasizes this conclusion by showing that section 201 duties "protect[ ] the bottom line of domestic producers," in contrast to section 301 duties that aim to address technology transfer and theft of intellectual property. *See* Applnt. Br. at 23 (quoting the Issues and Decision Memorandum accompanying *Circular Welded Carbon-Quality Steel Pipe from the Sultanate of Oman*, 86 Fed. Reg. 18,513 (Dep't of Commerce Apr. 9, 2021) and citing 83 Fed. Reg. at 14,907).

Therefore, even under the *Wheatland Tube* analysis, substantial evidence supports Commerce's decision to deduct the section 301 duties.

## IV. Commerce's Decision to Cap Tainai's Extra Revenue from Section 301 Duties and Exclude that Revenue from U.S. Price Is Supported by Substantial Evidence

Tainai reported a duty collection fee or "tariff charge" as a separate line item on some of its invoices, and , in some instances this charge exceeded the amount of section 301 duties that were due.  Appx05736; Appx01159; Appx03060-03062.  When this charge was present, Commerce capped it at the actual amount of section 301 duties and did not include any additional revenue earned by Tainai as part of U.S. price.  Commerce determined that this additional revenue was not attributable to the merchandise itself, but represented a profit Tainai made from the service of importing the merchandise.  Appx05736; Appx00147-00148.

When making deductions to an exporter's U.S. price, Commerce makes adjustments "that are reasonably attributable to the subject merchandise."  19 C.F.R. § 351.401(c); *see* 19 U.S.C. § 1677a(c)(2)(A).  For example, Commerce does not consider profits an exporter makes from freight charges to be attributable to the subject merchandise and does not treat these profits as part of U.S. price. Appx05736-05737 (citing Comment 6 of the Issues and Decision Memorandum accompanying *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany*, 82 Fed. Reg. 16,360 (Dep't of Commerce Apr. 4, 2017)).

In accordance with the regulation and its practice, Commerce found that the additional revenue Tainai charged its customers beyond the cost of the section 301 duty was profit on the sale of services (collecting duties) and not on the sale of the

merchandise. Appx05736. In its fuller discussion on remand, Commerce explained that "Tainai's additional tariff charge revenue relates directly to the section 301 duty expense and, therefore, is considered a movement-related revenue attributable to movement services incidental to transporting the subject merchandise to the United States." Appx00148. Commerce acknowledged that Tainai's section 301 charges were a "unique source of revenue" but concluded any "additional revenue generated by overcharging customers for section 301 duty expenses is incidental to transporting the subject merchandise to the United States," and, for that reason, "it is still appropriate to offset the associated expense with the additional revenue." Appx00147. Therefore, Commerce's exclusion of this additional revenue Tainai obtained serves the objective of performing an "apples-to-apples" comparison between normal value and U.S. price. *See APEX Exps.*, 777 F.3d at 1374-75. The trial court correctly held that Commerce "made a proper comparison . . . by not artificially inflating the U.S. price." *Shanghai Tainai II*, 2024 WL 5154032 at *12. This Court should affirm.

To challenge Commerce's decision to cap this additional revenue, Tainai first cites an inapplicable regulation to argue that the U.S. price evaluated by Commerce should be the "total payment" assessed by Customs. Applnt. Br. at 26-27 (quoting 19 C.F.R. § 152.101(d)). Tainai does not explain why a Customs regulation should override the specific regulations that govern Commerce's calculation of U.S. price. Indeed, "the customs valuation statute and antidumping statute are substantially

different in both purpose and operation." *Koyo Seiko Co. v. United States*, 955 F. Supp. 1532, 1541 (Ct. Int'l Trade 1997) (citing *Smith Corona Corp. v. United States*, 915 F.2d 683, 686 (Fed. Cir. 1990)).

Tainai then argues that the amount it collected in excess of the section 301 duties constituted "revenue received" that is indistinguishable from other payments made for the goods. Applnt. Br. at 29-30. Tainai's argument ignores Commerce's nuanced approach to this additional revenue. Commerce observed that if the tariff charges "are invoiced separately from the invoice for the subject merchandise, then that second invoice, which is limited to services provided, is not for the subject merchandise." Appx00152. In such a circumstance, Commerce did not adjust the price from the separate invoice for sale of the subject merchandise. *Id.* But "[w]hen Tainai included the section 301 duty revenue as part of the price invoiced for the subject merchandise, and separately itemized the amount for the section 301 duty revenue on the invoice, Commerce offset the section 301 duty expense by the amount of the separately itemized revenue." Appx00147. As the trial court observed, Commerce treated this charge like a "handling fee," excluding the revenue from U.S. price when Tainai charged it separately. *Shanghai Tainai II*, 2024 WL 5154032 at *12.

