2025-1405

———————————

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

———————————

SHANGHAI TAINAI BEARING CO., LTD., C&U AMERICAS, LLC,
*Plaintiff-Appellants*

PRECISION COMPONENTS., INC, XINCHANG NEWSUN XIANTIANLONG PRECISION BEARING MANUFACTURING CO., LTD. HEBEI XINTAI BEARING FORGING CO., LTD,
*Plaintiffs*

v.

UNITED STATES

*Defendant-Appellee.*

———————————

Appeal from the United States Court of International Trade in No. 22-cv-00038, Judge Steven A. Vaden

———————————

Reply Brief of Plaintiff-Appellants
SHANGHAI TAINAI BEARING CO., LTD
C&U AMERICAS, LLC

DAVID J. CRAVEN
CRAVEN TRADE LAW LLC
3744 N Ashland Avenue
Chicago, Illinois 60613
Tel. 773-709-8506
David.craven@tradelaw.com
Counsel to Plaintiff-Appellants

October 14, 2025

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2025-1405

**Short Case Caption** Shanghai Tainai Bearing Co., Ltd. v. United States

**Filing Party/Entity** C&U Americas, LLC

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 02/11/2025

Signature: /s/ David Craven

Name: David Craven

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| C&U Americas, LLC | | Shanghai Tainai Bearing Co., Ltd. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

ii

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑     None/Not Applicable       ☐     Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)     ☑   No     ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑     None/Not Applicable       ☐     Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2025-1405

**Short Case Caption** Shanghai Tainai Bearing Co., Ltd. v. United States

**Filing Party/Entity** Shanghai Tainai Bearing Co., Ltd.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 02/11/2025

Signature: /s/ David Craven

Name: David Craven

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Shanghai Tainai Bearing Co., Ltd. | | Wenzhou C&U Bearing Co., ltd |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

v

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☑ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

## Table of Contents

Certificate of Interest ..................................................................................i

Table of Contents ................................................................................ vii

Table of Authorities .......................................................................... viii

Summary of Argument .......................................................................... 1

Argument .............................................................................................. 2

    A. The Department Should Not Have Solely Used the Financial Statement of Timken Romania in Valuing Financial Ratios .....................2

        1. The Timken Romania Financial Statement is Badly Distorted....................................................................................2

        2. The Other Financial Ratios of Record, While Flawed, are Less Flawed....................................................................................5

    B. The Department Should Not Have Double Counted Financial Ratios for Certain Inputs.........................................................................7

    C. The Department Should Not Have Deducted the Section 301 Duties from U.S. Price..........................................................................7

    D. The Department's Decision to Cap the Monies Received by Tainai from its Customers Ignores the Law.........................................................8

    E. The Department Should Have Provided a By-Product Offset..............12

Conclusion ..........................................................................................13

TABLE OF AUTHORITIES

**Court Cases**:

*American Tubular Products* (*Am. Tubular Prods., LLC v. United States*, 847 F.3d 1354 (Fed. Cir. 2017) ........................................................................12

*Borusan Mannesmann Boru Sanyi ve Ticaret A.S. v. United States*, 63 F.4th 25 (Fed. Cir. 2023) ........................................................................7,8

*Jinko Solar Import and Export Co., Ltd., et al. v. United States*, 701 F.Supp.3d 1367 (Ct. Int'l Trade 2024).............................................................8

*Neimenggu Fufeng Biotechnologies Co., et. al. v. United States*, 741 F.Supp.3d 1354 (Ct. Int'l Trade 2024) .........................................................8

**Laws:**

19 U.S.C. 1677(a) ................................................................................ 9-11

19 U.S.C. 1677(b) ................................................................................11

19 U.S.C. 1677(c) ................................................................................11

19 U.S.C. 1677(d) ................................................................................11

**Administrative:**

19 CFR 351.401(c)................................................................................9

- The Department has not properly explained why the financial statements of Timken Romania were not distorted on their face.

- The Department ignored the goal of accuracy when it applied surrogate financial ratios to those components which are valued by surrogate values for complete components.