Tainai finally urges the Court to extend the reasoning of *Floral Trade Council v. United States*, in which the lower court held that antidumping surcharges should be considered part of the "starting price" of 19 U.S.C. § 1677a(b) that is then adjusted pursuant to sections (c) and (d). 41 F. Supp. 2d 319, 335 (Ct. Int'l Trade 1999). In

addition to being non-binding, this decision is inapposite. In *Floral Trade Council*, we argued that antidumping surcharges added by consigners that were unaffiliated with the exporters were not part of the pre-adjusted constructed export price of 19 U.S.C. § 1677a(b) because the revenue from those surcharges never accrued to the exporter. *Id.* at 334. The lower court disagreed, holding that such surcharges should be part of the pre-adjusted constructed export price. *Id.* at 335. The court reasoned that other expenses and charges that do not accrue to the exporter, such as freight charges, are separately listed as part of the "starting price" that are then deducted, therefore antidumping surcharges should also be part of the "starting price." *Id.* (citing 19 U.S.C. § 1677a(c)(2)-(d)). Here, by contrast, the issue is not whether Tainai's section 301 charges are included in the starting price of the merchandise. Rather, Commerce refused to adjust upward Tainai's U.S. price for its merchandise when Tainai made a profit by overcharging for collecting section 301 duties. Appx00145-00147. Tainai's argument misses the point.

Therefore, substantial evidence supports Commerce's decision to cap the additional revenue Tainai earned from section 301 duties and not to include this revenue in U.S. price.

## V. Commerce's Refusal to Grant a Byproduct Offset Is Supported by Substantial Evidence

Commerce did not grant Tainai a byproduct offset because Tainai did not provide information to demonstrate the amount of steel scrap it produced as a

byproduct during the period of review. Appx05739; *see* 19 C.F.R. § 351.401(b)(1). Commerce's questionnaires explicitly instructed Tainai that byproduct offsets would be granted only for byproducts produced during the period of review and requested information including the quantity produced, the quantity sold, and the quantity reintroduced into production. Appx00627-00628; Appx00632. Tainai admitted to Commerce, that although it sold scrap, it "does not record the generated quantity in its normal course of business. Appx01456; Appx01474 ("Tainai and its affiliates only record the sales quantity of the steel scrap, but not the production quantity."); Applnt. Br. at 32 (acknowledging that "the quantity of scrap produced by each operation is not directly recorded"). Rather, Tainai contends that its sale of steel scrap is sufficient to show that it produced steel scrap as a byproduct. Appx01474; Appx01614 (listing the quantity of scrap produced as "N/A" but recording the amounts sold); Applnt. Br. at 32 ("[T]he quantity of scrap produced is the same as the quantity of scrap sold."). Tainai retroactively "allocated" scrap to the finished products by comparing the weight of scrap to the weight of finished products at each stage of manufacture. Appx01476-01477; Appx01635.

This Court has rejected the same argument in *American Tubular Products*. In that case, the appellant provided evidence of byproduct sales but "could not document the quantity of scrap produced during the period of review." 847 F.3d at 1361. Indeed, like Tainai, the appellant in that case "unambiguously responded that it did not measure or record [byproduct] production at the time it was produced." *See id.* And,

again like Tainai, the appellant in *American Tubular Products* "equated total scrap sold during the period of review with total scrap produced during the period of review." *See id.* The Court determined that Commerce's decision to deny a byproduct offset under those circumstances was supported by substantial evidence, and should apply the same reasoning here, because Tainai's retroactive allocation of the amount of scrap it *sold* does not demonstrate the amount of scrap it *produced*. *See id.* at 1362; Appx05739. Therefore, the trial court correctly determined that Tainai had presented an "insufficient" entitlement to a byproduct offset, and this Court should affirm. *See Shanghai Tainai I*, 658 F. Supp. 3d at 1296.

## CONCLUSION

For these reasons, the judgment of the trial court should be affirmed.

Respectfully submitted,

BRETT A. SHUMATE
   *Assistant Attorney General*

PATRICIA M. McCARTHY
   *Director*

*/s/ Claudia Burke*
CLAUDIA BURKE
   *Deputy Director*

*Of Counsel:*

JESUS N. SAENZ
    *Senior Attorney*
    *Office of Chief Counsel for Trade*
       *Enforcement and Compliance*
    *U.S. Department of Commerce*


September 9, 2025

*/s/ Daniel Bertoni*

DANIEL BERTONI
    *Trial Attorney*
    *Commercial Litigation Branch*
    *Civil Division*
    *U.S. Department of Justice*
    *P.O. Box 480, Ben Franklin Station*
    *Washington, DC 20044*
    *(202) 202-880-0336*
    *Daniel.Bertoni@usdoj.gov*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Circuit Rule 32(b)(1) because it contains 8,048 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ Daniel Bertoni*
DANIEL BERTONI