- The Department's analysis that the Section 301 duties should not be deducted from U.S. price is unavailing.

- The Department cannot invoke the doctrine of substantial evidence to exclude certain monies received by plaintiffs from its customers in payment of goods. Such "cap" is contrary to the reading of the law.

- The Department must grant an offset for valuable by-products and scrap;

## A. The Department Should Not Have Solely Used the Financial Statement of Timken Romania in Valuing Financial Ratios

In its response at pages 14[1] to 19 the Department argues that the Department properly used the Timken Romania financial statement and did not use any other financial statements notwithstanding the significant flaws in the Timken Romania data. The Department's argument turns on two points. A finding that the other two financial statements under consideration were not appropriate, and a finding that the Timken financial statement was not flawed, and thus not distorted, because it was audited.

The Department's analysis is flawed and is not based on substantial evidence. Both Appellants and the Appellee agree that Romania was the appropriate source for surrogate values and that there are only three financial statements for consideration for financial ratios. The issue is a dispute as to the nature of these statements.

### 1. *The Timken Romania Financial Statement is Badly Distorted*

Contrary to the response of the Department, the facts are clear, and the distortions are readily apparent. Timken Romania's financial statement was badly

---

[1] The first 14 pages do not contain anything characterized as argument, but rather satisfy the other required elements in a response brief. They are not, therefore, addressed in this reply.

distorted.   This is, in many ways, a question of first impression.

The Department's first argument is that the Timken Romania financial statement is reliable, and not distorted, because it was audited.   In fact, all the audit does is establish the accuracy of the financial statement, it does not establish that the financial statement is not distorted.   All of the distortions are obvious based on the audited facts.   It cannot be disputed that Timken Romania, has numerous related parties.   It is clear that Timken Romania had multiple transactions with these related parties.(APPX2290-2295).   It is clear that Timken Romania had very few transactions with unrelated parties.  (APPXX2292-2295 and APPX2234-2235). Specifically, the sales and results are badly distorted due to the very high percentage of related party transactions. (APPX2290-2295) As clearly stated in the financial statement, Timken Romania had L421,113,434[2] in sales to affiliated parties. See Timken Romania SA Financial Statement (hereafter "TR FS") supplied as Exhibit 13 to petitioner's submission of surrogate values of December 11, 2020 at pages 36-37 (APPX2292-2295) out of total sales of L441,806,260 See TR FS at page 7 (APPX2234-2235) . This means that only L20,692,826[3] in sales were, in fact, to unaffiliated parties.  This is less than 5% of sales.[4]

The Department rejected this argument based in part on the claim that Tainai

---

[2] A Leu (the Romanian unit of currency) is approximately .25 USD.
[3] Derived by subtracting 421,113,424 from 441,806,260.
[4] Derived by placing 20,692,826 over 441,806,260.

also engaged in transactions with both affiliated and unaffiliated entities. (Response at 27). This, however, ignores the fact that Tainai's sales in the antidumping duty action were based on the sales to the Unaffiliated parties, (APPX711) and critically, the relationship between Timken Romania and its related entities, impacted both sales and production. (APPX2335) Tainai's transactions primarily only impacted sales. Timken Romania acknowledged that these related party relationships impacted its business. Timken Romania financial statement provides:

> During 2019, the Company held transactions with related parties which quantify approximately 96% of total turnover. Within the group, Timken Romania acts as a complex producer with limited functions and risks. For goods delivery transactions, Timken Romania acts as a limited distributor because, in most cases, the distributor activities were performed only when the company receives a firm order from a third-party customer. It can be considered a limited degree of dependence to related parties; the elimination of the dependent relationship with the affiliated distributor may result in a temporary reduction of the sales volume.
> Annual Report at page 5. (APPX2335)

The Department also argues that there is no evidence of inflated profits. (Response at 17) Such argument ignores the comparison submitted by Tainai of the Timken Romania data with data of other members of the industry in the same country. (APPX5643-5644). One such entity is URB Rulmenti Suceava ("Rulmenti"). Rulmenti is also a Romanian producer of bearings. Rulmenti ran at a loss in 2019. (APPX4989). In this matter there are two companies (Rulmenti and Timken Romania) in the same country (Romania) and in the same industry

(Bearings).  One company is making healthy profits, and another is losing money.  This difference is critical.  The primary difference appears to be that Timken Romania, the purportedly profitable entity, has a significant number of related party transactions which may have artificially inflated its profits and potentially deflated its raw material costs while Rulmenti, the non-profitable entity, does not have these related party transactions.  Two companies in the same industry and in the same country should not have such diverse results.  In other words, the absence of profit for Rulmenti, which does not have a related foreign entity, is evidence of the distortion of the financial statement of Timken Romania and inflated profits for Timken Romania.  This distortion resulted in a significantly higher NV and thus significantly inflated the margins.

2.    *The Other Financial Ratios of Record, While Flawed, are Less Flawed*

The record has two additional financial statements of record, both of which, while flawed, are significantly less flawed than the financial statement of Timken Romania.  The other two financial statements are Compa S.A. (Sibu) (APPX1905-2102) and the previously mentioned Rulmenti (APPX4989-5029). The Rulmenti financial statement is of a producer of essentially identical merchandise in the country determined to be the source of surrogate values.  It has sufficient detail in its financial statements to calculate ratios.  The only flaw is that during the relevant period of time Rulmenti did not make a profit.  This is a flaw.  Tainai submits that

such flaw is no more significant than the flaws in the Timken Romania financial statement, and at a minimum, this FS could be used for two of the portions of the financial ratios that are not related to the profitability of a company. Such values also show the highly distorted nature of the Timken Romania financial statement as they are far lower than those of Timken Romania. In fact, as discussed above, the Rulimenti financial statement is more reliable than that of Timken Romania as it does not have the distortions resulting from the presence of an overwhelming number of related party transactions.

The second financial statement is that of Compa S.A. (Sibu). (APPX1905-2102). While Sibu does not produce bearings, Sibu is involved in the processing and assembly of alloy metals into precision articles. This is similar to the operations undertaken by Tainai – Tainai produces articles of alloy metals and converts them into precision articles. (APPX5644). Critically, the Sibu financial statement establishes the purchase (and therefore use) of milling, grinding and measuring machines. Machines used to perform the same operations undertaken by Tainai. (APPX1933). While not bearings, these are precision articles of alloy metals, a description which would also apply to that of bearings. The Sibu financial statement does not have any flaws, and should have been used instead of, or at a minimum with, the financial statement of Timken Romania. As discussed in the case brief in this matter, these operations are much closer to those of Tainai, and the resultant

product is similar to that of bearings.

### B. The Department Should Not Have Double Counted Financial Ratios for Certain Inputs

In its response at pages 19 to 21 the Department argues Tainai is seeking to have manufactured sub-components excluded from the calculation and that including these inputs is necessary for the calculation of the values.

This misapprehends Tainai's argument. Tainai agrees that the sub-components should be used in the calculation if the raw material is not used in the calculation. It is Tainai's position that the subcomponents produced from raw materials necessarily included the profit and other costs to produce the subcomponents. The subcomponents were, in turn, incorporated into the finished bearings and the financial ratios were applied to these subcomponents a second time. As the financial ratios included all of the expenses for the production of the steel and other raw materials to finished goods, applying these ratios to the production of the subcomponents means that full production expenses were applied twice to these components. Tainai's case brief should be read in light of the foregoing.

### C. The Department Should Not Have Deducted the Section 301 Duties from U.S. Price

In its response at pages 22 to 28 the Department argues that the Department should not have deducted the cost of Section 301 and cites in support of this certain CIT matters and the decision in *Borusan Mannesmann Boru Sanyi ve Ticaret A.S. v.*

*United States*, 63 F.4th 25 (Fed. Cir. 2023). As discussed in the case brief in this matter, *Borusan* is inapplicable as it relates to the issue as to the deduction of Section 232 duties, not duties imposed under section 301. Tainai relies upon the arguments presented in its case brief and submits that the Section 301 duties are akin to Section 201 and antidumping duties. Such 301 duties are temporary in nature as such duties will be lifted as soon as compliance with the demands which triggered the imposition of 301 duties are satisfied. Unlike 232 duties, the elimination of the conduct being remedied will result in elimination of the duties.

In addition, Tainai wishes to update the Court as to the status of the two other Court determinations cited in the case brief. These two decisions are *Jinko Solar Import and Export Co., Ltd., et al. v. United States*, 701 F.Supp.3d 1367, (Ct. Int'l Trade 2024) and *Neimenggu Fufeng Biotechnologies Co., et. al. v. United States*, 741 F.Supp.3d 1354 (Ct. Int'l Trade 2024). As of the filing of this reply, these matters are still pending before the Court of International Trade, and such decisions are not final. Further, such determinations were made by the U.S. Court of International Trade and are not controlling on this Court. It does not appear that this issue has been considered and reviewed by this Court.

D. ***The Department's Decision to Cap the Monies Received by Tainai from its Customers Ignores the Law***

In its response at pages 29 to 32 the Department argues the amount of monies

received and separately invoiced as "301 duties" should be capped as the amount of 301 duties paid and they remainder should not be considered the part of the price of the goods but rather profit on services.

As an initial matter, the duties are not akin to freight and related expenses. Such duties are directly tied to the goods in a particular transaction and the payment for the goods. It is not payment for services, such as the transportation of the goods, it is payment for a component of the goods – the duty. It is uncontested that if the payments for the duty were not broken out on the invoice, no cap would apply.

Secondly, the Department continues to ignore the plain language of the AD regulations and statutes which details price adjustments. The relevant regulation states:

> Use of price net of price adjustments. In calculating export price, constructed export price, and normal value (where normal value is based on price), the Secretary normally will use a price that is net of price adjustments, as defined in § 351.102(b), that are reasonably attributable to the subject merchandise or the foreign like product (whichever is applicable). The Secretary will not accept a price adjustment that is made after the time of sale unless the interested party demonstrates, to the satisfaction of the Secretary, its entitlement to such an adjustment.
> 19 CFR 351.401(c)
>
> The Statute, at 19 U.S.C. 1677(a) states:
>
> (a)Export price
> The term "export price" means the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United

States or to an unaffiliated purchaser for exportation to the United States, as adjusted under subsection (c).

(b)Constructed export price

The term "constructed export price" means the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter, as adjusted under subsections (c) and (d).

(c)Adjustments for export price and constructed export price

The price used to establish export price and constructed export price shall be—

(1)increased by—

  (A) when not included in such price, the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the subject merchandise in condition packed ready for shipment to the United States,

  (B) the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States, and

  (C) the amount of any countervailing duty imposed on the subject merchandise under part I of this subtitle to offset an export subsidy, and

(2)reduced by—

  (A) except as provided in paragraph (1)(C), the amount, if any, included in such price, attributable to any additional costs, charges, or expenses, and United States import duties, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States, and

  (B) the amount, if included in such price, of any export tax, duty, or other charge imposed by the exporting country on the exportation of the subject merchandise to the United States, other than an export tax, duty, or other charge described in section 1677(6)(C) of this title.

(d)Additional adjustments to constructed export price

For purposes of this section, the price used to establish

constructed export price shall also be reduced by—

(1) the amount of any of the following expenses generally incurred by or for the account of the producer or exporter, or the affiliated seller in the United States, in selling the subject merchandise (or subject merchandise to which value has been added)—

(A) commissions for selling the subject merchandise in the United States;

(B) expenses that result from, and bear a direct relationship to, the sale, such as credit expenses, guarantees and warranties;

(C) any selling expenses that the seller pays on behalf of the purchaser; and

(D) any selling expenses not deducted under subparagraph (A), (B), or (C);

(2) the cost of any further manufacture or assembly (including additional material and labor), except in circumstances described in subsection (e); and

(3) the profit allocated to the expenses described in paragraphs (1) and (2)

19 U.S.C. 1677a

The statute, as stated in 19 U.S.C. 1677(b), clearly provides that the price is the price at which the subject merchandise is to be sold. In the case of Tainai, this price includes both the bearing price and the additional amounts collected to compensate for duties, whether incorporated directly in the price or as a surcharge made at the time of sale.

The statute clearly lays out the limited circumstances where the price can be increased or decreased. (19 U.S.C. 1677(c)(2) and (d)). In this case, the question is whether the price can be reduced by the difference between the duty paid and the portion of the price attributed to the duty paid. The statute does not provide for such reduction. The statute makes it clear that the price can only be reduced by:

- Additional costs and duties attendant to bringing the subject merchandise to the United States. This is already present in the calculation for Tainai for items such as Customs Duties. It does not, however, include the difference between the 301 duties and the amount denominated as additional monies collected.

- Export taxes imposed on the exportation of goods. This does not apply to the issue at bar.

This is revenue received and should be treated as such. There is no legal basis to distinguish between these payments and other payments made for the goods. None of the deductions set forth in the statute apply. Tainai relies on the arguments presented in its case brief and submits that the response does not overcome the argument presented therein.

E. ***The Department Should Have Provided a By-Product Offset***

In its response at pages 32 to 34 the Department argued that while Tainai produced scrap and sold scrap, it did not record the amount of scrap produced and thus was not entitled to a by-product offset. In support thereof, the Department cited to the CAFC decision in *American Tubular Products* (*Am. Tubular Prods., LLC v. United States*, 847 F.3d 1354 (Fed. Cir. 2017). As an initial matter, the Department's refusal to grant a scrap offset is based on a technicality and the Department should not require the submission of records not kept in the ordinary course of business. Furthermore, the facts in this case can be distinguished from those in *American Tubular Products.* In that case, this Court rejected the offset based, in part, on the fact that there was no tie between the sale of scrap and the subject product.

Apparently the producer in American Tubular Products produced a range of both subject and non-subject merchandise. In the case of Tainai, it provided a full list of its products produced. (APPX1487-1495) This shows that all of the products produced by Tainai were bearings. As such, the scrap sold was related to the subject merchandise.

Tainai has no business purpose for retaining scraps as such scrap would not be re-used in Tainai's operations. The record is clear; there is no evidence of record that Tainai purchased and resold steel scrap. There is a reasonable inference that scrap is a natural consequence of the production process. There is clear evidence that scrap is sold for money. The failure to provide a by-product offset, after such by-product has been sustained by the ordinary business records of the company, results in an artificial increase in the margin and results in a margin which is not accurately calculated. The refusal to provide a scrap offset, based on the technical absence of detailed inventory records of the scrap, is unreasonable and an abuse of discretion.

## CONCLUSION

In conclusion, the Department made a number of errors in its determination which should not survive judicial review. Specifically, the Department erred as follows:

- The Department's choice to use the financial statements of Timken Romania,

a heavily distorted financial statement, instead of the undistorted financial statements also of record, is not based on sound facts;

- The Department erred when it double counted the financial ratios by applying these ratios first to the completed components, and then a second time when applying the ratios to the completed bearings;

- The Department improperly deducted the temporary Section 301 duties from U.S. price. Such duties are akin to antidumping duties and should not be deducted to avoid the application of remedial duties to other remedial duties;

- The Department should not "cap" the monies received from the customers as payment for goods by the amount of 301 duties paid for the merchandise; and

- The Department must grant an offset for valuable by-products and scrap.

The arguments presented in the response by the United States are unavailing and the relief requested by Tainai should be provided.

<div style="margin-left: 40%;">

Respectfully submitted,

/s/David J. Craven
DAVID J. CRAVEN
CRAVEN TRADE LAW LLC
3744 N Ashland
Chicago, IL 60613

(773) 709-8506

Counsel to Plaintiff-Appellants

</div>

October 14, 2025

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2025-1405

**Short Case Caption:** Shanghai Tainai Bearing Co., Ltd. v. U.S.

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes ___3292___ words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 10/14/2025

Signature: /s/ David Craven

Name: David Craven